Eric B. Hanson – pro hac vice
ehanson@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Counsel for *Amicus Curiae* Backcountry
Hunters & Anglers

# UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>BRADLEY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual,<br><br>　　　　　　　Defendants. | Case No. 22-CV-00067-SW |

**BRIEF OF AMICUS CURIAE BACKCOUNTRY HUNTERS & ANGLERS
IN OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND**

## **STATEMENT OF IDENTITY AND INTEREST**

Backcountry Hunters & Anglers (BHA) is the voice for our wild public lands, waters and wildlife. BHA is a non-profit that seeks to ensure North America's outdoor heritage of hunting and fishing in a natural setting through education and work on behalf of fish, wildlife, and wild places. With more than 350,000 members and supporters, and chapters in 48 states, Washington, D.C., two Canadian provinces and one Canadian territory, BHA draws support from sportsmen and -women from across the continent who share our commitment to fair and equal public access to our public lands and waters, the principles of fair chase, and the ethical pursuit of wild fish and game. BHA is also invested in the conservation and stewardship of fish and wildlife habitat, through collaboration with a diverse array of partners who share an interest in the future of these landscapes.

Unfortunately, millions of acres of public land are locked in a dispute that is a function of the checkerboard pattern of land ownership in the West. Preserving the right of every American to access public land is critically important to BHA and its members and supporters. Indeed, one of BHA's best-known slogans is, "Keep Public Land in Public Hands." No individual monied interest should have the right to restrict the public from stepping across the corner of one adjoining parcel of federal public land to another, commonly known as "corner crossing." In defense of its mission, and for the reasons set out below, BHA believes this case should remain in federal court so that the issues raised are adjudicated under federal law and federal court precedent. Consequently, BHA urges this Court to deny Plaintiff's Motion for Remand.

Corners where federal public land intersects private land are the keys to unlocking access to millions of acres of land owned by every American.

One recent analysis from a mapping and geographic information systems company shows that more than 8.3 million acres of public land across the West are "corner locked", e.g. only accessible by crossing a corner like a chess bishop or a checkers piece might do. *The Corner-Locked Report*, OnX Maps (April 2022), https://www.onxmaps.com/onx-access-initiatives/corner-crossing-report ("OnX Report"). Of that land, 72 percent (5.98 million acres) is specifically locked in a "checkerboard" pattern (e.g. land all arranged in square mile grids). Notably, the report found that 49 percent of those corner-locked acres are just one corner away from being accessible. *Id.* Further, more than 2.44 million acres of public land are corner locked in the state of Wyoming alone. *Id.* According to the report, more than half of all landlocked public land in the West would be unlocked if corner crossing were legal. *Id.*

This case exemplifies the national interest in deciding the fate of those millions of acres of corner-locked public land. Plaintiff contends that Defendants' movement over a corner from public land to public land using a ladder to cross the airspace over the corner should be treated as a simple question of trespass. But in reality, Plaintiff's Complaint raises the more significant and complicated question of whether federal law allows private landowners to close access to millions of acres of public land by threating or suing for trespass when individuals move from public land to public land over common corners.

In an early Wyoming case with parallels to this one, the Eighth Circuit (before the creation of the 10th Circuit) answered that question in the negative:

> The company admitted [defendant's] right as to the public domain, but warned him not to go over any of its lands on penalty of prosecution for trespass. The odd-numbered sections touch at their corners and their points of contact, like a point in mathematics, are without length or width. If the position of the company were sustained, a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon terms prescribed by it. Not even a solitary horseman could pick his way across without trespassing. In such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party. As long as the present policy of the government continues, all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership.

*Mackay v. Uinta Dev. Co.*, 219 F. 116, 118 (8th Cir. 1914).

Nonetheless, as demonstrated by Plaintiff's Complaint, questions regarding the legality of corner crossing remain unresolved. If Plaintiff's attempt to remand the case back to state court

succeeds, it would result in continued legal uncertainty about whether ordinary Americans across the West have the right to access public land over corners, leading to a de facto usurpation of public land by private interests. On the other hand, adjudicating the question of whether a private landowner controls access to adjacent public land via common corners under federal law would help decisively answer whether people have the right to move across corners to access public land throughout the West.

