### UNITED STATES DISTRICT COURT
### DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming,<br><br>Plaintiff,<br><br>vs.<br><br>BRADLEY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 22-CV-00067-SWS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### BRIEF OF *AMICUS CURIAE* WYOMING STOCK GROWERS ASSOCIATION AND WYOMING WOOL GROWERS' ASSOCIATION IN OPPOSITION TO MOTION TO DISMISS

## <u>Statement of Identity and Interest of *Amici*</u>

The Wyoming Stock Growers Association (WSGA) was organized on April 4, 1872 to advance and protect the interest of the state's livestock producers. It was the second state cattlemen's organization created in the United States. The WSGA was the first association formed in the Wyoming territory and is the primary organization in the state focused on serving the needs of the cattle industry, which is the largest segment of Wyoming's agricultural production. WSGA's mission is to serve the livestock business and families by protecting their economic, legislative, regulatory, judicial, environmental, custom, and cultural interests. The WSGA advocates for the protection of private property rights from over burdensome regulatory interference.

The Wyoming Wool Growers Association (WWGA) is a membership organization whose mission is to protect and preserve the lamb and wool industry and the ranching

community lifestyle.  The WWGA works with the legislatures at the state and national levels, governmental officials and the general public to provide accurate information about the industry itself, private property rights, and other important issues.  They also work to educate their members on the latest production practices and state and federal laws that impact their livelihoods.

Combined, these *Amici* represent hundreds of agricultural producers owning thousands of acres of private land in the Wyoming. Many of these private lands share adjoining boundaries, including corners with federal or public[1] (collectively federal) lands. Accordingly, the *Amici* bring a unique perspective to this case because of the impact this case will have on their private property rights[2].

## I.   THE DETERMINATION AS TO THE SCOPE OF LANDOWNERS' RIGHTS IN THE AIRSPACE ABOVE THEIR PRIVATE PROPERTY IS A QUESTION OF STATE LAW.

Wyoming statutes and common law make it clear that landowners hold a property right in the airspace above their lands. However, the scope of this property right regarding the physical trespass of third parties has yet to be fully determined by State law.

---

[1] Federal lands are reserved lands which cannot be eventually transferred into private hands through any homestead, Desert Land Entry, Small Tracts Act or other laws. Conversely public lands could be acquired by an individual through one of these Acts. The passage of the Federal Land Policy and Management Act in 1976 repealed most of the laws allowing the privatization of public lands changing the land from public lands to federal land.  Pub. L. 94-579, 90 Stat. 2787 § 702 (Oct. 21, 1976).

[2] Amici WSGA and WWGA take no position with regard to Defendant's claim that the fencing of Plaintiff's property violated the Unlawful Enclosures Act.  As explained in this brief, regardless of the fencing scheme on Plaintiff's property, Plaintiff's property interests in the air space are governed by state law, not the Unlawful Enclosures Act; Congress did not provide for access across common corners to the federal checkerboard lands; even the federal agencies themselves do not recognize trespass on private airspace at common corners to access federal lands.

*A. Questions as to the existence and scope of a property right is a state law issue.*

Questions as to the existence and scope of a person's property right have long been a creature of state law. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by … an independent source such as state law." *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 539 (1985*)*. "Generally speaking, state law defines property interests…." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010).

The federal courts have respected this principal of property law even when the state court's determination of a property right may have national implications affecting federal powers. *U.S. v. Cress* dealt with a takings claim brought by landowners who claimed their lands and water rights were taken by flooding resulting from the federal government's construction and maintenance of locks and dams on the Cumberland and Kentucky Rivers. 243 U.S. 316, 318 (1917). These Rivers were important as they connected interstate commerce between several states. *Id.* at 326. According to the Supreme Court, "The states have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders, both navigable and non-navigable, and the ownership of the lands forming their beds and banks." *Id.* at 319.  While navigable streams are subject to Congress's authority to control the navigation of water when necessary to regulate interstate commerce, each state's property laws dictate whether a person owns a property interest in those navigable waters or the stream beds the waters flowed over. *Id.* at 320.  Thus, the Court noted that Kentucky common law and statutes clearly indicated that landowners owned the stream beds of all rivers crossing their lands, regardless as to

3

their navigability and that the scope of navigable waters was limited to the flow of the stream in its natural state. *Id*. Thus, the Court determined amount of compensation due to the landowners from the United States because of the government's action of constructing dams and raising the water level was based on state law principals. *Id*. at 327. Thus, Wyoming's state law should determine whether the airspace above private property is owned by the property owner.

