Eric B. Hanson – pro hac vice
ehanson@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:   415 397 7188

Counsel for *Amicus Curiae* Backcountry Hunters & Anglers

# UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual,<br><br>　　　　　　Defendants. | Case No. 22-CV-00067-SW |

**BRIEF OF AMICUS CURIAE
BACKCOUNTRY HUNTERS & ANGLERS**

1926557

## STATEMENT OF IDENTITY AND INTEREST

Backcountry Hunters & Anglers ("BHA") is the voice for our wild public lands, waters, and wildlife. BHA is a non-profit that seeks to ensure North America's outdoor heritage of hunting and fishing in a natural setting through education and work on behalf of fish, wildlife, and wild places. With more than 350,000 members and supporters, and chapters in 48 states, Washington, D.C., two Canadian provinces and one Canadian territory, BHA draws support from sportsmen and -women from across the continent who share our commitment to fair and equal public access to our public lands and waters, the principles of fair chase, and the ethical pursuit of wild fish and game. BHA is also invested in the conservation and stewardship of fish and wildlife habitat, through collaboration with a diverse array of partners who share an interest in the future of these landscapes.

Unfortunately, millions of acres of public land are locked in a dispute that is a function of the checkerboard pattern of land ownership in the West. Preserving the right of every American to access public land is critically important to BHA and its members and supporters. Indeed, one of BHA's best-known slogans is "Keep Public Land in Public Hands." No individual monied interest should have the right to restrict the public from stepping across the corner of one adjoining parcel of federal public land to another, commonly known as "corner crossing."

BHA offers the Court the perspective of everyday Americans – the many millions of responsible public landowners across the country who deeply respect private property but also are devoted to the recreation and solace provided by our shared public lands. These individuals are being discouraged from exercising their rights to recreate on public land – and in some cases are harassed or worse – by landowners seeking to claim for themselves land that belongs to all Americans.

I.  **Uncertainty Over Corner Crossing Is Preventing Access to Millions of Acres of Public Land and Creates Uncertainty Over Access Rights.**

Corners where federal public land intersects private land are the keys to unlocking access to millions of acres of land owned by every American.

One recent analysis from a mapping and geographic information systems company shows that more than 8.3 million acres of public land across the West are "corner locked", *e.g.* only accessible by crossing a corner, like a chess bishop or a checkers piece might do. *See* Declaration of Eric B. Hanson ("Hanson Decl."), Ex. 1 (*The Corner-Locked Report*, OnX Maps (April 2022) ("OnX Report")).[1] Of that land, 72 percent (5.98 million acres) is specifically locked in a "checkerboard" pattern (e.g. land all arranged in square mile grids), according to the report. Notably, the report found that 49 percent of those corner-locked acres are just one corner away from being accessible. *Id.* Further, more than 2.44 million acres of public land are corner locked in the state of Wyoming alone. *Id.* According to the report, more than half of all landlocked public land in the West would be unlocked if corner crossing were legal. *Id.*

Conflict over corner crossing is neither rare nor unique. For example, in 2003, a hunter in Wyoming was charged with criminal trespass for corner crossing between public land adjacent to private land, and was found not guilty. *See* OnX Report. More recently, a hunter and shed antler collector in Montana was similarly charged in 2019. *See Testing Boundaries of Public Access, Private Property Rights*, Yellowstone Public Radio, Feb. 28, 2020.[2] He was also found not guilty, though was later convicted of a second offense where he was found not have crossed at a corner, but to have cut across an 80-foot stretch of private land. *Id. See also* Angus M. Thuermer Jr., *Corner Crossing: Hunters challenge public land access issue in court*, The Sheridan Press, Dec. 31, 2021.[3] The Defendants in this case were also prosecuted for criminal trespass as part of

---

[1] https://www.onxmaps.com/onx-access-initiatives/corner-crossing-report

[2] https://www.ypradio.org/environment-science/2020-02-28/park-county-court-cases-testing-boundaries-of-public-access-private-property-rights

