

**FILED**

1:57 pm, 12/6/22

**Margaret Botkins
Clerk of Court**

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

|  |  |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 22-CV-00067-SWS ) |
| BRADLEY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) ) |
| Defendants. | ) ) |

### BRIEF OF *AMICUS CURIAE* WYOMING STOCK GROWERS ASSOCIATION AND WYOMING WOOL GROWERS' ASSOCIATION

### <u>Statement of Identity and Interest of *Amici*</u>

The Wyoming Stock Growers Association (WSGA) was organized on April 4, 1872 to advance and protect the interest of the state's livestock producers. It was the second state cattlemen's organization created in the United States. The WSGA was the first association formed in the Wyoming territory and is the primary organization in the state focused on serving the needs of the cattle industry, which is the largest segment of Wyoming's agricultural production. WSGA's mission is to serve the livestock business and families by protecting their economic, legislative, regulatory, judicial, environmental, custom, and cultural interests.  The WSGA advocates for the protection of private property rights from over burdensome regulatory interference.

The Wyoming Wool Growers Association (WWGA) is a membership organization whose mission is to protect and preserve the lamb and wool industry and the ranching

1

community lifestyle.  The WWGA works with the legislatures at the state and national levels, governmental officials and the general public to provide accurate information about the industry itself, private property rights, and other important issues.  They also work to educate their members on the latest production practices and state and federal laws that impact their livelihoods.

Combined, these *Amici* represent hundreds of agricultural producers owning thousands of acres of private land in the Wyoming. Many of these private lands share adjoining boundaries, including corners with federal or public[1] (collectively federal) lands. Accordingly, the *Amici* bring a unique perspective to this case because of the impact this case will have on their private property rights[2].

## I.    THE DETERMINATION AS TO THE SCOPE OF LANDOWNERS' RIGHTS IN THE AIRSPACE ABOVE THEIR PRIVATE PROPERTY IS A QUESTION OF STATE LAW.

Wyoming statutes and common law make it clear that landowners hold a property right in the airspace above their lands. However, the scope of this property right regarding the physical trespass of third parties has yet to be fully determined by State law.

---

[1] Federal lands are reserved lands which cannot be eventually transferred into private hands through any homestead, Desert Land Entry, Small Tracts Act or other laws. Conversely public lands could be acquired by an individual through one of these Acts. The passage of the Federal Land Policy and Management Act in 1976 repealed most of the laws allowing the privatization of public lands changing the land from public lands to federal land.  Pub. L. 94-579, 90 Stat. 2787 § 702 (Oct. 21, 1976).

[2] Amici WSGA and WWGA take no position with regard to Defendant's claim that the fencing of Plaintiff's property violated the Unlawful Enclosures Act.  As explained in this brief, regardless of the fencing scheme on Plaintiff's property, Plaintiff's property interests in the air space are governed by state law, not the Unlawful Enclosures Act; Congress did not provide for access across common corners to the federal checkerboard lands; even the federal agencies themselves do not recognize trespass on private airspace at common corners to access federal lands.

*A. Questions as to the existence and scope of a property right is a state law issue.*

Questions as to the existence and scope of a person's property right have long been a creature of state law. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by … an independent source such as state law." *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 539 (1985*)*. "Generally speaking, state law defines property interests…." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010).

The federal courts have respected this principal of property law even when the state court's determination of a property right may have national implications affecting federal powers. *U.S. v. Cress* dealt with a takings claim brought by landowners who claimed their lands and water rights were taken by flooding resulting from the federal government's construction and maintenance of locks and dams on the Cumberland and Kentucky Rivers. 243 U.S. 316, 318 (1917). These Rivers were important as they connected interstate commerce between several states. *Id.* at 326. According to the Supreme Court, "The states have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders, both navigable and non-navigable, and the ownership of the lands forming their beds and banks." *Id.* at 319.  While navigable streams are subject to Congress's authority to control the navigation of water when necessary to regulate interstate commerce, each state's property laws dictate whether a person owns a property interest in those navigable waters or the stream beds the waters flowed over. *Id.* at 320.  Thus, the Court noted that Kentucky common law and statutes clearly indicated that landowners owned the stream beds of all rivers crossing their lands, regardless as to

their navigability and that the scope of navigable waters was limited to the flow of the stream in its natural state. *Id.* Thus, the Court determined amount of compensation due to the landowners from the United States because of the government's action of constructing dams and raising the water level was based on state law principals. *Id.* at 327. Thus, Wyoming's state law should determine whether the airspace above private property is owned by the property owner.

> B. *Wyoming law suggests that landowners hold a property interest in the airspace above their surface but does not define the scope of this interest.*

According to Wyoming statute, "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303." Wyo. Stat. § 10-4-302. The "right of flight" refers to a general aircraft flight easement held by the State of Wyoming and the federal government over navigable airspace. Wyo. Stat. § 10-4-303. The question in this case however is, with the exception of the right of flight, if such airspace ownership includes the right to exclude others at adjoining corners if they trespass in the airspace. There should be no dispute that "Ownership of property implies the right of possession and control and includes the right to exclude others; that is, a true owner of land exercises full dominion and control over it and possesses the right to expel trespassers." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82, (1980). One of the essential sticks in the bundle of property rights is the right to exclude others. *Kaiser Aetna v. United States*, 444 U.S. 164, 179–180 (1979). And, in Wyoming, the right to protect property is a state constitutional right. *Cross v. State,* 370 P.2d 371, 377 (Wyo. 1962). The question then is whether the right to exclude others extends to the airspace of above the landowners' private property, including the corners of that private

4

property.  *Amici* could find no Wyoming cases or statutes, except those specifically discussing the "right of flight," that answers this question.

> ### C. The Wyoming Courts and Legislature are well equipped to answer this state property law question.

Like the courts of Kentucky, the Wyoming Supreme Court has a long history of answering questions regarding the existence and scope of various property rights in Wyoming.  *See for ex. Edgcomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850 (Wyo. 1996) (defining the general scope of easements in Wyoming); *Sammons v. American Auto. Ass'n*, 912 P.2d 1103 (Wyo. 1996) (ruling that the right to exclude others and expel trespassers is a right of property owners, but it is limited when a license is given to the public to enter upon its premises for business purposes); *similarly See* Wyo. Const. art. I, § 31 (Wyoming water is owned and controlled by the state); Wyo. Stat. § 11-28-101 (defining who is considered an owner of a fence). Thus *Amici*  suggest that Wyoming courts and legislature, rather than the federal courts, are the appropriate entities to determine whether there is a property interest in the airspace at a shared property corner which would allow a property owner to enforce a trespass claim.