**I.     Laws Encouraging Westward Expansion Divided Public and Private Land in a Checkerboard Pattern, but Congress Also Provided for Access to Public Land.**

The checkerboard pattern of public and private land in the West has historic antecedent in the Union Pacific Act of 1862 and its various subsequent amendments. John W. Sheridan, *The Legal Landscape of America's Landlocked Property*, UCLA Journal of Environmental Law and Policy, 37:2 (2019) at 232-234 ("Sheridan"). Congress sought to encourage the building of a transcontinental railroad, and enacted a law granting contiguous rights of way within 200 feet on either side of newly laid track as well as establishing alternating 640 acre (one square mile) plots of land on either side of tracks for every ten to forty miles. *Id*. The ungranted and unsold land was either made available to the public through the Homestead Act of 1862 or retained by the federal government. *Id.* The land retained by the federal government became public land now administered by the Bureau of Land Management ("BLM") or U.S. Forest Service ("USFS").

An example of the current checkerboard ownership in the general area at issue in this case is shown below[1]:



---

[1] The yellow areas identify federal public BLM land; the blue represents Wyoming state land; and the unshaded areas represent private land. Elk Mountain, the area at issue in this case, is shown in the lower right corner of this image, with parcels of Plaintiff's land intermixed with public BLM land visible.

3

More than 130 years ago, in an attempt to settle the range wars erupting between cattlemen and farmers over access and use of land in the West, Congress passed the Unlawful Inclosures Act ("UIA"). 43 U.S.C. § 1061, *et seq*. The UIA set out broad prescriptions against inclosing public land or restricting access thereto.

For example, the legislation states that "[a]ll inclosures of any public lands . . . constructed by any person . . . to any of which land included within the inclosure the person . . . had no claim or color of title made or acquired in good faith . . . are declared to be unlawful." 43 U.S.C. § 1061. Congress also said that "[n]o person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon . . . any tract of public land . . . or shall prevent or obstruct free passage or transit over or through the public lands. . . ." 43 U.S.C. § 1063.

The UIA remains in force and continues to guarantee access to federal land while preventing landowners from fencing access to public land or otherwise unlawfully preventing access to that land. Still, private landowners in the West often appear to assume that their ownership of private land adjacent to public land gives them domain over that public land. For example, advertisements for the sale of land in Wyoming, Montana, New Mexico, and other states in the West commonly include checkerboarded public land as part of the landowner's exclusive inholdings.[2] *See, e.g.*, https://www.landwatch.com/carbon-county-wyoming-farms-and-ranches-for-sale/pid/412537344 ("The North Platte River Ranch features 92,447+/- acres in one contiguous block of land. . . This diversified ranch consists of approximately 25,000 deeded acres, 40,960 acres of BLM, 2,960 acres State School lease, and 23,527 acres private lease"); https://www.landwatch.com/prairie-county-montana-farms-and-ranches-for-sale/pid/401004698 ("This 29,000+/- acre ranch consists of 15,000+/- deeded acres and 14,000+/- acres of State & BLM Leases."); https://www.landwatch.com/cibola-county-new-mexico-farms-and-ranches-for-sale/pid/413289913 ("Cerro Verde Ranch has 32,721 Total acres located 50 miles west of Albuquerque, New Mexico and 60 miles north of Magdalena. . . . 1,040 acres of Deeded Land 3,681 acres of NM State Grazing Lease Land 27,000 acres of BLM Grazing Lease Land.").

---

[2] While landowners may lease access to BLM land for grazing cattle, that does not give them ownership rights or dominion over that land.

## II. Plaintiff Claims That It Can Prohibit Corner Crossing Between Parcels of Federal Public Land, Implicating Federal Law Regarding Public Access Rights.

The Plaintiff in this case, a private ranch owned by an individual whose property is interspersed with BLM-managed public lands in a checkerboard pattern, has accused Defendants of civil trespass for momentarily crossing private airspace at a corner where public and private land intersect. *See* Dkt. 2 (State Court Complaint) at pp. 1-2 ("Complaint"). Plaintiff also asks for a declaratory judgment confirming that "Defendants had no right to cross the Property and to carry out a 'corner crossing.'" Complaint, ¶ 28.

Plaintiff purportedly placed stakes on his land with a chain across the corner at issue along with "No Trespassing" signs, according to a news report. Angus M. Thuermer Jr., *Corner crossing: Hunters challenge public-land access issue in court*, WyoFile, Dec. 27, 2021 (https://wyofile.com/corner-crossing-hunters-challenge-public-land-access-issue-in-court/).



Defendants used a ladder to cross the corner, never actually touching Plaintiff's land. *Id. See also* Complaint, ¶ 17.

Importantly, Plaintiff contends it has a "right to exclusive control, use, and enjoyment of its Property, which includes the airspace at the corner, above the Property" and that it "owns and controls the airspace above its real property, and is entitled to exclude others from the use of that airspace by a 'corner crossing.'" *Id.*, ¶¶ 18-19. This claim goes to the heart of whether private landowners can prohibit public access to the millions of corner-locked acres in Wyoming and across the West.