> ### B. Wyoming law suggests that landowners hold a property interest in the airspace above their surface but does not define the scope of this interest.

According to Wyoming statute, "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303." Wyo. Stat. § 10-4-302. The "right of flight" refers to a general aircraft flight easement held by the State of Wyoming and the federal government over navigable airspace. Wyo. Stat. § 10-4-303. The question in this case however is, with the exception of the right of flight, if such airspace ownership includes the right to exclude others at adjoining corners if they trespass in the airspace. There should be no dispute that "Ownership of property implies the right of possession and control and includes the right to exclude others; that is, a true owner of land exercises full dominion and control over it and possesses the right to expel trespassers." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82, (1980). One of the essential sticks in the bundle of property rights is the right to exclude others. *Kaiser Aetna v. United States*, 444 U.S. 164, 179–180 (1979). And, in Wyoming, the right to protect property is a state constitutional right. *Cross v. State,* 370 P.2d 371, 377 (Wyo. 1962). The question then is whether the right to exclude others extends to the airspace of above the landowners' private property, including the corners of that private

property.  *Amici* could find no Wyoming cases or statutes, except those specifically discussing the "right of flight," that answers this question.

### C. The Wyoming Courts and Legislature are well equipped to answer this state property law question.

Like the courts of Kentucky, the Wyoming Supreme Court has a long history of answering questions regarding the existence and scope of various property rights in Wyoming.  *See for ex. Edgcomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850 (Wyo. 1996) (defining the general scope of easements in Wyoming); *Sammons v. American Auto. Ass'n*, 912 P.2d 1103 (Wyo. 1996) (ruling that the right to exclude others and expel trespassers is a right of property owners, but it is limited when a license is given to the public to enter upon its premises for business purposes); *similarly See* Wyo. Const. art. I, § 31 (Wyoming water is owned and controlled by the state); Wyo. Stat. § 11-28-101 (defining who is considered an owner of a fence). Thus *Amici*  suggest that Wyoming courts and legislature, rather than the federal courts, are the appropriate entities to determine whether there is a property interest in the airspace at a shared property corner which would allow a property owner to enforce a trespass claim.

Traditionally, when a central question of state law is determinative of a case before the federal courts and there is no controlling precedent for its decision, those courts have often appropriately remanded the decision back to the state courts or have certified a question of law to the state's highest court. *See Murray v. BEJ Minerals, LLC*, 924 F.3d 1070 (9th Cir. 2019) (certifying a question of law to the Montana Supreme Court as to whether dinosaur fossils belong to the surface owner or the mineral owner). The United States Supreme Court has looked favorably at courts exercising their discretion to either remand a case back to the state level or to certify the question before

the state's highest court when the case will turn on a state law question. In *Lehman Bros. v. Schein*, the Court recognized that federal courts have "not infrequently" stayed their hands and remitted the parties back to resolve the controlling state law on which the federal rule may turn. 416 U.S. 386, 390-91 (1974). In turn, the Court emphasized that "We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory. It does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism. Its use in a given case rests in the sound discretion of the federal court." *Id.* Wyoming allows federal courts to certify a question to the Wyoming Supreme Court "if there are involved in any proceeding before the federal court questions of law of this state which may be determinative of the cause then pending in the federal court, and as to which it appears to the federal court there is no controlling precedent in the existing decisions of the supreme court." Wyo. Stat. § 1-13-106. Thus, in order to promote cooperative judicial federalism, as well as save time and resources in the long run, the Court should certify a question to the Wyoming Supreme Court to determine the scope of a landowner's right to airspace over adjoining property corners shared with neighboring land.