[3] https://www.thesheridanpress.com/news/regional-news/hunters-challenge-public-land-access-issue-in-court/article_c51d46a4-68e0-11ec-b8f1-8f4a638db509.html

1926557

the same incident at issue here and were found not guilty. *See, e.g.*, Angus M. Thuermer Jr., *Jury finds four corner-crossing hunters not guilty of trespass*, Wyofile.com, Apr. 29, 2022.[4]

Individuals should not have to roll the dice and potentially subject themselves to the mercy of litigious landowners or local prosecutors just to recreate on public land that they legally are allowed to use. Yet media reports indicate a chilling effect emanating from the legal uncertainty around crossing corners to access public land, including the threat of being prosecuted for trespass. *See, e.g.*, Keegen Sentner, *The Wyoming Corner-Crossing Lawsuit Is Headed to Federal Court, Where a Ruling Could Affect Public Access Across the West*, Outdoor Life, Apr. 5, 2022 ("In the American West, roughly 1.6 million of acres of public land are inaccessible to the public because of this pattern and the public's inability to cross corners without fear of harassment from private landowners. The legality of corner crossing is a gray area that has never been fully resolved in the court system.");[5] Thuermer Jr., *Corner Crossing*, *supra* at n. 3 ("Meantime access to 404,000 Wyoming acres 20 miles north and south of the Union Pacific line — and 1,583,000 million landlocked federal public checkerboard acres across the West — remains largely controlled by private landowners and local and state law enforcement and judicial institutions."); Matthew Copeland, *Cornered: Western Sportsmen Trapped by Arcane Regulation Prohibiting Public Access at Corner Crossings*, Outdoor life, Aug. 10, 2015 ("The de facto ban on stepping from public land, to public land, over an intersection with private, hits sportsmen and –women hardest in Montana and Wyoming. . . . Large landowners, it turns out, still hold immense political sway in the Rocky Mountain states.").[6]

Private landowners in the West who own land checkerboarded with public land often appear to assume that their ownership of land intermixed with public land gives them domain over that public land. For example, advertisements for the sale of land in Wyoming, Montana, and other states in the West commonly include checkerboarded public land as part of the

---

[4] https://wyofile.com/jury-finds-four-corner-crossing-hunters-not-guilty-of-trespass/

[5] https://www.outdoorlife.com/hunting/corner-crossing-case-headed-to-federal-court/

[6] https://www.outdoorlife.com/blogs/open-country/cornered-western-sportsmen-trapped-arcane-regulation-prohibiting-public-access/

3

landowner's exclusive inholdings.[7] *See, e.g.*, Hanson Decl., Ex. 2 ("Located in Albany County, Wyoming, approximately 45 miles north of Laramie, or 55 miles west of Wheatland, Wyoming, the Laramie Plains Ranch features 54,209 total contiguous acres and consists of 25,764 deeded acres, 5,338 State of Wyoming lease acres, 8,251 BLM lease acres and 14,856 private lease acres fenced into the ranch."); Ex. 3 ("The Historic Kite Ranch, located in southeastern Wyoming, consists of 8,561 deeded acres, 3,738 State of Wyoming and 23,702 BLM and private lease acres for a total of 36,001 acres."); Ex. 4 ("Imagine gazing out from the deck of your 10,000 sq. ft. Log Lodge onto this safe, secure, pristine property that reaches from skyline to skyline. This huge offering encompasses 45,400 deeded acres, 12,800 acres leased, all contiguous.").

The Plaintiff in this case, a private ranch owned by an individual whose property is interspersed with BLM-managed public lands in a checkerboard pattern, has accused Defendants of civil trespass for momentarily crossing private airspace at a corner where public and private land intersect. *See* Dkt. 2 (State Court Complaint) at pp. 1-2, ¶¶ 39-53. Plaintiff also asks for a declaratory judgment confirming that "Defendants had no right to cross the Property and to carry out a 'corner crossing,'" among other requests. *Id.*, ¶¶ 24-37.