Traditionally, when a central question of state law is determinative of a case before the federal courts and there is no controlling precedent for its decision, those courts have often appropriately remanded the decision back to the state courts or have certified a question of law to the state's highest court. *See Murray v. BEJ Minerals, LLC*, 924 F.3d 1070 (9th Cir. 2019) (certifying a question of law to the Montana Supreme Court as to whether dinosaur fossils belong to the surface owner or the mineral owner). The United States Supreme Court has looked favorably at courts exercising their discretion to either remand a case back to the state level or to certify the question before

the state's highest court when the case will turn on a state law question. In *Lehman Bros. v. Schein*, the Court recognized that federal courts have "not infrequently" stayed their hands and remitted the parties back to resolve the controlling state law on which the federal rule may turn. 416 U.S. 386, 390-91 (1974). In turn, the Court emphasized that "We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory. It does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism. Its use in a given case rests in the sound discretion of the federal court." *Id.* Wyoming allows federal courts to certify a question to the Wyoming Supreme Court "if there are involved in any proceeding before the federal court questions of law of this state which may be determinative of the cause then pending in the federal court, and as to which it appears to the federal court there is no controlling precedent in the existing decisions of the supreme court." Wyo. Stat. § 1-13-106. Thus, in order to promote cooperative judicial federalism, as well as save time and resources in the long run, the Court should certify a question to the Wyoming Supreme Court to determine the scope of a landowner's right to airspace over adjoining property corners shared with neighboring land.

## II. CHECKERBOARD LAND GRANTS BY CONGRESS DO NOT INCLUDE AN IMPLIED OR EXPRESS GRANT OF PUBLIC ACCESS.

The term "checkerboard lands" refers to the pattern of alternating ownership that occurs in vast swaths of western lands. Odd sections are typically held by private interests and the even sections are generally owned by the U.S. government and

managed by the Bureau of Land Management (BLM).[3] Most checkerboard lands are associated with the land grants that occurred in the mid-1800s which provided land for the development of transcontinental railroads. However, the creation of transcontinental railroads was not the first time this method was employed. Land grants of alternating sections were also used to develop canals, wagon roads, and eastern railways.

A.   *Congress made early checkerboard land grants to states to enable internal improvements.*

In the early 1800s, the United States was a young country attempting to develop its necessary infrastructure. *See* PAUL W. GATES, *History of Public Land Law Development,* 341 (1968). Congress was heavily involved in this development, appropriating money for road building and surveying, and eventually granting land to fund internal improvement projects. *See id.* at 341-347. In 1827, Congress authorized the first federal land grant for the creation of the Wabash and Erie Canal. *Id.* (citing Act of Mar. 2, 1827, 4 Stat. 236). This granted to the State of Indiana:

> a quantity of land equal to one half of five sections in width, on each side of said canal, and reserving each alternate section to the United States to be selected by the commissioner of the land office, under the direction of the President of the United States, from one end thereof to the other; and the said lands shall be subject to the disposal of the legislature of said state, for the purpose aforesaid, and no other.

Act of Mar. 2, 1827, 4 Stat. 236. Similar grants were made to Ohio, Illinois, and Alabama in 1827 and 1828, some following the alternating section pattern and others allowing states to select lands at will. *See* GATES, at 345. For the following decades, land grants

---

[3] "The U.S. Public Land Survey System (PLSS) is the method of subdividing and describing land, mainly in the Western United States." Bureau of Land Management, *About the Public Land Survey System*, MINERAL AND LAND RECORDS SYSTEM (Nov. 15, 2020), https://mlrs.blm.gov/s/article/PLSS-Information. "The PLSS components are state, prime meridian, township, range, and section, and then further subdivided into aliquot parts, or lots." *Id.* A section is an area of land covering a 640-acre square. *Id.*

became the common practice to fund development. The intent was that the granted lands would be sold by the states to finance the project and reserved lands would be sold by the federal government at a higher price due to their proximity to the improvement.

> [T]he price of the reserved sections was doubled so that it could be argued, as the *Congressional Globe* shows *ad infinitum*, that by giving half the land away and thereby making possible construction of the road, canal, or railroad, the government would recover from the reserved sections as much as it would have received from the whole.

*Id.* at 346. In 1838, the first grant was made to an incorporated company instead of a state. *See id.* at 352. This grant included granting the odd sections and reserving the even ones. *See id.*

The first checkerboard land grant for a railroad occurred in 1850 when Congress enacted The Chicago and Mobile Act. It granted to Illinois, Mississippi, and Alabama "a 100-foot right-of-way, together with one half the land in even numbered sections within 6 miles of the line" with the added lands being "given to help finance the road." *Id.* at 357. This grant of land for a railway was a "continuation and indeed an expansion of a policy that Congress had been pursuing since 1827 when if first granted land to Illinois and Indiana for canals." *Id.* at 358. More land grants for railroads in eastern states followed with a heavy emphasis in Minnesota, Iowa, and Missouri. *See id.* at 344. By the end of 1853, over 2,600 miles of railroads were projected and over 8 million acres had been granted for railroads. *See id.* at 360.

In 1862 the Pacific Railroad Act was passed by Congress, marking the first land grant for a transcontinental railroad. *See id.* at 364. The Pacific Railroad Act was established to "aid in the Construction of a Railroad and Telegraph Line from the Missouri River to the Pacific Ocean." 12 Stat. 489 (1862). The act granted the odd numbered sections within ten miles from each side of the railroad, resulting in ten

sections per mile. *See id*. at § 3. The grant was extended to twenty sections per mile in 1864. The Act of July 2, 1864, 13 Stat. 356 (1864). While these grants were given to incorporated companies and not the states, the same plan applied. Railroads would sell granted lands to raise funds and the federal government would sell the reserved lands at an increased value. While this plan worked well in eastern states where people were more willing to move, it did not prove as successful out west. The government was unable to sell all of its lands, so it began disposing of them through the Homestead acts. *See* Merry J. Chavez, *Public Access to Landlocked Public Lands*, 39 STANFORD L. REV. 1373, 1377-78 (1987). The lands that were not disposed of were retained by the government with many now managed by the BLM. *See id*. at 1778.

B.    *Congress did not reserve any means of access to reserved lands in the checkerboard.*

Congress understood it could reserve rights unto itself when making checkerboard land grants. *See* The Pacific Railroad Act, 12 Stat. 489, § 3, 6 (1862) (reserving mineral lands to the United States and granting a preference to the U.S. government for use of the railway); The Act of March 2, 1827, ch. 52, 1827 Stat. 234, § 1 (1827) (requiring future use of canal by the U.S. government be free from toll or other charges); and The Act of May 23, 1828, ch. 75, 1828 Stat. 290, § 7 (1828) (requiring future use of improved rivers by the U.S. government be free from toll).  None of these reservations included a right of access.  In contrast to the "checkerboard" land grants described above, Congress specifically reserved access rights in the 1916 Stock-Raising Homestead Act. 43 U.S.C. § 299(a). Unlike the Homestead and other preceding acts that granted lands to settlers across the West, the 1916 Stock-Raising Homestead Act specifically reserved all minerals to those lands for the federal government as well as to

those developing the reserved minerals, including the right to "reenter and occupy" as much of the private surface as needed for purposes "reasonably incident" to the mining of minerals beneath. This explicit, rather than implied right to access, allows a mineral developer to not only enter the land to develop the minerals on that land, but to also cross that private land in order to develop federal minerals on neighboring lands. *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1253, 55-56 (10th Cir. 2014).