Federal court jurisdiction is appropriate when a plaintiff's claims necessarily raise a substantial issue of federal law that is actually disputed and capable of resolution in federal court.

5

*See Gunn v. Minton*, 568 U.S. 251, 258 (2013). "Federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* The issues raised by Plaintiff meet this test, and resolution under federal law will have a far ranging impact on access to public land in the West.

Courts have repeatedly reinforced that the UIA prevents private landowners from blocking access to public land. The *Mackay* case, discussed above, involved an individual in Wyoming who was sued for damages for trespass for trailing his sheep over private land interspersed with public land while moving his sheep to public land. In reviewing the case under the UIA, the court looked askance at restrictions on corner crossing, noting that if it were illegal, "[n]ot even a solitary horseman could pick his way across without trespassing." *Mackay*, 219, F. 118. The court noted that the UIA "has been construed to prohibit every method that works a practical denial of access to and passage over the public lands." *Id.* at 119. The court went on to hold that the defendant "was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass." *Id.* at 120. In coming to that conclusion, the court noted that the plaintiff "cannot secure for itself that value, which includes as an element the exclusive use of the public lands, by warnings and actions in trespass." *Id.* at 119.

Other cases have held similarly. In *Camfield v. United States*, an early case upholding the UIA, the Supreme Court prevented fencing designed to enclose public land even if the fence were built solely on private property. The Court explained that it is "only by treating [the UIA] as prohibiting all 'enclosures' of public land, by whatever means, that the act becomes of any avail." *Camfield v. United States*, 167 U.S. 518, 525 (1897).

In *Stoddard v. United States*, another pre-Tenth Circuit Court of Appeals case, the Eighth Circuit held that the UIA was "intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands. It is a well-known fact that the free herding and grazing of cattle on the public lands is a legitimate use to which they may be put, and we think Congress must have had the preservation and protection of this use in mind in the enactment under consideration." *Stoddard v. United States*, 214 F. 566, 568–69 (8th Cir. 1914).

The same considerations have been adopted in a more modern context. "In the years since the 1885 passage of the UIA, the then-pressing concerns of settlement and range wars have faded. But, new present-day concerns have arisen. In the Federal Land Policy and Management

6

Act (FLPMA) . . . Congress set out new goals for the public lands." *U.S. ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414, 1417 (D. Wyo. 1985), aff'd, 848 F.2d 1502 (10th Cir. 1988).

One of the legislative policy goals of the FLPMA is that "public lands be managed in a manner that will . . . provide for outdoor recreation and human occupancy and use." *See* 43 U.S.C. § 1701(a)(8). The court in *Bergen* found it "proper to consider FLPMA statute in light of UIA, especially since Congress as recently as 1984 considered and amended the UIA." *Bergen*, 620 F. Supp. at 1417. *Bergen* found that a fence designed to enclose public land, and thereby prevent pronghorn access to their winter range, ran afoul of the UIA.

Notably, the *Bergen* decision explained that "the free passage of hunters and their quarry is a lawful purpose for which the public may seek access to public lands. In light of these precedents, the Court is hardpressed to understand how the UIA could apply to cattle, but not to antelope." *Id.* As another court explained, "Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands." *State of Minn. by Alexander v. Block*, 660 F.2d 1240, 1249 (8th Cir. 1981).

Congress is permitted to make laws like the UIA that override conflicting state laws. "Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 543, (1976) (cleaned up). The Court, quoting *Camfield*, explained that a "different rule would place the public domain of the United States completely at the mercy of state legislation." *Id.* The Court went on to explain that "it is clear that regulations under the Property Clause may have some effect on private lands otherwise under federal control. . . ." *Id.* at 546 (citation omitted). Indeed, with regard to public lands, Congress "may sanction some uses and prohibit others, and may forbid interference with such as are sanctioned." *McKelvey v. United States*, 260 U.S. 353, 359 (1922) (citations omitted).

If a private landowner can prohibit access to public land through simple claims of state law trespass based on the momentary passage of a person through the common, mixed-corner airspace of private and public land, his claim essentially wipes out the public's rights as to that public land and effectively grants the landowner dominion over public land he does not own and that he has not paid for. The Supreme Court has cast a cold eye on such an outcome. "It seems but an ill return for the generosity of the government in granting these [rail]roads half its lands to

7

claim that it thereby incidentally granted them the benefit of the whole." *Camfield*, 167 U.S. at 526.

### III. The Legality of Corner Crossing Is an Unresolved Issue, and this Court Is In the Best Position to Resolve the Dispute.

In resolving this case, the Court has the unique opportunity to decide a core issue affecting the rights of millions of Americans across the country regarding their access millions of acres of public land here in Wyoming, in other states in the 10th Circuit, and throughout the West.