## II.   CHECKERBOARD LAND GRANTS BY CONGRESS DO NOT INCLUDE AN IMPLIED OR EXPRESS GRANT OF PUBLIC ACCESS.

The term "checkerboard lands" refers to the pattern of alternating ownership that occurs in vast swaths of western lands. Odd sections are typically held by private interests and the even sections are generally owned by the U.S. government and

managed by the Bureau of Land Management (BLM).[3] Most checkerboard lands are associated with the land grants that occurred in the mid-1800s which provided land for the development of transcontinental railroads. However, the creation of transcontinental railroads was not the first time this method was employed. Land grants of alternating sections were also used to develop canals, wagon roads, and eastern railways.

A. *Congress made early checkerboard land grants to states to enable internal improvements.*

In the early 1800s, the United States was a young country attempting to develop its necessary infrastructure. *See* PAUL W. GATES, *History of Public Land Law Development,* 341 (1968). Congress was heavily involved in this development, appropriating money for road building and surveying, and eventually granting land to fund internal improvement projects. *See id.* at 341-347. In 1827, Congress authorized the first federal land grant for the creation of the Wabash and Erie Canal. *Id.* (citing Act of Mar. 2, 1827, 4 Stat. 236). This granted to the State of Indiana:

> a quantity of land equal to one half of five sections in width, on each side of said canal, and reserving each alternate section to the United States to be selected by the commissioner of the land office, under the direction of the President of the United States, from one end thereof to the other; and the said lands shall be subject to the disposal of the legislature of said state, for the purpose aforesaid, and no other.

Act of Mar. 2, 1827, 4 Stat. 236. Similar grants were made to Ohio, Illinois, and Alabama in 1827 and 1828, some following the alternating section pattern and others allowing states to select lands at will. *See* GATES, at 345. For the following decades, land grants

---

[3] "The U.S. Public Land Survey System (PLSS) is the method of subdividing and describing land, mainly in the Western United States." Bureau of Land Management, *About the Public Land Survey System*, MINERAL AND LAND RECORDS SYSTEM (Nov. 15, 2020), https://mlrs.blm.gov/s/article/PLSS-Information. "The PLSS components are state, prime meridian, township, range, and section, and then further subdivided into aliquot parts, or lots." *Id.* A section is an area of land covering a 640-acre square. *Id.*

became the common practice to fund development. The intent was that the granted

lands would be sold by the states to finance the project and reserved lands would be sold

by the federal government at a higher price due to their proximity to the improvement.

> [T]he price of the reserved sections was doubled so that it could be argued,
> as the *Congressional Globe* shows *ad infinitum*, that by giving half the
> land away and thereby making possible construction of the road, canal, or
> railroad, the government would recover from the reserved sections as
> much as it would have received from the whole.

*Id.* at 346. In 1838, the first grant was made to an incorporated company instead of a

state. *See id.* at 352. This grant included granting the odd sections and reserving the

even ones. *See id.*

The first checkerboard land grant for a railroad occurred in 1850 when Congress

enacted The Chicago and Mobile Act. It granted to Illinois, Mississippi, and Alabama "a

100-foot right-of-way, together with one half the land in even numbered sections within

6 miles of the line" with the added lands being "given to help finance the road." *Id.* at

357. This grant of land for a railway was a "continuation and indeed an expansion of a

policy that Congress had been pursuing since 1827 when if first granted land to Illinois

and Indiana for canals." *Id.* at 358. More land grants for railroads in eastern states

followed with a heavy emphasis in Minnesota, Iowa, and Missouri. *See id.* at 344. By the

end of 1853, over 2,600 miles of railroads were projected and over 8 million acres had

been granted for railroads. *See id.* at 360.