An example of the current checkerboard ownership of land in the general area at issue in this case is shown below:[8]



---

[7] While landowners may lease access to BLM land for grazing, that does not give them ownership rights or dominion over that land. *See* 43 CFR § 4130.2(c) ("Grazing permits or leases convey no right, title, or interest held by the United States in any lands or resources.").

[8] The yellow areas identify federal public BLM land, the blue represents Wyoming state land, and the unshaded areas represent private land. Elk Mountain, the area at issue in this case, is shown in the lower right portion of this image, with parcels of Plaintiff's land intermixed with public BLM land visible.

1926557

Plaintiff purportedly placed stakes on his land with a chain across the corner at issue, along with "No Trespassing" signs, in an attempt to prevent access across the corner from public land to public land. Angus M. Thuermer Jr., *Corner crossing: Hunters challenge public-land access issue in court*, WyoFile, Dec. 27, 2021.[9]



Defendants allegedly used a ladder to cross the corner, never actually touching Plaintiff's land. *Id. See also* Dkt. 2, ¶ 17.

Plaintiff contends it has a "right to exclusive control, use, and enjoyment of its Property, which includes the airspace at the corner, above the Property" and that it "owns and controls the airspace above its real property, and is entitled to exclude others from the use of that airspace by a 'corner crossing.'" *Id.*, ¶¶ 18-19.

Plaintiff's claim goes to the heart of whether private landowners can prohibit public access to the millions of corner-locked acres in Wyoming and across the West. Federal law is clear that Plaintiff cannot.

## II. Laws Encouraging Westward Expansion Divided Public and Private Land in a Checkerboard Pattern, but Congress Provided for Access to The Public Land.

The checkerboard pattern of public and private land in the West has historic antecedent in the Union Pacific Act of 1862 and its various subsequent amendments. John W. Sheridan, *The Legal Landscape of America's Landlocked Property*, UCLA Journal of Environmental Law and Policy, 37:2 (2019) at 232-234. Congress sought to encourage the building of a transcontinental

---

[9] https://wyofile.com/corner-crossing-hunters-challenge-public-land-access-issue-in-court/.

1926557

railroad and enacted a law granting contiguous rights of way within 200 feet on either side of newly laid track as well as establishing alternating 640 acre (one square mile) plots of land on either side of tracks for every ten to forty miles. *Id*. The ungranted and unsold land was either made available to the public through the Homestead Act of 1862 or retained by the federal government. *Id.* The land retained by the federal government became public land now administered by the Bureau of Land Management ("BLM") or U.S. Forest Service ("USFS"). Congress' decision in 1862 led to the checkerboard pattern of land ownership still seen today.

More than 130 years ago, in an attempt to settle the range wars erupting between cattlemen and farmers over access and use of land in the West, Congress passed the Unlawful Inclosures Act ("UIA"). 43 U.S.C. § 1061, *et seq*. The UIA set out broad prescriptions against enclosing public land. The legislation states that "[a]ll inclosures of any public lands . . . constructed by any person . . . to any of which land included within the inclosure the person . . . had no claim or color of title made or acquired in good faith . . . are declared to be unlawful." 43 U.S.C. § 1061. Even more relevant is Section 1063, where Congress stated that "[n]o person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon . . . any tract of public land . . . or shall prevent or obstruct free passage or transit over or through the public lands. . . ." 43 U.S.C. § 1063.

**III.     The Supreme Court Already Held that the UIA Protects Corner Crossing.**

Federal law, not state law, governs the issue of whether private landowners can prevent corner crossing. The UIA reflects the exercise of Congress' police power to abate the nuisance of landowners proscribing access to public land at corners, overriding competing state law concerns. The UIA remains in force and continues to prevent landowners from using "force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means" to prevent access to public land. 43 U.S.C. § 1063.