This contrast between the reservations in the checkerboard land grants versus the Stock Raising Homestead Act must mean something. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...."). The absence of a specific access reservation in the "checkboard" grants in contrast to the specific access reservation in the 1916 Stock-Raising Homestead Act must be given recognition.  And even though Congress never considered that checkerboard land grants may inhibit public access because Congress assumed the land would be sold, the court cannot amend the law to fit what the court thinks Congress may have intended had Congress known what we do today.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 76 (1996) (stating "Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known.  If that effort is to be made, it should be made by Congress, and not by the federal courts.").  In this case, there is no statutory language or legislative history that shows that Congress intended to either reserve public access across private checkerboard corners or that Congress granted the right to public access to reach the federal checkerboard lands.[4]

_____

[4] Similarly, the U.S. Supreme Court has held that the federal government does not have any type of "easement by necessity" to cross private land to reach federal or public land.

### III.   CORNER CROSSING HAS NEVER BEEN AN ACCEPTED MEANS OF ACCESSING FEDERAL LANDS.

Even if Congress can adopt legislation that overrides "conflicting state law" with respect to authorizing public access across private property to reach federal lands (including airspace), Congress has never adopted such legislation. Simply put, the Plaintiff's and *Amicus Curiae*'s argument that federal law authorizes trespass across private property is patently incorrect.  Congress directly spoke on how public access is to be acquired across private lands to federal lands through the Federal Lands Policy and Management Act (FLPMA).  43 U.S.C. § 1715(a).  FLPMA grants to the federal agencies the ability to acquire access across private lands to federal lands "by purchase, exchange, donation, or eminent domain, ... the Secretary may exercise the power of eminent domain only if necessary to secure access to federal lands, and then only if the lands so acquired are confined to as narrow a corridor as is necessary to serve such purpose." *United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty., Wyo*., 691 F.2d 474 (10th Cir. 1982) (quoting 43 U.S.C. § 1715(a)).  In that case, the court described the need for the access across the private lands because:

> The present problem has its genesis in the federal land grants of the 1800's, whereby the federal government, which initially owned all the land here involved, conveyed alternate sections to private parties. Such grants resulted in a "checkerboard" pattern of land ownership in many western states, to the end that sections granted to private parties frequently are surrounded by public lands, and, conversely retained public land is often completely surrounded by land owned by private parties.

691 F.2d at 475.  FLPMA granted the only authorization to the Federal government to acquire the necessary access across the private lands.  *Id.*  In another ruling, the Tenth

---

*Leo Sheep Co. v. United States.* 440 U.S. 668, 678 (1979). According to the Court, if the federal government wishes to have access to the landlocked parcels, the Government must utilize its powers of eminent domain or some other legal means because no easement of any kind otherwise exists. *See id.*

Circuit again recognized that access over private lands to the federal lands is to be acquired through purchase, exchange, donation or eminent domain. *Deane v. United States*, 329 F. App'x 809, 813 (10th Cir. 2009). Had Congress believed that access to federal lands across private lands could have been accomplished by trespassing across corners of private land, it would not have passed statutes authorizing the acquisition of access across private property.

Neither the BLM nor the U.S. Forest Service believe that they have the jurisdiction or authority to authorize trespass across private lands to access federal lands. According to a pamphlet published by the BLM Wyoming State Office, even in the areas containing checkerboard lands or fragmented land patterns, the federal government does not authorize trespass across private lands, including in the "airspace." *See* Exhibit 1. Access to the federal lands across private lands can only be provided pursuant to the FLPMA or by the willingness of private landowners to voluntarily allow public access. *See id.*

Similarly, a 1980 brochure developed by the U.S. Forest Service, BLM, Wyoming State Lands Office, Wyoming Game and Fish Department, Wyoming State Parks and Historic Sites and the Wyoming State Planning Coordinator's Office, includes the following notations regarding access across private lands to federal lands for recreational purposes (including hunting):

- Ask first before entering private land;
- State lands must be legally accessed;
- There is no specific state or federal law with regard to corner crossing. Corner crossings in the checkerboard land pattern area are not considered public access;
- Public access to public lands is often limited in checkerboard and other public and private intermingled landownership areas in Wyoming. If there is a legal public road through the checkerboard or intermingled land,

> then a person has legal access to those public land sections which are traversed by the public road;
> - **Unless a public agency acquires a right-of-way for the road across private land, the landowner is completely within their legal right to close the road at any time, to be selective in who is allowed to use the road, or to charge a fee for use of the road;**

Exhibit 2 (emphasis in original).

These pronouncements that the federal statutes do not authorize trespass to reach federal lands remain true today. As recently as March 12, 2019, Congress adopted the John D. Dingell Jr., Conservation, Management and Recreation Act (Dingell Act) which included a provision permanently funding the Land and Water Conservation Fund (LWCF) to improve public access across private lands to federal lands. Pub. L. No. 116-9, 133 Stat. 586, § 3001. Initially enacted in 1965, the LWCF was created to preserve, develop, and ensure access to outdoor recreational activities. U.S. Congressional Research Service, *Land and Water Conservation Fund: Overview, Funding, History, and Issues,* Report RL33531, June 19, 2019, [Land and Water Conservation Fund: Overview, Funding History, and Issues (congress.gov)](congress.gov) (last accessed May 18, 2022). In response to the new funding in the Dingell Act, the BLM and Forest Service have now established a database whereby the public can nominate areas where greater access across private land is needed. No such nomination system would be necessary if Congress has authorized trespass on private lands.

Neither the legislative history nor any federal statute evidence Congress's intent to repeal state property law by implication. *U.S. v. Barrett*, 837 F.2d 933, 934 (10th Cir. 1988). Since as late as 2019, Congress was fashioning legislation allowing the acquisition of public access across private lands, Congress must not have believed that the Unlawful Enclosures Act granted the public some lawful authority to trespass on

private lands for access to federal lands.  *Watt v. Alaska*, 451 U.S. 259, 266-267 (1981)

(holding that even if two statutes somewhat conflict, a court must read them so as to

give effect to both).  The Unlawful Enclosures Act did not repeal the prohibition against

trespass on private lands to access federal lands.

So too do the Wyoming statutes limit the manner in which access can be acquired

across private land to federal lands including for recreational purposes. Access across

private lands for recreation can only be acquired by "purchase, lease, agreement, gift or

devise, not including the powers of eminent domain." Wyo. Stat. § 23-1-302(a)(iii).  The

purpose for such acquisition includes providing suitable access roads leading to federal

lands.  *Id.* § (a)(iv).  Additionally, in 2021 the Wyoming Legislature passed HB 122

which imposed an additional $9.00 fee on the purchase of conservation stamps by each

sportsman to specifically fund the Wyoming Access Yes Program. H.B. 0122, 66th Leg.,

2021 Gen. Sess. (Wyo. 2021). The Wyoming Access Yes Program is used by the

Wyoming Game and Fish Commission "for the purposes of purchasing access easements

or other agreements to provide public access to private, federal and state lands that are

difficult to access or inaccessible by the public for hunting and fishing purposes." *Id.*

Some of those funds have been used to purchase access to "checkboard" lands that did

not otherwise have public access. *See* "Carbon 1 and Carbon 6" found

https://wgfd.wyo.gov/Public-Access/Walk-In-Hunting/Carbon-County/Carbon-

County-Walk-In-Area-1 and https://wgfd.wyo.gov/Public-Access/Walk-In-

Hunting/Carbon-County/Carbon-County-Walk-In-Area-6. Thus, had the Wyoming

legislature believed that the public could simply trespass across private corners, it would

not needed to have provided the authority to acquire public access across private lands

to federal lands.