The situation Defendants find themselves in is not unique or constrained to the facts of this case. In 2003, a hunter in Wyoming was criminally charged with trespass for corner crossing between public land adjacent to private land, and was found not guilty. *See* OnX Report. More recently, a hunter and shed antler collector in Montana was similarly charged in 2019. *Testing Boundaries of Public Access, Private Property Rights*, Yellowstone Public Radio, Feb. 28, 2020 (https://www.ypradio.org/environment-science/2020-02-28/park-county-court-cases-testing-boundaries-of-public-access-private-property-rights). He was also found not guilty, though was later convicted of a second offense where he was found not have crossed at a corner, but to have cut across an 80-foot stretch of private land. *Id. See also* Angus M. Thuermer Jr., *Corner Crossing: Hunters challenge public land access issue in court*, The Sheridan Press, Dec. 31, 2021 (https://www.thesheridanpress.com/news/regional-news/hunters-challenge-public-land-access-issue-in-court/article_c51d46a4-68e0-11ec-b8f1-8f4a638db509.html). The Defendants in this case were also prosecuted for criminal trespass as part of the same incident at issue here and were recently found not guilty. *See, e.g.*, Angus M. Thuermer Jr., *Jury finds four corner-crossing hunters not guilty of trespass*, Wyofile.com, Apr. 29, 2022 (https://wyofile.com/jury-finds-four-corner-crossing-hunters-not-guilty-of-trespass/).

Beyond these cases, media reports indicate a general chilling effect emanating from the legal uncertainty around crossing corners to access public land, including the threat of being prosecuted. *See, e.g.*, Keegen Sentner, *The Wyoming Corner-Crossing Lawsuit Is Headed to Federal Court, Where a Ruling Could Affect Public Access Across the West*, Outdoor Life, Apr. 5, 2022 ("In the American West, roughly 1.6 million of acres of public land are inaccessible to the public because of this pattern and the public's inability to cross corners without fear of harassment from private landowners. The legality of corner crossing is a gray area that has never been fully resolved in the court system.") (https://www.outdoorlife.com/hunting/corner-crossing-

8

case-headed-to-federal-court/); Theurmer Jr., *Corner Crossing*, *supra*  ("Meantime access to 404,000 Wyoming acres 20 miles north and south of the Union Pacific line — and 1,583,000 million landlocked federal public checkerboard acres across the West — remains largely controlled by private landowners and local and state law enforcement and judicial institutions."); Matthew Copeland, *Cornered: Western Sportsmen Trapped by Arcane Regulation Prohibiting Public Access at Corner Crossings*, Outdoor life, Aug. 10, 2015 ("The de facto ban on stepping from public land, to public land, over an intersection with private, hits sportsmen and –women hardest in Montana and Wyoming. . . . Large landowners, it turns out, still hold immense political sway in the Rocky Mountain states.") (https://www.outdoorlife.com/blogs/open-country/cornered-western-sportsmen-trapped-arcane-regulation-prohibiting-public-access/). Given that federal law issues should decisively determine rights regarding corner crossing, individuals should not have to roll the dice and potentially subject themselves to the mercy of litigious landowners or local prosecutors just to recreate on public land.

The necessary consequence of Plaintiff's arguments in this case is not to obtain damages for the few seconds Defendants may have occupied inchoate airspace over Plaintiff's land (while also occupying the same inchoate airspace over public land). Nor is it to close off the particular corner at issue from access, or even to bar corner crossing everywhere Plaintiff's land intersects with federal public land. Instead, Plaintiff's arguments necessarily implicate *any* attempt to move between public land at corners when the other two sides of the corner comprise private land. Consequently, its claims should be resolved using the lens of federal law as it applies to public land access.

**IV.     Conclusion**

A private landowner with half the ownership of a corner should not have a veto over access by the owner of the other half of the corner—namely the government, and by extension, its citizens. Many thousands of BHA members, as well as millions of public land recreators, have an interest in the determination of Plaintiff's and Defendants' respective rights in this case under federal law. This court has already recognized the federal questions raised by Plaintiff's suit, and should continue to exercise jurisdiction over the case.

                                                  Respectfully submitted,

                                                  KEKER, VAN NEST & PETERS LLP

Dated:  May 6, 2022

                                      By:   */s/ Eric B. Hanson*
                                                     ERIC B. HANSON (admitted pro hac vice)
                                                     633 Battery Street
                                                     San Francisco, CA 94111-1809
                                                     Telephone:  415 391 5400
                                                     Facsimile:  415 397 7188

                                                     Attorneys for Amicus Curiae Backcountry
                                                     Hunters & Anglers