In 1862 the Pacific Railroad Act was passed by Congress, marking the first land

grant for a transcontinental railroad. *See id.* at 364. The Pacific Railroad Act was

established to "aid in the Construction of a Railroad and Telegraph Line from the

Missouri River to the Pacific Ocean." 12 Stat. 489 (1862). The act granted the odd

numbered sections within ten miles from each side of the railroad, resulting in ten

sections per mile. *See id.* at § 3. The grant was extended to twenty sections per mile in 1864. The Act of July 2, 1864, 13 Stat. 356 (1864). While these grants were given to incorporated companies and not the states, the same plan applied. Railroads would sell granted lands to raise funds and the federal government would sell the reserved lands at an increased value. While this plan worked well in eastern states where people were more willing to move, it did not prove as successful out west. The government was unable to sell all of its lands, so it began disposing of them through the Homestead acts. *See* Merry J. Chavez, *Public Access to Landlocked Public Lands*, 39 STANFORD L. REV. 1373, 1377-78 (1987). The lands that were not disposed of were retained by the government with many now managed by the BLM. *See id.* at 1778.

B.    *Congress did not reserve any means of access to reserved lands in the checkerboard.*

Congress understood it could reserve rights unto itself when making checkerboard land grants. *See* The Pacific Railroad Act, 12 Stat. 489, § 3, 6 (1862) (reserving mineral lands to the United States and granting a preference to the U.S. government for use of the railway); The Act of March 2, 1827, ch. 52, 1827 Stat. 234, § 1 (1827) (requiring future use of canal by the U.S. government be free from toll or other charges); and The Act of May 23, 1828, ch. 75, 1828 Stat. 290, § 7 (1828) (requiring future use of improved rivers by the U.S. government be free from toll).  None of these reservations included a right of access.  In contrast to the "checkerboard" land grants described above, Congress specifically reserved access rights in the 1916 Stock-Raising Homestead Act. 43 U.S.C. § 299(a). Unlike the Homestead and other preceding acts that granted lands to settlers across the West, the 1916 Stock-Raising Homestead Act specifically reserved all minerals to those lands for the federal government as well as to

those developing the reserved minerals, including the right to "reenter and occupy" as much of the private surface as needed for purposes "reasonably incident" to the mining of minerals beneath. This explicit, rather than implied right to access, allows a mineral developer to not only enter the land to develop the minerals on that land, but to also cross that private land in order to develop federal minerals on neighboring lands. *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1253, 55-56 (10th Cir. 2014).

This contrast between the reservations in the checkerboard land grants versus the Stock Raising Homestead Act must mean something. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...."). The absence of a specific access reservation in the "checkboard" grants in contrast to the specific access reservation in the 1916 Stock-Raising Homestead Act must be given recognition. And even though Congress never considered that checkerboard land grants may inhibit public access because Congress assumed the land would be sold, the court cannot amend the law to fit what the court thinks Congress may have intended had Congress known what we do today. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 76 (1996) (stating "Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known. If that effort is to be made, it should be made by Congress, and not by the federal courts."). In this case, there is no statutory language or legislative history that shows that Congress intended to either reserve public access across private checkerboard corners or that Congress granted the right to public access to reach the federal checkerboard lands.[4]

---

[4] Similarly, the U.S. Supreme Court has held that the federal government does not have any type of "easement by necessity" to cross private land to reach federal or public land.

### III.   CORNER CROSSING HAS NEVER BEEN AN ACCEPTED MEANS OF ACCESSING FEDERAL LANDS.

Even if Congress can adopt legislation that overrides "conflicting state law" with respect to authorizing public access across private property to reach federal lands (including airspace), Congress has never adopted such legislation. Simply put, the Plaintiff's and *Amicus Curiae*'s argument that federal law authorizes trespass across private property is patently incorrect.  Congress directly spoke on how public access is to be acquired across private lands to federal lands through the Federal Lands Policy and Management Act (FLPMA).  43 U.S.C. § 1715(a).  FLPMA grants to the federal agencies the ability to acquire access across private lands to federal lands "by purchase, exchange, donation, or eminent domain, … the Secretary may exercise the power of eminent domain only if necessary to secure access to federal lands, and then only if the lands so acquired are confined to as narrow a corridor as is necessary to serve such purpose." *United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty., Wyo.*, 691 F.2d 474 (10th Cir. 1982) (quoting 43 U.S.C. § 1715(a)).  In that case, the court described the need for the access across the private lands because:

> The present problem has its genesis in the federal land grants of the 1800's, whereby the federal government, which initially owned all the land here involved, conveyed alternate sections to private parties. Such grants resulted in a "checkerboard" pattern of land ownership in many western states, to the end that sections granted to private parties frequently are surrounded by public lands, and, conversely retained public land is often completely surrounded by land owned by private parties.

691 F.2d at 475.  FLPMA granted the only authorization to the Federal government to acquire the necessary access across the private lands.  *Id.*  In another ruling, the Tenth

---

*Leo Sheep Co. v. United States.* 440 U.S. 668, 678 (1979). According to the Court, if the federal government wishes to have access to the landlocked parcels, the Government must utilize its powers of eminent domain or some other legal means because no easement of any kind otherwise exists. *See id.*

Circuit again recognized that access over private lands to the federal lands is to be acquired through purchase, exchange, donation or eminent domain.  *Deane v. United States*, 329 F. App'x 809, 813 (10th Cir. 2009).  Had Congress believed that access to federal lands across private lands could have been accomplished by trespassing across corners of private land, it would not have passed statutes authorizing the acquisition of access across private property.

Neither the BLM nor the U.S. Forest Service believe that they have the jurisdiction or authority to authorize trespass across private lands to access federal lands.  According to a pamphlet published by the BLM Wyoming State Office, even in the areas containing checkerboard lands or fragmented land patterns, the federal government does not authorize trespass across private lands, including in the "airspace." *See* Exhibit 1.  Access to the federal lands across private lands can only be provided pursuant to the FLPMA or by the willingness of private landowners to voluntarily allow public access.  *See id.*

Similarly, a 1980 brochure developed by the U.S. Forest Service, BLM, Wyoming State Lands Office, Wyoming Game and Fish Department, Wyoming State Parks and Historic Sites and the Wyoming State Planning Coordinator's Office, includes the following notations regarding access across private lands to federal lands for recreational purposes (including hunting):

- Ask first before entering private land;
- State lands must be legally accessed;
- There is no specific state or federal law with regard to corner crossing. Corner crossings in the checkerboard land pattern area are not considered public access;
- Public access to public lands is often limited in checkerboard and other public and private intermingled landownership areas in Wyoming.  If there is a legal public road through the checkerboard or intermingled land,

then a person has legal access to those public land sections which are
traversed by the public road;

- **Unless a public agency acquires a right-of-way for the road
  across private land, the landowner is completely within their
  legal right to close the road at any time, to be selective in who is
  allowed to use the road, or to charge a fee for use of the road;**

Exhibit 2 (emphasis in original).

These pronouncements that the federal statutes do not authorize trespass to
reach federal lands remain true today.  As recently as March 12, 2019, Congress adopted
the John D. Dingell Jr., Conservation, Management and Recreation Act (Dingell Act)
which included a provision permanently funding the Land and Water Conservation
Fund (LWCF) to improve public access across private lands to federal lands.  Pub. L. No.
116-9, 133 Stat. 586, § 3001.  Initially enacted in 1965, the LWCF was created to
preserve, develop, and ensure access to outdoor recreational activities.  U.S.
Congressional Research Service, *Land and Water Conservation Fund: Overview,
Funding, History, and Issues,* Report RL33531, June 19, 2019, [Land and Water
Conservation Fund: Overview, Funding History, and Issues (congress.gov)](#) (last
accessed May 18, 2022).  In response to the new funding in the Dingell Act, the BLM
and Forest Service have now established a database whereby the public can nominate
areas where greater access across private land is needed.  No such nomination system
would be necessary if Congress has authorized trespass on private lands.