In *Camfield v. United States*, the Supreme Court held that fences put up inches inside private land on the checkerboard border with public land was unlawful under the UIA because the fences prevented access to public lands via corners. 167 U.S. 518, 525 (1897). The Court provided a diagram showing how the fences were constructed, with the fences indicated by the dotted lines:

6

| 6 | 5 | 4 | 3 | 2 | 1 |
| --- | --- | --- | --- | --- | --- |
| 7 | 8 | 9 | 10 | 11 | 12 |
| 18 | 17 | 16 | 15 | 14 | 13 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 30 | 29 | 28 | 27 | 26 | 25 |
| 31 | 32 | 33 | 34 | 35 | 36 |

*Id.* at 520. To better illustrate the issue, the figure has been adapted to show public land in yellow, private land in gray, and the fences in red. The fences were placed inside private land, but plainly had the effect of enclosing public land by restricting access at the corners where private and public land intersect. *Id.* at 522.

| 6 | 5 | 4 | 3 | 2 | 1 |
| --- | --- | --- | --- | --- | --- |
| 7 | 8 | 9 | 10 | 11 | 12 |
| 18 | 17 | 16 | 15 | 14 | 13 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 30 | 29 | 28 | 27 | 26 | 25 |
| 31 | 32 | 33 | 34 | 35 | 36 |

The Supreme Court held that "[c]onsidering the obvious purposes of this structure, and the necessities of preventing the inclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual." *Id.*

The Supreme Court also held that Congress had the power to enact legislation like the UIA to avoid having federal territory appropriated by states and private property owners:

> The inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands. While we do not undertake to say that congress has the unlimited power to legislate against nuisances within a state which it would have within a territory, we do not think the admission of a territory as a state deprives it of the power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the 'police power,' so long as such power is directed solely

7

> to its own protection. A different rule would place the public domain of the United States completely at the mercy of state legislation.

*Id.* at 525-526. Importantly, the Supreme Court explained that its decision was not limited to stopping private landowners from using fences to keep the public of off public land. "It is only by treating [the UIA] as prohibiting all 'enclosures' of public land, by whatever means, that the act becomes of any avail." *Id.* at 525. It said that "[t]here is no doubt of the general proposition that a man may do what he will with his own, but this right is subordinate to another, which finds expression in the familiar maxim, '*Sic utere tuo ut alienum non laedas* [use your own property in such manner as not to injure that of another].'" *Id.* at 522.

The effect of blocking transit over the shared corners was sufficient to violate the UIA. "So far as the fences were erected near the outside line of the odd-numbered sections [the private land], there can be no objection to them; but, so far as they were erected immediately outside the even-numbered sections [the public land], they are manifestly intended to inclose the government's lands. . . ." *Id.* The Court also held that Congress' police power trumped private rights to prohibit access to federal lands via corners. "The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute." *Id.*

In short, *Camfield* shows that the UIA protects the public's right to access public land via corner crossing, and that Congress prohibited attempts by private landowners to restrict access.

**IV. In Cases Spanning the Last Century, Courts Have Continued to Apply the UIA and *Camfield* to Prevent Private Landowners From Prohibiting Corner Crossing From Public Land to Public Land.**

Courts have repeatedly applied the UIA and *Camfield* to ensure access to public land via corner crossing, rejecting claims of state law trespass that would interfere with the public's right to move across public land.

In an early Wyoming case with parallels to the present case, the Eighth Circuit (before the creation of the 10th Circuit) applied the UIA and *Camfield* to a case of corner crossing and explicitly held that an individual had the right to trail his sheep across a shared public-private corner, even when fences were not present.

> The company admitted [defendant's] right as to the public domain, but warned him not to go over any of its lands on penalty of prosecution for trespass. The odd-numbered sections touch at their corners and their points of contact, like a point in mathematics, are without length or width. If the position of the company were

8

> sustained, a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon terms prescribed by it. Not even a solitary horseman could pick his way across without trespassing. In such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party. As long as the present policy of the government continues, all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership.

*Mackay v. Uinta Dev. Co.*, 219 F. 116, 118 (8th Cir. 1914).