## CONCLUSION

Checkerboard land grants were used for decades by the federal government to enable internal improvement projects and settlement of new areas. Some of these lands were granted with reservations for minerals or requirements that the federal government be able to use the transportation systems being built upon them. These reservations make it clear that Congress was well aware of its ability to reserve necessary rights in granted lands. However, Congress did not reserve any rights for public access in the "checkerboard lands" in western states. Consequently, the agencies who administer these lands have long cautioned members of the public against crossing private lands to access federal lands. When accessing federal lands, the public is subject to state property laws and risks trespassing if it crosses private property to do so. The scope of property rights on private lands in common corners has yet to be decided in the State of Wyoming; this question should be certified to the Wyoming Supreme Court before it can be determined whether the act of corner crossing is considered a trespass.

RESPECTFULLY SUBMITTED this 16th day of August, 2022.

Karen Budd-Falen (Wyo. Bar No. 5-2467)
Rachael L. Buzanowski (Wyo. Bar. No. 8-6693)
BUDD-FALEN LAW OFFICES, LLC
Post Office Box 346
300 East 18th Street
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
Karen@buddfalen.com
Rachael@buddfalen.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2022, a true and correct copy of the foregoing was transmitted by email and U.S. Mail to the following:

Ryan A. Semerad, Esq.
The Fuller Law Firm
242 South Grant Street
Casper, Wyoming 82601
semerad@thefullerlawyers.com

*Counsel for Defendants*

M. Gregory Weisz, Wyo. Bar #6-2934
Crystal D. Stewart, Wyo. Bar #7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003-0765
gweisz@penceandmac.com

*Counsel for Plaintiff*

Eric B. Hanson – pro hac vice
Keker, Van Nest & Peters LLP
633 Battery Street
San Fransisco, CA  94111-1809

*Counsel for* Amicus Curiae *Backcountry Hunters & Anglers*

_____
Budd-Falen Law Offices, LLC

# Wyoming
## Bureau
## of
## Land
## Management

# ACCESS
# MANAGEMENT
# POLICY



**EXHIBIT 1-1**

# Introduction

Access is one of the most sensitive issues in the west today. Recreation groups are concerned about access to public lands. Private landowners are concerned about their property rights and the potential for adverse impacts to leased public lands and adjacent private property. The Bureau of Land Management (BLM) has developed an access policy to address these concerns.

The purpose of this document is to (1) describe BLM intentions for management of access to and on public lands in Wyoming, (2) to achieve better overall public understanding of the program, (3) establish greater management efficiency for lands and resources through identification and prioritization of access needs, and (4) provide guidance to BLM managers in planning for and managing access in their areas of responsibilities.

2

**EXHIBIT 1-2**

## Policy

It will be the policy of the BLM in Wyoming to manage access to BLM administered lands in order to achieve the multiple use resource management goals and objectives contained in the Federal Policy and Management Act (FLPMA) of 1976.

Access, in a BLM management context, involves more than the physical and/or legal ability to enter or use land. This program includes such diverse activities as public land signing, mapping, public education, intergovernmental coordination, and land and easement acquisition through purchase or exchange. Proper management of access may also involve the restriction or closure of public lands to protect fragile lands or resources and for health and safety reasons. All of the above concepts will be considered from a balanced perspective and based on land use plans and subsequent transportation plans developed with public involvement.

The public land pattern in Wyoming is complex. Access to some of the 17.9 million acres of public land is difficult or impossible as a result of a long history of public disposal laws (railroad grants, homesteading, state selection, etc.). Modern-day conflicts over access can occur where prime resource values or recreational demands involve checkerboard or fragmented land patterns. Some of these conflicts can be, and are, resolved by the willingness of some private landowners to voluntarily allow public access.

Legal access is needed for proper multiple use management of public land. However, legal access and its use must be properly managed to meet management goals while protecting public and private property rights.

Uncontrolled access is sometimes not in the public interest. In certain situations, limited, restricted, or regulated public access is appropriate. These restrictions usually result from the need to prevent damage to public lands and resources. Public safety and protection of private property rights may also be reasons for regulating access.

A logical access management program can only be initiated after a thorough analysis of current and future needs. Generally, legal access, in some form, is sought for administrative purposes of the agency, for authorized users, and for the general public. Legal access obtained for any of these reasons may involve an easement, right-of-way, land exchange, memorandum of agreement, cooperative agreement, and/or condemnation as a *last resort*.

## Access Goals and Objectives

The BLM shall endeavor to maintain existing access, meet future access needs, and manage access to public lands in coordination with other Federal agencies, State and local governments, and private landowners. Access management decisions will be made only after a thorough analysis and study of land use potential, resource values and public demand, and should achieve the following objectives.

*1.*  Maintain and update the information base (transportation plans) on existing access and future needs.

*2.*  Continue public education and interagency cooperation with specific emphasis on the following efforts:

> *Operation Respect* - This program has been very successful in reducing conflicts between hunters and landowners. The program provides maps, answers to questions regarding access and land status, and serves as a contact point for hunters and landowners.

> *Brochures* - Continue to distribute the Public Land Access Handbook, developed jointly by several Federal and State agencies, which answers a number of questions regarding access to and use of State and Federal lands in Wyoming. Revise the handbook and develop other informational material as needed.

> *Interagency Cooperation* - Continue to participate in the Interagency Committee established under the Memorandum of Understanding between the Wyoming Board of Land Commissioners, Wyoming Game and Fish Department, United States Forest Service, and BLM. The agreement provides for coordinating access acquisition efforts and pooling resources to achieve a more efficient and effective access program.

*3.*  Increase the use of signs on BLM roads, trails, and other public access points.

*4.*  Protect, maintain, and manage existing access to public lands.

*5.*  Obtain access to public lands as defined in land use plans, district transportation plans, and activity management plans. Any acquisitions must be in conformance with an approved land use plan and a district transportation plan.

*6.*  Manage access to public lands within the Bureau's multiple use mandate.

3

4

**EXHIBIT 1-3**

## Access Program Direction

Legal and physical access to public lands by BLM employees, contractors, and licensees, as well as the general public, is a basic need. Acquisition priorities will be based on issues and resource management needs identified during the planning process.

Legal and physical access needs may be obtained through any of the means described in the Access Acquisition Methods section below. Acquisition by land exchanges or direct purchase of easements are the preferred methods.

The land use plan, and subsequent transportation and activity plans, should identify the areas of public land which need legal and/or physical access in priority order (note: changes in national or regional resource priorities and economies may change these priorities from time to time). The types of access (exclusive, nonexclusive, or temporary) will normally be addressed at the project or activity planning stage. In some instances, this may be addressed during the land use planning process. Planning of specific routes will normally be done during preparation of activity plans and/or transportation plans.