Neither the legislative history nor any federal statute evidence Congress's intent
to repeal state property law by implication.  *U.S. v. Barrett*, 837 F.2d 933, 934 (10th Cir.
1988).  Since as late as 2019, Congress was fashioning legislation allowing the
acquisition of public access across private lands, Congress must not have believed that
the Unlawful Enclosures Act granted the public some lawful authority to trespass on

private lands for access to federal lands. *Watt v. Alaska*, 451 U.S. 259, 266-267 (1981) (holding that even if two statutes somewhat conflict, a court must read them so as to give effect to both). The Unlawful Enclosures Act did not repeal the prohibition against trespass on private lands to access federal lands.

So too do the Wyoming statutes limit the manner in which access can be acquired across private land to federal lands including for recreational purposes. Access across private lands for recreation can only be acquired by "purchase, lease, agreement, gift or devise, not including the powers of eminent domain." Wyo. Stat. § 23-1-302(a)(iii). The purpose for such acquisition includes providing suitable access roads leading to federal lands. *Id.* § (a)(iv). Additionally, in 2021 the Wyoming Legislature passed HB 122 which imposed an additional $9.00 fee on the purchase of conservation stamps by each sportsman to specifically fund the Wyoming Access Yes Program. H.B. 0122, 66th Leg., 2021 Gen. Sess. (Wyo. 2021). The Wyoming Access Yes Program is used by the Wyoming Game and Fish Commission "for the purposes of purchasing access easements or other agreements to provide public access to private, federal and state lands that are difficult to access or inaccessible by the public for hunting and fishing purposes." *Id.* Some of those funds have been used to purchase access to "checkboard" lands that did not otherwise have public access. *See* "Carbon 1 and Carbon 6" found https://wgfd.wyo.gov/Public-Access/Walk-In-Hunting/Carbon-County/Carbon-County-Walk-In-Area-1 and https://wgfd.wyo.gov/Public-Access/Walk-In-Hunting/Carbon-County/Carbon-County-Walk-In-Area-6. Thus, had the Wyoming legislature believed that the public could simply trespass across private corners, it would not needed to have provided the authority to acquire public access across private lands to federal lands.

## CONCLUSION

Checkerboard land grants were used for decades by the federal government to enable internal improvement projects and settlement of new areas. Some of these lands were granted with reservations for minerals or requirements that the federal government be able to use the transportation systems being built upon them. These reservations make it clear that Congress was well aware of its ability to reserve necessary rights in granted lands. However, Congress did not reserve any rights for public access in the "checkerboard lands" in western states. Consequently, the agencies who administer these lands have long cautioned members of the public against crossing private lands to access federal lands. When accessing federal lands, the public is subject to state property laws and risks trespassing if it crosses private property to do so. The scope of property rights on private lands in common corners has yet to be decided in the State of Wyoming; this question should be certified to the Wyoming Supreme Court before it can be determined whether the act of corner crossing is considered a trespass.

RESPECTFULLY SUBMITTED this 15th day of August, 2022.

Karen Budd-Falen (Wyo. Bar No. 5-2467)
Rachael L. Buzanowski (Wyo. Bar. No. 8-6693)
BUDD-FALEN LAW OFFICES, LLC
Post Office Box 346
300 East 18th Street
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
Karen@buddfalen.com
Rachael@buddfalen.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2022, a true and correct copy of the foregoing was transmitted by email and via CM/ECF to the following:

Ryan A. Semerad, Esq.
The Fuller Law Firm
242 South Grant Street
Casper, Wyoming 82601
semerad@thefullerlawyers.com

*Counsel for Defendants*

M. Gregory Weisz, Wyo. Bar #6-2934
Crystal D. Stewart, Wyo. Bar #7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003-0765
gweisz@penceandmac.com

*Counsel for Plaintiff*

Budd-Falen Law Offices, LLC