The court in *Mackay* recognized the conflict between private property and public lands, and held that the landowner cannot use state trespass laws to prohibit access to public land via corner crossing. The court explained that the UIA, as interpreted by the Supreme Court, could lessen "in a moderate degree" what otherwise are considered the absolute rights of private property:

> This case illustrates the conflict between the rights of private property and the public welfare under exceptional conditions. It is difficult to say that a man may not inclose his own land, regardless of the effect upon others; but the Camfield Case, supra, has been recognized as sustaining the doctrine that 'wholesome legislation' may be constitutionally enacted, though it lessens in a moderate degree what are frequently regarded as absolute rights of private property. This large body of land, with the odd-numbered sections of the company and the even-numbered sections of the public domain located alternately like the squares of a checkerboard, remains open as nature left it. Its appearance is that of a common, and the company is so using the contained public portions. In such use it makes no distinction between them and its own holdings. It has not attempted physically to separate the latter for exclusive private use.

*Id.* at 119 (cleaned up).

The court noted that the private landowner could legally restrict access to the private land while keeping open access over the corners to public land, but it cannot use threats of trespass to keep the public from using corners to cross between parcels of public land.

> [The landowner] admits that Mackay had the right in common with the public to pass over the public lands. But the right admitted is a theoretical one, without utility, because practically it is denied except on terms it prescribes. Contrary to the prevailing rule of construction, it seeks to cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form. It could have lawfully fenced its own without obstructing access to the public lands. That would have lessened the value of the entire tract as a great grazing pasture, but it cannot secure for itself that value, which includes as an element the exclusive use of the public lands, by warnings and actions in trespass.

*Id.* at 120.

The same is true here. Plaintiff cannot secure for itself the value of public land interspersed with its property by threatening trespass, since the government and its licensees (the public) have an equal right to access their lands. Plaintiff here would have been within his right

9

to fence his properties while keeping access to public lands open over the corners. Instead, he did the opposite, placing a fence only over the shared private/public corner. That is impermissible.

Similarly, in *Stoddard v. United States*, another pre-Tenth Circuit Court of Appeals case, the Eighth Circuit held that the UIA was "intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands. It is a well-known fact that the free herding and grazing of cattle on the public lands is a legitimate use to which they may be put, and we think Congress must have had the preservation and protection of this use in mind in the enactment under consideration." 214 F. 566, 568–69 (8th Cir. 1914). Again, the court held that the free passage over corners was a legitimate use that Congress intended when it enacted the UIA.

Importantly, the same considerations have also been adopted in a more contemporary context. In *U.S. ex rel. Bergen v. Lawrence*, a Wyoming district court and the 10th Circuit acknowledged that the UIA continues to apply in the modern era, and that it prohibits landowners from blocking access to public land across shared corners. *U.S. ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414 (D. Wyo. 1985), *aff'd*, 848 F.2d 1502 (10th Cir. 1988). *Bergen* involved a landowner who owned property checkerboarded with public land. 848 F.2d at 1504. He fenced his private property, blocking the ability of pronghorns to travel over public land to their winter range. *Id.* The court found the impediment impermissible.

The 10th Circuit succinctly explained the UIA's modern relevance: "The UIA proscribes unlawful enclosures; enclosures are unlawful when they deny access to public lands for 'lawful purposes'. . . . Obviously, lawful uses of the public lands will change over time." *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988), *cert. denied*, 488 U.S. 980 (1988). The district court noted that modern laws continued to redefine the lawful purposes that the UIA protects, including recreation and hunting. "In the years since the 1885 passage of the UIA, the then-pressing concerns of settlement and range wars have faded. But, new present-day concerns have arisen. In the Federal Land Policy and Management Act (FLPMA) . . . Congress set out new goals for the public lands." *Bergen*, 620 F. Supp. at 1417. The district court in *Bergen* found it "proper to consider FLPMA statute in light of UIA, especially since Congress as recently as 1984 considered and amended the UIA." *Bergen*, 620 F. Supp. at 1417. One of the legislative policy goals of the FLPMA is that "public lands be managed in a manner . . . that will provide