Currently access to the public lands is available by the following means:

○ State and county roads which adjoin or cross public land.

○ Bureau-owned or controlled roads and trails.

○ Roads over which the Bureau has acquired nonexclusive (permanent and/or temporary) easements from the owners. In this case, the ownership of the road remains with the individual landowner. The Bureau only acquires the right to use the road along with its agents, licensees, and permittees for a specific purpose. Rights for the general public are not obtained.

○ Written permission of the landowners to cross private lands to reach a particular tract of public land. Such permission may be withdrawn at any time by the landowner and could be lost with a change of ownership. This category includes cooperative agreements between BLM and the landowner for specific areas or tracts of land and permission granted to specific individuals or groups.

5

Access needs are to be determined on the basis of the following program management considerations:

**1. Resource Values** - The commercial, casual use or protection of the public lands are important management issues for the Bureau. Resource values and their use or nonuse require a multiple use perspective including various access oriented considerations. Important considerations include but are not limited to:

- *Forest Management* - Legal access will normally be obtained to all stands of merchantable timber which are scheduled to be sold by competitive bid. This access may be in the form of a temporary easement across private land in certain instances. However, permanent rights are preferred where continued access is needed for subsequent timber sales, reforestation, or the management of other resources.

- *Recreation* - Legal access is to be provided to rivers, water bodies, trails, and tracts of public lands having significant values for outdoor recreation. The 43 CFR 8300.0-6 provides that: "In cooperation with State and local government and private landowners, the Bureau of Land Management shall endeavor to provide for public access to public lands with outdoor recreational values."

- *Wildlife* - Provide access or control of access to wildlife habitat, for hunting, fishing, or nonconsumptive wildlife uses.

- *Minerals* - Although the Bureau is not required to provide access to mineral resources, the planning and acquisition of such access could be helpful in preventing uncontrolled networks of access routes within the same general area. The planning of major access routes across public lands for future road construction, either by the Bureau or subsequent mineral developers, should also be considered in some areas.

**2. Public Demand** - Public demand is closely tied to resource use. As the need for a resource changes, its value fluctuates accordingly. Demand is one of the key criteria in prioritization of access needs.

**3. Size** - The size of the public land tract is an important consideration. As a rule, large tracts have a priority. But, resource values, such as recreational sites, may justify acquisition of access to smaller tracts. We will not attempt to acquire access to every parcel of public land.

**4. Bureau Investment** - Legal access will be required when the Bureau has or will invest substantial funds or effort to improve the public land. Capital improvements or investments can only be made on Bureau roads which are on the District transportation plan and legalized by exclusive easements.

6

**EXHIBIT 1-4**

## Access Acquisition Methods

The following is a list of potential acquisition methods and specific policies, which should be considered when additional access must be obtained:

**1. Public Access by Easement Acquisition** - An easement is an interest in land entitling the owner or holder, as a matter of right, to enter upon another person's land for a particular purpose. An exclusive road easement grants control to the U.S., rights for the public, and allows the U.S. to authorize third party use and set road use rules. A nonexclusive road easement to the U.S. Government only allows use by the U.S. Government and its agents and those authorized to do business on public lands. The underlying landowner still controls the road use, subject to the right granted to the U.S.

Permanent exclusive use easements are preferred when public use is a major objective or significant public investments are involved. Temporary or nonexclusive easements are appropriate when access for only administrative or resource management purposes is needed. In either case acquisition of an appropriate easement by exchange or purchase will be the preferred method of meeting access needs in Wyoming.

**2. Land Exchanges** - Exchanges can be used as a flexible means of acquiring access. For example, land can be exchanged for land or it may be exchanged for easements. Care will be exercised to ensure that in any land exchange the public interest will be served.

**3. Reciprocal Right-of-Way Grants.** Reciprocal right-of-ways (ROW) involve granting a ROW across public land in exchange for an equivalent ROW across private land. All ROW applications will be evaluated to determine the potential for obtaining a reciprocal ROW. The key factor to be considered is that a reciprocal right-of-way must be equivalent in extent and for a similar purpose.

**4. Acquiring Access Through Condemnation Procedures** - This procedure may be used when a landowner is unable to convey a clear title and, occasionally, in emergency situations. Under these circumstances this is usually mutually acceptable by all parties.

Condemnation may also be used to acquire access when an impasse is reached in negotiations and the landowner's objections cannot be resolved through administrative remedies. **Condemnation procedures will be initiated *only after all other possible means of obtaining access have been exhausted, and the access is absolutely essential for carrying the Bureau's multiple use mandate.***

7

**5. Other Methods of Acquiring Access** - The following are access acquisition methods, which will be considered if the opportunity arises.

*- Land and Water Conservation Fund -* The Land and Water Conservation fund can be used to acquire easements, as well as land. Individual proposals need to be fully developed in the budgeting process. They must be fully coordinated within the BLM and with other outside interests.

*- Donations -* These include both donations or gifts. They are simply voluntary transfers of land or interests in land to the United States without payment by the United States.

*- Assignments from Other Federal Agencies -* If a Federal agency has an easement across private land and the easement document states that the grant is to the United States, its successors and assignees, then this easement could be assigned to another Federal agency. Since the easement already vests title in the United States, the right-of-way will continue to exist and the jurisdictional responsibility may be reassigned. The agency relinquishes its jurisdiction over the easement and assigns the same to the other Federal agency. This will only be considered in cases where land or resource management functions are being transferred to BLM or where BLM is taking over road maintenance responsibility.

*-Easement Transfer from Oil and Gas Companies -* Under certain circumstances, it may be possible for an oil and gas company to transfer its interest in access across private land to BLM. These types of transfers may involve some type of payment, or they may take the form of a gift or donation. This is anticipated to be a very rare situation and should be considered only with the full knowledge and consent of the affected landowner.

*- Private Landowner Cooperative Agreements -* Agreements may be negotiated with landowners concerning access for public use. Any agreement will be consistent with existing BLM policy and formats must conform to existing manual guidance. The use of this method is encouraged especially in those cases where it is mutually advantageous to both the landowner and the BLM to close certain areas to public use and access to other lands can be obtained. Formal and informal reciprocal agreements with landowners are another form of cooperative agreement, where portions of private land may be opened to the public in return for closing tracts of public land during specified times of the year.