food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

Examining the decisions in *Mackay* and *Stoddard*, the district court explained that "[s]urely, the free passage of hunters and their quarry is a lawful purpose for which the public may seek access to public lands. In light of these precedents, the Court is hardpressed to understand how the UIA could apply to cattle, but not to antelope." *Id.* Plainly, then, the UIA applies to ensuring access for deer, elk, and antelope (and the hunters who pursue those game) just as much as it does to the herder trailing sheep or cattle over the land more than a century ago.[10]

Courts consistently recognize that when Congress makes laws regarding federal land, it necessarily has the right to control conduct that impacts that land, even if that impacts state law. "Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands." *State of Minn. by Alexander v. Block*, 660 F.2d 1240, 1249 (8th Cir. 1981). Congress "may sanction some uses and prohibit others, and may forbid interference with such as are sanctioned." *McKelvey v. United States*, 260 U.S. 353, 359 (1922) (citations omitted). Finally, in *Kleppe v. New Mexico*, the Court explained that "Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." 426 U.S. 529, 543 (1976) (cleaned up). Quoting *Camfield*, the Court noted that a "different rule would place the public domain of the United States completely at the mercy of state legislation." *Id.* The Court also explained that *Camfield* ruled on "the scope of congressional power to regulate conduct on Private land that

---

[10] The Supreme Court's decision in *Leo Sheep Co. v. U.S.*, 440 U.S. 668 (1979), is not to the contrary. That case involved an action to quiet title after the federal government asserted that it had an implied easement over a shared corner after it cleared a road touching both public and private land. *Id.* at 678. The Court held that the federal government had no implied easement or other right to build a road over private land. *Id.* at 679-680. The Court distinguished *Camfield* as being based on nuisance law and Congress' police powers, which were not applicable to the government's claim that it had a right to physically build a road on private land. *Id.* at 685.

In *Bergen*, the Tenth Circuit distinguished *Leo Sheep*, holding the decision inapplicable to the facts of the case because no taking or easement was implicated. "The UIA declares enclosures of federal lands to be unlawful and orders that such enclosures be removed. It creates no easements or servitudes. . . . We conclude with the district court that 'while *Leo Sheep* has no applicability in this matter, *Camfield* is dispositive of it.'" *Bergen*, 848 F.2d at 1506 (citation omitted).

affects the public lands. . . . *Camfield* contains no suggestion of any limitation on Congress' power over conduct on its own property; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits." *Id.* at 538. Notably, "where those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede." *Id.* at 543.

The upshot is that the UIA plainly prevents private landowners from prohibiting access to public land for lawful purposes, including the momentary crossing of private land / airspace at a corner to access another section of public land. A finding to the contrary effectively grants the landowner dominion over federal public land he does not own and that he has not paid for. The Supreme Court has cast a cold eye on such an outcome. "It seems but an ill return for the generosity of the government in granting these [rail]roads half its lands to claim that it thereby incidentally granted them the benefit of the whole." *Camfield*, 167 U.S. at 526.

## V.  Conclusion

A private landowner with half the ownership of a corner does not have a veto over access by the owner of the other half of the corner—namely the federal government, and by extension, the people of the United States. Federal law is clear that attempts to bar access to public lands, whether by fences or threats of trespass, are improper nuisances that Congress abated through the UIA. Many thousands of BHA members, as well as millions of public land recreators, have an interest in seeing this Court apply the clear tenor of federal law and find that private property owners cannot prevent corner crossing as practiced by defendants.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  December 5, 2022        By:    */s/ Eric B. Hanson*
                                       ERIC B. HANSON (admitted pro hac vice)
                                       633 Battery Street
                                       San Francisco, CA 94111-1809
                                       Telephone:  415 391 5400
                                       Facsimile:  415 397 7188

                                       Attorneys for Amicus Curiae Backcountry
                                       Hunters & Anglers