8

**EXHIBIT 1-5**

For further information concerning access in Wyoming contact one of the following BLM offices:

**Wyoming State Office**
2515 Warren Avenue
Cheyenne, Wyoming 82001
(307)775-6256

**Pinedale Resource Area**
431 W. Pine St.
Pinedale, Wyoming 82941
(307)367-4358

**Worland District Office**
101 South 23rd
Worland, Wyoming 82401
(307)347-9871

**Casper District Office**
1701 East "E" Street
Casper, Wyoming 82601
(307)261-7600

**Cody Resource Area**
1714 Stampede Avenue
Cody, Wyoming 82414
(307) 587-2217

**Platte River Resource Area**
815 Connie
Mills, Wyoming 82644
(307)261-7500

**Rawlins District Office**
1300 Third Street
Rawlins, Wyoming 82301
(307)324-7171

**Buffalo Resource Area**
189 North Cedar
Buffalo, Wyoming 82834
(307)684-5586

**Lander Resource Area**
125 Sunflower
Lander, Wyoming 82520
(307)332-7822

**Newcastle Resource Area**
1101 Washington Blvd.
Newcastle, Wyoming 82701
(307)746-4453

**Great Divide Resource Area**
812 E. Murray
Rawlins, Wyoming 82301
(307)324-4841

**Rock Springs District Office**
Highway 191 North
Rock Springs, Wyoming 82902-1869
(307)382-5350

**Kemmerer Resource Area**
415 Highway 30 North
Kemmerer, Wyoming 83101
(307)877-3933

**Green River Resource Area**
79 Winston Drive
Rock Springs , Wyoming 82902-1170
(307)362-6422

# EXHIBIT 1-6

BLM-WY-AE-91-003-2300

**EXHIBIT 1-7**



Wyoming

Jim @ WYSGA.Org



# Public Land ACCESS



**EXHIBIT 2-1**

# PUBLIC LANDS

## Q What is Public Land?

### Federal Land

For purposes of this handbook, public land is defined as:

*Any land surface which is under the jurisdiction of (managed by) one of the following agencies:*

*Bureau of Land Management,*
*U.S. Department of Interior*
*or*
*Forest Service,*
*U.S. Department of Agriculture*
*(National Forests and*
*National Grasslands)*

These lands are generally open to public recreational use, including hunting and fishing, in accordance with regulations prescribed by the managing agency.

---

*Wyoming is a mixture of public, state, and private land, each with different laws and regulations. So, use common sense. Know where you are at all times. Ask first before entering private land. Observe signs and posted areas. Avoid travel that will cause damage to the land. Don't litter. Leave all gates the way you found them.*

*In other words... be a good neighbor. Respect both public and private land.*

---

1

### State Land

State of Wyoming lands are not "public" lands in the same sense as the federal lands managed by the Federal land management agencies. Almost all of the 3.8 million acres of Wyoming's state-owned land are "trust lands" granted to the state on its admission to the Union. These trust lands are managed to produce income for the support of the state's schools and public institutions.

In general, state lands, other than cultivated croplands, are available for public hunting, fishing and casual recreational day uses. The lands must be legally accessed, and public users must comply with the regulations of the Wyoming Board of Land Commissioners. These regulations prohibit any off-road motor vehicle use, overnight camping, or open fires. Any activity which would damage state lands, roads, improvements or lessee property interests is also prohibited. Motor vehicle use is restricted to established roads. The Board may close specific State land roads and areas to public use on a permanent, temporary, or seasonal basis. While lessee permission is not required to use legally accessed state lands, public users are encouraged to notify state grazing lessees as a courtesy, whenever it is reasonably possible to do so.

   

2

**EXHIBIT 2-2**

**Q What are the rights of the public to cross private lands to access public land?**

The public may cross private lands to access public lands only when a public road or right-of-way (easement) for public access exists across the private lands. In the absence of such a right-of-way, the public has no right to cross private lands without first obtaining permission from the landowner. *The landowner is under no obligation to grant such permission.*

**Q What does the law say with regard to corner crossing?**

There is no specific state or federal law with regard to corner crossing. Corner crossings in the checkerboard land pattern area are not considered legal public access.

**Q What is the access situation on BLM checkerboard lands and intermingled lands?**

Public access to public lands is often limited in checkerboard and other public and private intermingled landownership areas in Wyoming. If there is a legal public road through the checkerboard or intermingled land, then a person has legal access to those public land sections which are traversed by the public road.

**Q What are the rights and privileges of lessees and permittees on federal lands?**

Federal grazing lease or permit privileges are only for grazing purposes. Like any other private landowner, a federal grazing lessee or permittee can control access across his private property; however, he has no authority to control access on or use of public land, nor can he restrict travel over a public road or a road with an easement that allows public travel. Lessees and permittees are not allowed to charge the public for the privilege of using public lands.

*A private landowner holding a grazing lease or permit from the BLM or Forest Service does not have to allow or provide public access across his private property as a condition of the lease or permit.*

A federal lease or permit holder may not exclude the public from their lease or permit area, if appropriate public easements exist. However, they do have the right to exclude the public from entering any buildings they may have been authorized to construct on the area under permit. Additionally, some areas may be closed to public entry by order of the federal land management agency. An example of this is a mining operation that has been closed for reasons of public safety.

3

4

**EXHIBIT 2-3**

## Q What are the rights and privileges of lessees and permittees on state lands?

Lessees on state lands have specific rights and privileges under their leases, such as using the land for grazing and agricultural purposes.  There are also special use leases issued for non-agricultural purposes on state land.  A state lessee does not have to allow or provide public access across his private property as a condition of the lease.

Lessees, and others, are not allowed to charge for or receive payments from persons engaged in hunting, fishing or other recreational use of state lands, unless specifically authorized to do so under a special use lease or other Board authorization.  Lessees cannot exclude the public from legally accessible state land, other than cultivated cropland, unless the land has been closed by the Board.  However, lessees do have a legitimate and legal interest in protecting the forage they lease, protecting the condition of and improvements placed on state lands, and protecting their livestock. If public use privileges are abused or lessee interests damaged, public uses of state lands will be restricted by the Board. Any closure or posting of state lands must be approved by the Board of Land Commissioners.

Lessees and permittees on land owned by the Wyoming Game and Fish Commission and the Wyoming Department of Commerce do not have the right to exclude the public from their lease and permit area.

5

## Q Do rivers and streams offer legal access to public lands?

Boating or floating on rivers and streams is an allowable means of accessing public lands so long as any use of the stream bed itself, while on private lands, is restricted to incidental contact necessary to dislodge the boat or circumvent hazards.

## Q Can a wounded animal be pursued onto private land?

This can occur only with the permission of the private landowner.



6

**EXHIBIT 2-4**

 # What are the State of Wyoming's trespass laws?

Two separate Wyoming Statutes pertain to public trespass:

## 1. W.S. 6-3-303 Criminal trespass:

(a) A person is guilty of criminal trespass if he enters or remains on or in the land or premises of another person, knowing he is not authorized to do so, or after being notified to depart or to not trespass. For purposes of this section, notice is given by:

(i) Personal communication to a person by the owner or occupant, or his agent, or by a peace officer; or

(ii) Posting of signs reasonably likely to come to the attention of intruders.

(b) Criminal trespass is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750), or both.

## 2. W.S. 23-3-305 Hunting from highway; entering enclosed property without permission; hunting at night without permission prohibited:

(a) No person shall hunt, shoot, or attempt to kill any wildlife from any public road or highway.

(b) No person shall enter upon the private property of any person to hunt, fish or trap without the permission of the owner or person in charge of the property.

(c) No person shall fire any firearm from, upon, along, or across any public road or highway.

(d) No person knowingly shall fire any rifle from the enclosed lands of one person onto or across the enclosed lands of another without the permission of both persons.

(e) No person shall hunt at night upon privately owned or leased lands except with written permission of the landowner or lessee.

Violation of this statute is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than four hundred dollars ($400), or both.

7

8

**EXHIBIT 2-5**

 **What recourses are available if access problems arise?**

### Federal Agencies

Immediately report the incident to the nearest Forest Service, Wyoming Game and Fish, or BLM field office with all the specifics of the incident, particularly the exact location where the incident occurred.  An Access Problem Identification Form has been jointly develped for use in reporting incidents of this nature on state and federal lands.  A copy of this form is available at agency field offices identified in this brochure.

### State Agencies

The State Land Office will investigate state land access related problems and complaints which involve actions that are either illegal or contrary to State Land Board regulations and lease terms.  If the problem/complaint can be documented and verified the parties involved will be contacted and requested to immediately correct the situation.  Non-compliance with lease terms and related Board regulations is grounds for lease cancellation. Non-compliance with the Board's public use rules (such as off-road vehicle use), vandalism or property damage on state lands are grounds for arrest by any duly authorized peace officer and prosecution under pertinent Wyoming statutes.

       

9

10

**EXHIBIT 2-6**

# PUBLIC ROADS

**Q** What is a public road?

### Federal Lands

For purposes of this handbook, a public road is any road which is under the jurisdiction of the State Highway Department, county and municipal government, or one of the public land management agencies mentioned earlier. These roads are open to public travel unless closed by order of the agency having jurisdiction. Roads may be closed or use restricted to fulfill management objectives such as protecting public health and safety or preserving resources.

### State Lands

On state land, "public roads" are only those roads identified and maintained as state, federal, or county roads which are constructed on an easement or right-of-way which include the provisions for public use. Other established roads on state land which have been graded or constructed to carry vehicular traffic, or on which repeated vehicular traffic has created well defined tracks, are available for use by persons engaged in hunting, fishing and casual recreational use, unless closed by order of the Board. Such roads may be closed to prevent resource damage, to protect other Board authorized uses, or to protect public health and safety.

**Q** How can public roads be identified and located?

State and some county roads are shown on the official Wyoming State Highway Map. Public roads under the jurisdiction of land management agencies are less easy to identify. They can normally be identified by signing on the ground but may not be readily identifiable from maps published by the managing agency. Many maps published by land management agencies and topographic maps published by the U.S. Geological Survey show all roads that physically exist. These maps may not differentiate between private and public roads. Inquiry at the local office of the managing agency is suggested in order to avoid being denied access on a private road.

As mentioned, many maps show all existing roads whether public or private. The owners of many private roads (that is, those not under the jurisdiction of a government agency) have allowed the public to use their roads for access to public lands. *Unless a public agency acquires a right-of-way for the road across private land, the landowner is completely within their right to close the road at any time, to be selective in who is allowed to use the road, or to charge a fee for use of the road.*

**EXHIBIT 2-7**

 **What are travel management policies and practices of public agencies?**

**Federal Lands**

The majority of BLM and Forest Service roads open to the public are open to vehicular use. However, roads could be open to the public for horseback or foot travel only.

The BLM and the Forest Service may regulate the use of all roads and lands under its jurisdiction in order to accomplish specific land management objectives, protect resources, or for public safety. This may include restricting vehicle travel to designated travelways, either during specific periods of time, or yearlong. It may include closing areas to specific modes of travel or specific types of vehicles. All such restrictions are posted on the ground. Information and maps showing restrictions are available at Forest Service offices. *Anytime a BLM road open to the public is closed or any restriction is placed on the road, the closure or restriction is announced in local newspapers and news media.* The public can find out which BLM roads are open to the public by contacting the nearest BLM Office.

**State Lands**

Motor vehicle use on state land for recreation purposes is restricted to public roads and other established roads which have been graded or constructed to carry vehicular traffic, or on which repeated vehicular traffic has created well defined tracks. **No off-road motor vehicle use is allowed.** No new roads or extensions of existing roads may be created without specific Board authorization. The Board may restrict the use of certain established roads, or close such roads entirely. Such restrictions and closures will be posted at the directon of the Board.

**Game and Fish Department**

The majority of roads on lands owned by the Game and Fish Commission are open for public use. Travel is restricted to established roads and some roads may be regulated for resource protection.

**What is a prescriptive right?**

A prescriptive right-of-way may exist when use of a road has been open and notorious, adverse and continuous for the period specified by statute, which in Wyoming is 10 years. A prescriptive right can only be confirmed through court action. There are no prescriptive rights which can apply against state or federal lands.

**EXHIBIT 2-8**

 **What are the access acquisition management policies of ~~federal~~ agencies?**

**BLM**

The Bureau of Land Management strives to acquire legal access, with rights for the public, to the larger blocks of public land. BLM has the responsibility to manage public lands in accordance with laws passed by Congress. In areas where there are intermingled public and private lands, it is neither practical or feasible for the government to secure easements to ensure public access to *all* public land. It is the Bureau's policy to increase legal access into large blocked-up areas of public land that have high values for public recreation and use. The BLM has authority to condem rights-of-way for public access. However, "public access" may not be a suitable justification. The need for such action must be well justified and the landowner must be paid just compensation.

**Forest Service**

The Forest Service policy is to acquire, on a priority basis, rights-of-way needed to provide reasonable access to the National Forests and National Grasslands. Many roads which provide access to these lands may have been open to the public, courtesy of the landowner, for some years. However, the landowner may change his mind and deny access on these routes at any time in the absence of a formal right-of-way. The Forest Service has an annual program to acquire additional rights-of-way, many of which are for roads of this type.

The Forest Service does have authority to condemn rights-of-way for public access. The need for such action must, however, be well justified, and the landowner must be paid just compensation.

It should be recognized that not all existing access routes are necessarily needed to provide reasonable access to public lands. Most large blocks of Forest Service administered lands are legally accessible to the public to some degree even though some users may feel other private roads provide more convenient access.



15

16

**EXHIBIT 2-9**

## Q What are the access acquisition management policies of state agencies?

Access is acquired and developed for necessary state land management purposes on an as needed, case-by-case basis. The State Land Office also cooperates with other state, local, and federal entities in the acquisition, development and management of access to state and federal lands.

The Wyoming Game and Fish Department has an active access acquisition program to provide public access for hunting, fishing and other consumptive and nonconsumptive uses of wildlife. Priorities for access acquisition are based on public demand and wildlife population management needs. Access acquisition is primarily in the form of easements for stream or lakeside public pedestrian access, or rights-of-way across private lands for private vehicular access to these easements and other public and state lands. All transactions are conducted on a willing buyer-willing seller basis. The department also purchases lands for wildlife habitat management areas. These lands are open to public use but may have some seasonal or site specific restrictions to protect wildlife resources. Game and Fish Department access areas are marked with informational signs and permission is not required from lessees or permittees.





17

18

**EXHIBIT 2-10**

# INFORMATION

## Bureau of Land Management Offices

**Wyoming State Office**
2515 Warren Ave.
P.O. Box 1828
Cheyenne, WY 82003
(307) 775-6256

**Casper District Office**
1701 East E Street
Casper, WY 82601
(307) 261-7600

**Platte River
Resource Area**
815 Connie Street
Mills, WY 82644
(307) 261-7500

**Buffalo Resource Area**
189 N. Cedar
Buffalo, WY 82834
(307) 684-5586

**Newcastle
Resource Area**
1101 Washington Blvd.
Newcastle, WY 82701
(307) 746-4453

**Worland District Office**
101 South 23rd
P.O. Box 119
Worland, WY 82401
(307) 347-9871

**Cody Resource Area**
1714 Stampede Avenue
Cody, WY 82414
(307) 587-2216

**Grass Creek
Resource Area**
101 South 23 Street
Worland, WY 82401
(307) 347-9871

**Washakie
Resource Area**
101 South 23 Street
Worland, WY 82401
(307) 347-9871

**Rock Springs
District Office**
U. S. Highway 191 N.
P.O. Box 1869
Rock Springs, WY 82902
(307) 382-5350

**Green River
Resource Area**
79 Winston Drive
Rock Springs, WY 82902
(307) 362-6422

**Kemmerer
Resource Area**
415 Highway 30 North
Kemmerer, WY 83101
(307) 877-3933

**Pinedale
Resource Area**
431 West Pine Street
Pinedale, WY 82941
(307) 367-4358

**Rawlins District Office**
1300 Third Street
P.O. Box 670
Rawlins, WY 82301
(307) 324-7171

**Great Divide
Resource Area**
812 E. Murray
Rawlins, WY 82301
(307) 324-4841

**Lander Resource Area**
125 Sunflower Street
Lander, WY 82520
(307) 332-7822

## U. S. Forest Service Offices

**Big Horn National Forest**
1969 South Sheridan Ave.
Sheridan, WY 82801
(307) 672-0751

**Black Hills National Forest**
RR 2, Box 200
Custer, SD 57730
(605) 673-2251

**Bridger-Teton National Forest**
P.O. Box 1888
Jackson, WY 83001
(307) 733-2752

**Medicine Bow National Forest**
*(Including Thunder Basin
National Grasslands)*
605 Skyline Drive
Laramie, WY 82070
(307) 745-8971

**Shoshone National Forest**
225 W. Yellowstone Ave.
P.O. Box 2140
Cody, WY 82414
(307) 527-6241

**Wasatch-Cache National Forest**
8230 Federal Building
125 S. State Street
Salt Lake City, UT 84138
(801) 524-5030

## Ranger District Offices

| | |
|---|---|
| **Afton** | (307) 886-3166 |
| **Big Piney** | (307) 276-3375 |
| **Buffalo** | (307) 684-7981 |
| **Cody** | (307) 526-6241 |
| **Douglas** | (307) 358-4690 |
| **Dubois** | (307) 455-2466 |
| **Encampment** | (307) 327-5481 |
| **Evanston** | (307) 780-3194 |
| **Greybull** | (307) 765-4435 |
| **Jackson** | (307) 733-4755 |
| **Kemmerer** | (307) 877-4415 |
| **Lander** | (307) 332-5460 |
| **Laramie** | (307) 745-8971 |
| **Lovell** | (307) 548-6541 |
| **Meeteetse** | (307) 868-2379 |
| **Moran** | (307) 543-2386 |
| **Mountain View** | (307) 782-6555 |
| **Newcastle** | (307) 746-2783 |
| **Pinedale** | (307) 367-4326 |
| **Powell** | (307) 754-2407 |
| **Saratoga** | (307) 326-5258 |
| **Sheridan** | (307) 672-0751 |
| **Sundance** | (307) 283-1361 |
| **Worland** | (307) 347-8291 |

   

19

20

**EXHIBIT 2-11**

# Wyoming Game & Fish Department

**Cheyenne State Headquarters**
5400 Bishop Blvd.
Cheyenne, WY 82006
1-800-842-1934

**Casper District Office**
2800 Pheasant Drive
Casper, WY 82604
1-800-233-8544

**Cody District Office**
2820 State Highway 120
Cody, WY 82414
1-800-654-1178

**Green River District Office**
351 Astle
Green River, WY 82935
1-800-843-8096

**Jackson District Office**
360 North Cache
Jackson, WY 83001
1-800-423-4113

**Lander District Office**
260 Buena Vista
Lander, WY 82520
1-800-654-7862

**Laramie District Office**
528 South Adams
Laramie, WY 82070
1-800-843-2352

**Pinedale District Office**
117 S. Sublette Ave.
Pinedale, WY 82941
(307) 367-4353

**Sheridan District Office**
Sheridan County
Airport Road
Sheridan, WY 82801
1-800-331-9834

# Other State Agencies

**Wyoming State Land and Farm Loan Office**
122 West 25th Street
Herschler Building
Cheyenne, WY 82002
(307) 777-7331

**Wyoming State Parks and Historic Sites Department of Commerce**
2301 Central Avenue
Barrett Building
Cheyenne, WY 82002
(307) 777-6323

**Wyoming State Planning Coordinator's Office**
122 West 25th Street
Herschler Building
Cheyenne, WY 82002
(307) 777-7574

# Game Wardens

| | | | |
|---|---|---|---|
| Afton | (307) 886-3717 | Lusk | (307) 334-3281 |
| Baggs | (307) 383-2160 | Medicine Bow | (307) 379-2337 |
| Big Piney | (307) 276-3359 | Meeteetse | (307) 868-2212 |
| Buffalo | (307) 684-5223 | Mt. View | (307) 782-6467 |
| Cokeville | (307) 279-3466 | Moorcroft | (307) 756-3357 |
| Dayton | (307) 655-9495 | Newcastle | (307) 746-2248 |
| Douglas | (307) 358-3249 | Powell | (307) 754-5290 |
| Dubois | (307) 455-2424 | Rawlins | (307) 324-2973 |
| Elk Mountain | (307) 348-7311 | Riverton | (307) 856-9005 |
| Evanston | (307) 789-3285 | Rock Springs | (307) 382-5658 |
| Gillette | (307) 682-4363 | Saratoga | (307) 326-5583 |
| Glenrock | (307) 436-9617 | Sundance | (307) 283-1276 |
| Greybull | (307) 765-2163 | Ten Sleep | (307) 366-2213 |
| Jeffrey City | (307) 544-2347 | Thermopolis | (307) 864-3834 |
| Kaycee | (307) 738-2455 | Torrington | (307) 532-2433 |
| Kemmerer | (307) 877-3278 | Wheatland | (307) 322-2067 |
| Lovell | (307) 548-7310 | Worland | (307) 347-3650 |



*This brochure was developed in cooperation with the following agencies:*

    *U.S. Department of Agriculture*
    *Forest Service*

    *U.S. Department of the Interior*
    *Bureau of Land Management*

    *Wyoming State Land Office*

    *Wyoming Game and Fish Department*

    *Wyoming State Parks and Historic Sites*

    *Wyoming State Planning Coordinator's Office*

☆U.S. GOVERNMENT PRINTING OFFICE: 1990-776-553/25163

# EXHIBIT 2-12

BLM-WY-AE-89-017-2300

**EXHIBIT 2-13**