M. Gregory Weisz, Wyo. Bar No. 6-2934
Crystal D. Stewart, Wyo. Bar No. 7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
gweisz@penceandmac.com
cstewart@penceandmac.com
Plaintiff's Attorneys

# UNITED STATES DISTRICT COURT

# DISTRICT OF WYOMING

| | | |
|---|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-CV-00067-SWS |
| | ) | |
| BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its attorneys M. Gregory Weisz and Crystal D. Stewart of Pence and MacMillan LLC, and submits this memorandum in support of its motion for partial summary judgment of even date herewith, as follows:

### INTRODUCTORY STATEMENT

The Court has already laid out the basic facts of this case in its *Order Denying Defendants' Motion to Dismiss,* ECF 23.  The real property at issue herein lies in the "checkerboard" area of southeast Wyoming; the four Defendants Bradly H. Cape (hereinafter respectfully "Cape"), Zachary M. Smith (hereinafter respectfully "Smith"), Phillip G. Yeomans (hereinafter respectfully

1

"Yeomans"), and John W. Slowensky (hereinafter respectfully "Slowensky") intentionally crossed corners in the checkerboard area to hunt big game. Id. Each time they did so in 2020/2021, Defendants crossed through Plaintiff's real property when Plaintiff, and only Plaintiff, had the right to control who could enter and possess its real property.

By its motion for partial summary judgment, Plaintiff Iron Bar Holdings, LLC asks the Court to declare Plaintiff owns and has the sole right to possess its real property, including the airspace above the surface. Accordingly, Plaintiff asks the Court to declare Defendants Cape, Smith, Yeomans, and Slowensky (collectively "Defendants") committed numerous civil trespasses with respect to Plaintiff's real property. If the Court grants such relief, the remaining issue for trial will be a determination of the damages incurred by Plaintiff arising from Defendants' trespasses.

## SUMMARY OF KEY FACTS

Plaintiff's real property lies in the "checkerboard area" of Carbon County in southeast Wyoming. The checkerboard pattern was created by congress in the 1860's as part of a federal effort to encourage construction of a transcontinental railroad and settlement of the West.[1] It is undisputed Defendants carried out a so-called "corner crossing" in the checkerboard by which they intentionally traveled from land managed by the United States Department of Interior Bureau of Land Management ("BLM"), across Plaintiff's real property and then onto BLM-managed land near Elk Mountain, Wyoming. In several other locations, Defendants crossed through Plaintiff's

---

[1] The amicus brief submitted by the Wyoming Stock Growers Association and Wyoming Wool Growers Association, ECF 45, describes the checkerboard land ownership pattern created by the 1862 Pacific Railroad Act. That brief also describes Congress' understanding that when it created the checkerboard, Congress did not retain government access to the even-numbered sections of land. ECF 45 at 9-10. Finally, the brief explains that Congress intended the even-numbered sections of land would be sold (and not retained as public land). ECF 45 at 9-11.

real property to enter lands owned by the State of Wyoming, and in one location, lands owned by a municipality.

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

The following material facts are undisputed:

1. Plaintiff Iron Bar Holdings, LLC, is a North Carolina limited liability company. Iron Bar Holdings, LLC (hereinafter "IBH") owns real property located in Carbon County, Wyoming described in Exhibit 1 hereto. In their answer to the complaint, Defendants admitted such ownership. ECF 25, ¶ 13.

2. It is undisputed IBH sometimes does business as Elk Mountain Ranch.

3. It is undisputed in Township 20 North, Range 82 West 6th P.M., Carbon County, Wyoming at the corners of Section 13 (owned by IBH), Section 14 (managed by BLM), Section 23 (owned by IBH), and Section 24 (managed by BLM), IBH posted two "No Trespassing" signs on its real property on steel fence posts, clearly visible to others, including the Defendants. It is undisputed that in other locations where the Defendants passed over corners, Plaintiff had not placed any "No Trespassing" signs.

4. It is undisputed Section 14, Township 20 North, Range 82 West is crossed by a public road, Carbon County Road 400. Thus, any person can lawfully enter Section 14 by a motor vehicle and then travel on foot in a southeasterly direction towards the corners described in ¶ 3 above.

5. IBH put up the No Trespassing signs at this corner at the suggestion of a game warden employed by the Wyoming Game and Fish Department. Deposition of Steven Grende, p. 43:10-15, p. 46:13-19 (hereinafter "Grende Depo").

6.  The No Trespassing signs were put in place by IBH in an attempt to prevent trespassing on its real property. Grende depo., p. 41:5-15, p. 42:1-7. p. 81:11-17, p. 81:24-25, p. 82:1-4.

7.  In September 2020 and October 2020, Cape, Smith, and Yeomans crossed the corners described in ¶ 3 above.  They did so on foot by beginning on Section 14 (BLM), then grabbed onto one of the steel T-posts upon which the No Trespassing signs were located and swung themselves through either Section 13 (IBH) and/or Section 23 (IBH), and into Section 24 (BLM).  Deposition of Bradly H. Cape, p. 46:16-25, p. 47:1-5 and 9-24 (hereinafter "Cape Depo."); Deposition of Zachary Smith, p. 27:25, p. 28:1-11 (hereinafter "Smith Depo."); Deposition of Phillip G. Yeomans, p. 36:1-16, p. 43:9-12 (hereinafter "Yeomans Depo.").

8.  In doing so, Cape, Smith, and Yeomans entered the airspace above IBH's real property. Cape Depo., p. 86:20-25, p. 87:1-25, p. 88:1-25, p. 89:1; Smith Depo., p. 29:2-8, p. 29:21-25, p. 30:1-25, p. 31:16-25, p. 32:7-14; Yeomans Depo., p. 37:15-25, p. 38:1-12 and 24-25, p. 39:1-18 and 23-25, p. 40:1.

9.  Though they grabbed onto the steel fence posts on the IBH private property, Cape, Smith, and Yeomans deny stepping on the surface of the IBH private property.

10.  It is undisputed Cape, Smith, and Yeomans acknowledged that in 2020 they crossed over the corners described in ¶ 3 above multiple times.

11.  It is undisputed that during the 2020 incidents, IBH contacted law enforcement about the actions of Cape, Smith, and Yeomans in crossing through the IBH real property.

12.  In fact, Cape testified he received a letter from a Carbon County, Wyoming prosecuting attorney following the 2020 incidents, suggesting that Cape contact the prosecutor to discuss a possible plea agreement. Cape Depo., p. 65:7-22, p. 67:1-9.  However, no criminal citation or charges had been filed against him. Cape Depo., p. 67:15-18.

13.   IBH employee Steve Grende was under the impression criminal charges had been brought against Cape, Smith, and Yeomans with respect to the 2020 events. Grende Depo., p. 92: 17-22.   But in 2021, Mr. Grende discovered that in fact Cape, Smith, and Yeomans had not received criminal citations with respect to the 2020 incidents. Id.

14.   It is undisputed that in September 2021 and October 2021, Cape, Smith, and Yeomans returned to the Elk Mountain area to hunt again.   In 2021, Slowensky joined them.

15.   In September/October 2021, Defendants brought a home-made step ladder with them.   They acknowledged they brought the ladder to cross over the corners described in ¶ 3 above without having to grab onto the steel fence posts, but to instead climb over the top of those fence posts. Cape Depo., p. 77:2-5, p. 79:13-18; Smith Depo., p. 34:1-5 and 23-25, p. 35:7-10; Yeomans Depo., p. 43:20-25, p. 44:1; Slowensky Depo., p. 21:14-16, p. 51:14-16.

16.   In September 2021 and October 2021, Cape, Smith, Yeomans, and Slowensky crossed the corners described in ¶ 3 above.   They did so on foot by beginning on Section 14 (BLM), and they used the step ladder to cross over the corner to enter into Section 24 (BLM). ).   Cape Depo., p. 77:2-5, p. 79:13-18, p. 80:6-9, p. 81:3-5; Smith Depo., p. 35:7-10; Yeomans Depo., p. 43:20-25, p. 44:1; Slowensky Depo., p. 21:14-16, p. 51:14-16.

17.   In doing so, it cannot be disputed Cape, Smith, Yeomans, and Slowensky entered the airspace above IBH's real property. *See, e.g.,* Cape Depo., p. 77: 2-5, p. 79:13-18; Yeomans Depo., p. 37:15-20, p. 38: 2-8, p. 38:23-25, p. 39:1; Slowensky Depo., p. 21:18-25, p. 22:1, p. 27:8-18, p. 38:12-25, p. 39:1.   Indeed, it would be physically impossible to cross through the corner without entering the airspace above at least one section of IBH's real property.

18.   In 2021, IBH again contacted law enforcement about the Defendants' actions.   As a result, in 2021 each Defendant received a citation for criminal trespass under WYO. STAT. ANN. §

6-3-303. Cape Depo., p. 105:24-25, p. 106:1-2; Smith Depo., p. 50:10-13, p. 60:22-25, p. 61:1;

Yeomans Depo., p. 31:20-25, p. 32:1-8; Slowensky Depo., p. 28:16-18, p. 35:7-9.

19.  In addition to the real property described in ¶ 3 above, Defendants crossed over seven

(7) other corner locations, described as follows:

- #1.  Corners of 24/19/25/30: being Township 20 North, Range 82 West, Section 24
  (BLM), Township 20 North, Range 82 West, Section 25 (IBH), Township 20 North,
  Range 81 West, Section 19 (IBH), and Township 20 North, Range 81 West, Section 30
  (BLM). Cape Depo. p. 31:4-12, p. 45:19-21; Yeomans Depo. p. 35:5-16.

- #2.  Corners of 23/24/26/25: being Township 20 North, Range 82 West, Section 23
  (IBH), Township 20 North, Range 82 West, Section 24 (BLM), Township 20 North,
  Range 82 West, Section 26 (State of Wyoming), and Township 20 North, Range 82
  West, Section 25 (IBH). This area is depicted in a photograph of the corners taken by
  one of the Defendants, Exhibit 2 hereto (Cape Depo. Exh. 13); *see also* Cape Depo. p.
  31:4-12, p. 45:19-21; Yeomans Depo. p. 35:5-16.

- #3.  Corners of 25/30/36/31: being Township 20 North, Range 82 West, Section 25
  (IBH), Township 20 North, Range 81 West, Section 30 (BLM), Township 20 North,
  Range 82 West, Section 36 (State of Wyoming), and Township 20 North, Range 81
  West, Section 31 (IBH).  This area is depicted in a photograph of the corners taken by
  one of the Defendants, Exhibit 3 hereto (Cape. Depo. Exh. 8).

- #4. Corners of 36/31/1/6: being Township 20 North, Range 82 West, Section 36 (State
  of Wyoming), Township 20 North, Range 81 West, Section 31 (IBH), Township 19
  North, Range 82 West, Section 1 (IBH), and Township 19 North, Range 81 West,

Section 6 (BLM).  This area is depicted in a photograph of the corners taken by one of the Defendants, Exhibit 4 hereto (Cape Depo. Exh. 10).

- #5.   Corners of 26/25/35/36: being Township 20 North, Range 82 West, Section 26 (Town of Hanna), Township 20 North, Range 82 West, Section 25 (IBH), Township 20 North, Range 82 West, Section 35 (IBH), and Township 20 North, Range 82 West, Section 36 (State of Wyoming). This area is depicted in a photograph taken by one of the Defendants, Exhibit 5a and 5b hereto (Cape Depo. Exh. 11, Exh. 12).

- #6.   Corners of 6/5/7/8: being Township 19 North, Range 81 West, Section 6 (BLM), Township 19 North, Range 81 West, Section 5 (IBH), Township 19 North, Range 81 West, Section 7 (IBH), and Township 19 North, Range 81 West, Section 8 (BLM). This area is depicted in a photograph of the corners taken by one of the Defendants, Exhibit 6 hereto (Cape Depo. Exh. 14).

- #7: 5/6/31/32: being Township 19 North, Range 81 West, Section 6 (BLM),  Township 19 North, Range 81 West, Section 5 (IBH), Township 20 North, Range 81 West, Section 31 (IBH), and Township 20 North, Range 81 West, Section 32 (BLM). This area is depicted in a photograph of the corners taken by one of the Defendants, Exhibit 7 hereto (Cape Depo. Exh. 9).

Exhibit 8 hereto, a demonstrative map, depicts the seven locations in ¶ 19 where the Defendants crossed corners, plus the corners described in ¶ 3 above.

20.  At each of the seven locations described in ¶ 19 above, IBH owns two sections of land that lie in checkboard fashion with respect to adjacent sections of land that are either: (i) owned by the State of Wyoming, (ii) BLM-managed lands, or (iii) owned by the Town of Hanna.

21.   In crossing corners at these seven locations, Defendants did not use the step ladder, but instead stepped over a brass survey cap at the corner locations. *See, e.g.,* Cape Depo., p. 42:16-21, p. 43:1-18, p. 54:21-25, p. 55:1-2, p. 58:5-6 and 22-24.

22.   Because it would be physically impossible to cross through the airspace above the surface of at least one section of IBH real property at each of the seven locations described in ¶ 19, it cannot be disputed that Defendants must have physically passed through that airspace.

23.   It cannot be disputed the Defendants entered and crossed through IBH Property multiple times and at multiple locations in 2020 (Cape, Smith, Yeomans) and 2021 (all four Defendants), and that they did so knowingly and intentionally.  What is disputed is the ownership of the airspace and/or whether Defendants had a right to cross through that airspace.

24.   It is undisputed IBH did not consent to Defendants' actions in entering the IBH Property, and that IBH did not otherwise grant permission to Defendants to do so.

25.   The Defendants' actions in 2020 and 2021 in crossing through IBH Property as described in ¶ 3 above and ¶ 19 above resulted in IBH filing this civil trespass action.

Based on the above, some of the key application-of-fact-to-law contentions are as follows:

A.   IBH contends the Defendants' actions in crossing through IBH Property at each separate corner were each an independent act of trespass, as each such location is located at least one mile from any of the other locations.  IBH thus asserts separate civil trespass claims against Defendants with respect to each of the seven separate corner locations described in ¶ 19 above, and with respect to the location described in ¶ 3 above.

B.   IBH seeks a finding that the so-called "corner crossing" at each of the seven locations described in ¶ 19 (and at the location described in ¶ 3) physically required each Defendant to cross through the IBH Property, and that such actions were done without IBH consent or permission.

C.  IBH contends it has the right to exclusive control, use, and possession of its real property, which includes the airspace above its real property at checkerboard corners.

D.  Defendants somehow contend they have a right to cross through IBH real property, specifically the airspace above the IBH private property.

E.  For purposes of Plaintiff's motion and this memorandum, the phrase "IBH Property" used throughout is meant to encompass the airspace above the IBH deeded real property.

## A FUNDAMENTAL RIGHT IS AT ISSUE

The "right to exclude others" from private property is "one of the most essential sticks in the bundle of rights that are commonly characterized as property . . . ." Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979).  Yet, in 2020 and 2021, Defendants knowingly and intentionally entered into and across IBH's Property by way of "corner crossing" for purposes of hunting big game.  With each "corner crossing," the Defendants knowingly and intentionally traveled from real property managed by either the BLM/State of Wyoming/Town of Hanna, across and through IBH's Property, and then back onto either BLM-managed land/State of Wyoming land/Town of Hanna land.  In so doing, Defendants had to have physically crossed through that airspace (even though they assert some right to have done so).  Finally, in so doing, Defendants committed multiple civil trespasses against IBH's fundamental property and ownership rights.

## ARGUMENT

## I.  The Scope, Extent, and Definition of Property Interests are Governed by State Law

For this Court to determine whether IBH owns and has rights to exclude others from the IBH Property, a history of property rights in the United States and Wyoming is appropriate.  Most notably, property rights and interests are not defined or created by the United States Constitution, nor by the federal government.  Rather, laws governing the extent, use, and ownership of real

property, with some variations between the states, emerged from English common law. Thus, state law governs the scope, extent, and definition of property: in this case Wyoming law.

### A.  The Historical Importance of Property Rights and Protection of Those Rights

"Perhaps the most important value of the founding fathers of the American constitutional period was their belief in the necessity of securing property rights." Stuart Bruchey, The Impact of Concern for the Security of Property Rights on the Legal System of the Early American Republic, 1980 Wisconsin Law Review 1135, 1136. The underlying theories for these property right protections drew heavily upon English heritage.  Notably, in the Commentaries on the Laws of England (1765-1769), William Blackstone wrote:

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. … So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the owner of the land.

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, *134-135, vol. 1 (1765).

This 18th Century language, as later mirrored by the United States Constitution, makes clear that Blackstone's work and protection of absolute rights in property impacted the legal culture of early America. That principle remains both fundamental and undisturbed.

Thus, leaning heavily on Blackstone, the Supreme Court recently re-iterated "[t]he right to exclude is 'one of the most treasured' rights of property ownership." Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2072 (2021) (internal citation omitted).  In Cedar Point Nursery, the Supreme Court cited Blackstone's historic work for the proposition that property rights entail the "sole and despotic dominion which one man claims and exercises over the external things of the

world, **in total exclusion of the right of any other individual in the universe."** Id. (citing 2 W.

BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 2 (1766)) (emphasis added).

The Cedar Point Nursery Court affirmed that a private property owner's right to exclude

others is not "an empty formality" — it is a "fundamental element of the property right." Id. at

2077 (internal citation omitted).  The Supreme Court's 2021 reliance on Blackstone's historic

principles unequivocally demonstrates that control and dominion over real property remains a

fundamental guiding principle of property rights today.  Thus, today -- as at the time of our nation's

founding -- a property owner is entitled to exclude others from his or her private property.

Early American constitutional and legal history scholar John Phillip Reid explains: "[t]here

may have been no 18th Century educated Americans who did not associate defense of liberty with

property. Like their British contemporaries, **Americans believed that just as private rights in**

**property could not exist without constitutional procedures, liberty could be lost if private**

**rights in property were not protected**." John Phillip Reid, Constitutional History of the

American Revolution: The Authority of Rights (1986) at 33 (emphasis added).  Employing these

principles, our Nation's founders incorporated private property protection into the Constitution.

Real property interests are protected by the Fifth Amendment's Due Process Clause: "no

person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST.

amend. V.  Our Nation's founders placed the protection of real property on par with the highest

rights, namely life and liberty. Id.  Property rights are also similarly protected by the Takings

Clause: "nor shall private property be taken for public use, without just compensation." Id. The

Takings Clause requires that an individual citizen's interest in real property must be protected,

even if the desires of the entire population might otherwise warrant or desire the taking of real

property.  "Given the central importance of property ownership of the right to exclude, it comes as

little surprise that the [Supreme] Court has long treated government-authorized physical invasions as takings requiring just compensation." <u>Cedar Point Nursery</u>, 141 S. Ct. at 2073. With adoption of the Fourteenth Amendment, due process protections for real property were expanded to protect the interests of all American citizens as they related to the states. *See* U.S. Const. amend. XIV.

In 1945, the Supreme Court addressed the Fifth Amendment's meaning of the term "property" and recognized:

> The critical terms are 'property,' 'taken' and 'just compensation'. It is conceivable that the first was used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, **it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. In point of fact, the construction given the phrase has been the latter**. … The constitutional provision is addressed to **every sort of interest** the citizen may possess.

<u>United States v. Gen. Motors Corp.</u>, 323 U.S. 373, 377–78 (1945) (internal citation omitted) (emphasis added).

The Constitution protects real property interests so diligently that even a war between two nations cannot serve as a mechanism to divest private property rights. <u>Society for Propagation of Gospel in Foreign Parts v. Town of New Haven</u>, 21 U.S. 464, 493–94 (1823). The Supreme Court ruled property interests that had vested under a treaty of peace could not be divested when the treaty was terminated. <u>Id</u>. at 493. Thus, property interests were protected (even those held by *foreign entities*), and even when the relationship between nations was severed by war. By recognizing the rights of a foreign entity -- in wartime against that foreign entity -- the Supreme Court highlighted the significant value private property rights have under our Constitution.

In summary, our Constitution intends to -- and expressly does -- protect property rights from intrusion by the government and others. By placing property rights on par with life and liberty, private property interests remain a significant part of American society to this day.

*B. Creation of Property Rights and Interests*

While private property rights and interests are protected by the Constitution, they are not created by it.  Similarly, there is no federal common law that creates property rights and interests. Long ago, the Supreme Court declared "[t]here is no federal **general** common law." Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (emphasis added).  Though some federal courts today use the phrase "federal common law," such a term is in reality "a certain variety of statutory interpretation." Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 965 n. 3 (10th Cir. 2019) (internal citation omitted).

Thus, state law remains the source of most common law decisions in federal courts.  "There is a 'presumption that state law should be incorporated into federal common law.'" United States v. Turley, 878 F.3d 953, 957 (10th Cir. 2017) (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991)), *see also* United States v. Yazell, 382 U.S. 341, 353 (1966) (declining to "invent" a federal common law rule and "impose it upon the States"); Davilla, 913 F.3d at 971–73 (even though federal law governs a dispute over access to tribal lands, there is no federal common law of trespass; the federal courts should thus apply state trespass law in protecting tribal lands).

This Court should recognize the real property in this action is IBH private property, even though once owned by the federal government.  Accordingly, IBH's Property is subject to Wyoming regulation and its property rights are defined by Wyoming law:

> **Whenever the question** in any Court, state or federal, **is, whether the title** to property which had belonged to the United States **has passed**, that question must be resolved by the laws of the United States.  **But whenever the property has passed**, according to those laws, then the property, like all other in the state, is subject to state legislation; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.

Wilcox v. Jackson *ex dem*. McConnel, 38 U.S. 498, 499 (1839) (emphasis added).

Thus, IBH's Property and its property interests are defined by Wyoming law and regulated by Wyoming law.  Under the Wyoming Constitution, private property cannot be taken for private use without the consent of the owner, except for private ways of necessity, and not without due compensation to the owner. WYO. CONST. art. 1, §§ 32, 33.  "In Wyoming, the right to protect property is a state constitutional right." Sammons v. American Auto. Ass'n., 912 P.2d 1103, 1105 (Wyo. 1996) (*citing* Cross v. State, 370 P.2d 371, 377 (Wyo. 1962)).

In Sammons, the Wyoming Supreme Court confirmed that exclusive possession of land is a fundamental right of real property ownership. Id.  In Cross, the Wyoming Supreme Court drew on the constitutional principle that property rights, including the right to acquire, possess, and enjoy property, are inherent and inalienable rights enjoyed by all people. Cross, 370 P.2d at 376-77.  Consequently, the parallel between English common law and Wyoming law is self-evident. In Wyoming, a person enjoys the inherent and inalienable right to exercise dominion over land to the exclusion of others in the same manner described by Blackstone hundreds of years ago.

In summary, a person's ability to exercise rights over their real property is inherent in the development of American society *and* its legal culture.  American property rights stem from the common law understanding that a person can exercise complete dominion over real property to the exclusion of others.  These rights in real property were adopted by the Wyoming Constitution and must be applied in considerations involving real property situated in Wyoming.  Wyoming law reflects the common law principle that IBH is entitled to exercise total dominion over its property to the complete exclusion of Defendants.

## II.   Scope, Extent, and Definition of a Property Owner's Rights in Wyoming

The term "property" as used in the Takings Clause includes the entire "group of rights inhering in the citizen's [ownership]." General Motors Corp., 323 U.S. at 378. "A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." United States v. Craft, 535 U.S. 274, 278 (2002) (internal citations omitted).

The "bundle" generally consists of five separate rights: 1) the right of possession, 2) the right of control, 3) the right of exclusion, 4) the right of enjoyment, and 5) the right of disposition. As discussed above, state law determines which "sticks" are in an owner's bundle of rights. Id. Notably, the power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. *See* Kaiser Aetna, 444 U.S. at 176.

IBH is the lawful owner of real property in Wyoming—including all component parts. IBH purchased its ranch property in 2005, and obtained fee simple title. Exhibit 1. Thus, Wyoming law, both common law and statutory, defines IBH's rights in its property. One such right is the right to exclude others, even the airspace above the surface of the land, as explained *infra*.

### A. Extent of IBH Property

At common law, ownership of land included not only the face of the earth, but everything under it or over it: "ownership of the land extended to the periphery of the universe . . ." United States v. Causby, 328 U.S. 256, 260–61 (1946) (internal citations omitted). This ancient doctrine harkens use of the maxim "*[C]uius est solum eius est usque ad coelum,"* which is sometimes translated as "[t]o whomsoever it belongs, it is his all the way to the heavens (and all the way to hell)." https://www.oxfordreference.com/display/10.1093/acref/9780195369380.001.0001/acref-9780195369380-e-461. Blackstone noted that under the *ad coelum* doctrine "[u]pwards, therefore,

no man may erect any building, or the like to overhang another's land . . . ." <u>Hoffman v. Armstrong</u>, 46 Barb. 337, 338 (N.Y. S. Ct. 1866) (citing 2 BLACKSTONE COMMENTARIES 18.). As the <u>Causby</u> Court noted, however, over the course of time, the *ad coelum* doctrine has been modified to recognize aircraft travel. <u>Causby</u>, 328 U.S. at 261. The impacts of <u>Causby</u> are discussed *infra*.

### B. Aircraft Travel

"The federal government initiated the era of commercial air travel in 1926 with the enactment of the Air Commerce Act of 1926, 49 U.S.C. § 171 . . . ." <u>Cheyenne Airport Bd. v. Rogers</u>, 707 P.2d 717, 722 (Wyo. 1985). The 1926 federal act, in part, declared "a 'public right of freedom of interstate and foreign air navigation' in the navigable airspace of the United States." <u>Id</u>. Thus, this act led to a modified understanding of the *ad coelum* doctrine.

In response to the federal legislative action, the Wyoming legislature enacted a statute in 1931 to regulate air travel *and* to expressly define the extent of private property in Wyoming. The Wyoming Legislature confirmed and made clear that the airspace above the surface of private land belongs to the surface owner: "**ownership of the space above** the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight . . . ." Wyoming Session Laws 1931, ch. 106, § 6, codified at WYO. STAT. ANN. § 10-4-302 (1977) (emphasis added).

While Wyoming courts have not examined the implication of this statute specifically as to ownership of the airspace above real property, the Nevada Supreme Court's analysis of its airspace ownership statute (which is identical to WYO. STAT. ANN. § 10-4-302) is instructive. Nev. Rev. Stat. § 493.040 states: "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in NRS 493.050." In 2004, the Nevada Supreme Court analyzed Nev. Rev. Stat. §

16

493.040 and ruled that it does "not eliminate the landowners' right to their airspace. Thus, . . . the landowners held a property right in the airspace above their property." County of Clark v. Hsu, No. 38853, 2004 WL 5046209, at *9 (Nev. Sept. 30, 2004), *cert. denied* Tien Fu Hsu v. County of Clark, Nev., 544 U.S. 1056 (2005)). *See also* McCarran Int'l. Airport v. Sisolak, 137 P.3d 1110, 1120 (Nev. 2006) (stating "the landowners own the usable airspace above their property up to 500 feet, subject to intrusion by lawful air flight.");[2] Jackson Mun. Airport v. Evans, 191 So. 2d 126, 132–33 (Miss. 1966) ("'[T]he law has been made clear by both legislative and judicial declaration that a landowner is also the owner of the air space above his property, at least to the extent that such air space may reasonably be used by him.'" (quoting Indiana Toll Road Commission v. Jankovich, 193 N.E. 2d 237, 239 (Ind. 1963), *cert. denied*, 379 U.S. 487 (1965)).[3]

Similarly, in 1946 the Supreme Court -- two decades after enactment of the Air Commerce Act -- acknowledged that while strict application of the *ad coelum* doctrine may no longer have a place in the modern world because of aircraft, it must still be recognized that:

> if [a] landowner is to have full enjoyment of the land, **he must have exclusive control of the immediate reaches of the enveloping atmosphere.** Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land. **The landowner owns at least as much of the space above the ground as they can occupy or use in connection with the land. The fact that he does not occupy it in a physical sense – by the erection of buildings and the like–is not material**.
> …
> **The reason is that there would be an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it**. While the owner does not in any physical manner occupy that stratum of airspace or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light

---

[2] Citing 14 C.F.R. § 19.1119, which showed a "minimum safe altitude" of 500 feet over other than congested areas, except where necessary for takeoff or landing.'" McCarran, 137 P.3d at 1119.

[3] Notably, the Indiana Toll Road Comm'n decision cited a 1927 Indiana statute identical to both WYO. STAT. ANN. § 10-4-302 and Nev. Rev. Stat. 493.040, now codified at Ind. Code § 8-21-4-3 (1984).

and air is used. **The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself.** We think that the landowner, as an incident to his ownership, has a claim to it **and** that **invasions of it are in the same category as invasions of the surface.**

Causby, 328 U.S. at 264-65 (internal citations omitted) (emphasis added).

More than a decade after Causby, Congress amended the Air Commerce Act to define navigable airspace to "include airspace needed to ensure safety in take-off and landing of aircraft." Jackson Mun. Airport, 191 So. 2d at 130 (citation omitted). Notably, however, that court explained:

> The Federal Aviation Act of 1958 expressly provided that 'Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute . . . . 49 U.S.C.A. s 1506. **This makes it perfectly clear that it was not the intent of Congress to cut off common law and statutory rights of private landowners.**

Id. at 131 (emphasis added).[4]

Thus, while strict application of the *ad coelum* doctrine has softened, the Supreme Court still protects the principle that "[t]he landowner owns at least as much of the space above the ground as the [owner] can occupy or use in connection with the land." Causby, 328 U.S. at 264. The Causby Court spoke of uses to which a landowner *could put* the airspace, not just the uses *presently being* exercised: "**The fact that he does not occupy it** in a physical sense—by the erection of buildings and the like—**is not material.**" Id. (emphasis added).

Moreover, when Wyoming enacted legislation to regulate air traffic, it also carefully codified the *ad coelum* doctrine to specifically define private ownership of the airspace, up to the height of the aircraft servitude. *See* WYO. STAT. ANN. § 10-4-302.

---

[4] That court upheld the right of the landowner to bring an inverse condemnation claim against the airport. Jackson Mun. Airport Auth. v. Wright, 232 So. 2d 709, 716 (Miss. 1970).

Additionally, in 1977 the Department of Interior Solicitor's Office addressed the question of whether a person could legally step over a checkerboard corner without trespassing on the cornering private lands. *See* Exhibit 10 hereto at 1–2.  The Solicitor analyzed the same question at issue here: whether corner crossing constitutes a trespass.  The Solicitor stated: "Assuming one can find the precise location of the common corner, and assuming further one can step across that corner from public land to public land, one has, nevertheless, trespassed upon the property of the owner of the opposite, private, land." Id. at 1.  Thus, while the precise height of the aircraft servitude may be unclear, it is clear IBH owns the five or six feet of the IBH Property the Defendants passed through via use of their step ladder in 2021.[5]  The same is true with respect to Defendants' corner crossing without that step ladder in the seven other locations.

### C.  Right to Exclude Trespassers Under Wyoming Law

In Wyoming, "exclusive possession is a fundamental element of property ownership." Sammons, 912 P.2d at 1105.  Moreover, "the right to protect property is a state constitutional right." Id. (internal citation omitted).  The right to protect property dates to the very creation of our republic and organization of the constitutions of the first states created upon our separation from England.  The Wyoming Supreme Court has recognized:

> **The doctrine of natural and inherent rights to life, liberty and property** was announced in the Declaration of Independence, in the constitutions of New Hampshire, Virginia, and Pennsylvania in 1776, in the constitution of Vermont in 1777, in that of Massachusetts in 1780, in that of New Jersey in 1784.  Other

---

[5] A photo of the step ladder the Defendants used in 2021, Exhibit 9 hereto (Cape Depo. Ex. 15), shows the step ladder is a "stile," the use of which is discussed in Exhibit 10 hereto ("Some individuals have suggested that stiles constructed across the common corner of four 'checkerboard' sections, with both ends of the stile resting on public lands, would provide trespass-free access from one section of public land to another. Such is not the case. The stile would invade the airspace of the owner of the cornering private lands and constitute a trespass.") Exhibit 10 at 2.  A "stile" is defined as "a step or set of steps for passing over a fence or wall." Merriam-Webster Collegiate Dictionary 1151 (10th ed. 2001); *see also* Exhibit 11 hereto, a sample photograph from Wikipedia Commons.

constitutions followed in the same vein. Section 3 of Article 1 of our own constitution refers to natural rights of man and section 2 of the same article provides that 'in their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.' . . . **The doctrine is part of the positive law of the land**, . . . and so it becomes apparent, particularly in view of the history above outlined, that **the framers of the constitution meant that the *protection* thereof is important and that they, though loosely defined, should not be unduly invaded.**

Cross, 370 P.2d at 376 (italics in original, boldface emphasis added).

In Cross, the Wyoming Supreme Court directed dismissal of criminal charges against a landowner, finding that the landowner had justifiably killed two moose in defense of his property, after the landowner's repeated (and failed) attempts for assistance from the Wyoming Game and Fish Department to help prevent crop loss depredation. Id. at 378.

Thus, Wyoming law makes it clear a landowner has a right to protect his or her property interests, and that such right is fundamental. Under Wyoming law, a landowner's recourse for trespass with respect to invasion of real property interests is a civil trespass claim, as discussed *infra*.

A side note: Defendants will argue the need for the public to be able to cross through IBH Property to hunt on federal public lands. Without question, hunting is important in Wyoming. Indeed, Wyoming's constitution states "[t]he opportunity to fish, hunt and trap wildlife is a heritage that shall forever be preserved to the individual citizens of the state, subject to regulation as prescribed by law . . ." WYO. CONST. art. I, § 39. However, that same provision goes on to state the opportunity to hunt "**does not create a right to trespass on private property**, **diminish other private rights** or alter the duty of the state to manage wildlife." Id. (emphasis added).

Finally, the BLM in Colorado, through an August 29, 2013 web posting explicitly stated that "[i]t is illegal to cross public land at corners." Access Tips for Hunting on BLM Lands, Bureau

of Land Management, BLM Colorado State Office, August 29, 2013.  Exhibit 12 hereto (Cape Depo. Ex. 6).

In sum, in Wyoming the extent and scope of private property rights *expressly* includes the airspace above the surface of private property.  WYO. STAT. ANN. § 10-4-302.  The Wyoming Legislature codified the *ad coelum* doctrine, subject only to the aircraft flight servitude.  Moreover, Wyoming law affords a landowner the right to "exercise full dominion and control over" its real property and to "expel trespassers."  Sammons, 912 P.2d at 1105 (internal citation omitted).

Considering a landowner's right to expel persons who trespass through private property, Wyoming law both prohibits trespass as a matter of criminal law, and affords a landowner a civil remedy for trespass. *See* WYO. STAT. ANN. § 6-3-303 (criminal trespass); Edgcomb v. Lower Valley Power & Light, Inc., 922 P.2d 850, 859 (Wyo. 1996) (civil trespass).

### III.  Plaintiff is Entitled to Summary Judgment on its Claims for Civil Trespass

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." Libertarian

Party of NM v. Herrera, 506 F.3d 1303, 1309 (10th Cir. 2007) (internal quotation marks omitted). "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 256.  A court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

*A. Burden of Proof and Elements*

The Court will recall that property interests "are created, and their dimensions are defined by existing rules or understandings that stem from an **independent source such as state law**." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972) (emphasis added).  Thus, because of the close relationship between state law and property rights, it would not be appropriate to address IBH's civil trespass claims under anything but Wyoming law, even though the Defendants apparently assert some sort of a supposed right to enter IBH's Property.[6]

Under Wyoming law, claims for civil trespass require a plaintiff to prove there were invasions of his or her interests in real property.  The claim lies with respect to "'invasions of the interest in the exclusive possession of land **and in its physical condition**.'" Bellis v. Kersey, 2010 WY 138, ¶ 19 (*quoting* Edgcomb, 922 P.2d at 859) (other citation omitted) (emphasis added)). The "gist of [the] action is injury to possession." Bellis, 2010 WY 138, ¶ 19 (*citing* Skane v. Star Valley Ranch Ass'n, 826 P.2d 266, 268–69 (Wyo. 1992)).

---

[6] By this statement, IBH's counsel is not ignoring this Court's earlier discussion that the Unlawful Inclosures Act, 43 U.S.C. §§ 1061-1066, might be a *defense* to IBH's civil trespass claims.  Rather, the statement is intended to make clear that Wyoming law (and only Wyoming law) will control the question of whether the Defendants committed civil trespasses.

Wyoming's civil pattern jury instructions describe a civil trespass claim as follows:

1. The Plaintiff was in possession of the property when the entry occurred, or that Plaintiff was entitled to immediate possession of the property; and

2. While Plaintiff was [the owner] [in lawful possession of] (insert appropriate description of property), the Defendant intentionally [entered upon] [caused another to enter upon] [caused [insert description of something] to come upon] that property.

The entry was intentional if the Defendant intended to be in that location. An entry can be intentional even if the defendant mistakenly thought [he] [she] [it] had a right to be on the property.

If you determine that Plaintiff proved these things by a preponderance of the evidence, then you must [decide in favor of the Plaintiff on this claim.] [decide whether the Defendant's entry on the property was allowed by law, in which case you must decide in favor of Defendant.]...

21.09 Trespass - Elements (Wyoming Civil Pattern Jury Instructions (2022 Edition) (citing <u>Bellis</u>, 2010 WY 138; <u>Seven Lakes Dev. Co., L.L.C. v. Maxson</u>, 2006 WY 136 (other citations omitted)).

## IV.  APPLICATION OF LAW TO CASE AT BAR

Controlling law  -- both common law and statutory -- shows IBH is entitled to summary judgment with respect to its civil trespass claims against each of the four Defendants.  Review of the controlling law (with a few additional highlights) warrants entry of partial summary judgment.

*A.  IBH Has Exclusive Possession and Control of Airspace Above the Surface of Its Real Property*

First, "[t]he ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303." Wyo. Stat. Ann. § 10-4-302.

Second, a "landowner owns at least as much of the space above the ground as they can occupy or use in connection with the land. The fact that he does not occupy it in a physical sense – by the erection of buildings and the like – is not material." <u>Causby</u>, 328 U.S. at 264. "We think that the landowner, as an incident to his ownership, has a claim to it and that **invasions of it are**

23

in the same category as invasions of the surface." Id. at 265 (emphasis added).  "Otherwise no home could be built, no tree planted, no fence constructed, no chimney erected. An invasion of the 'superadjacent airspace' will often 'affect the use of the surface of the land itself.'" Griggs v. Allegheny County, Pa., 369 U.S. 84, 89 (1962) (quoting Causby, 328 U.S. at 265).

*B.  IBH is Entitled to Protect its Property and Exclude the Defendants*

Both federal and Wyoming law demonstrate IBH has a right to exclude others from the IBH Property.  The Supreme Court notes that the right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property . . . ." Kaiser Aetna, 444 U.S. at 176.  Moreover, the Wyoming Supreme Court has noted that "exclusive possession is a fundamental element of property ownership"; "protection thereof is important  . . . and should not be unduly invaded."  Sammons, 912 P.2d at 1105; Cross, 370 P.2d at 376.

*C.  IBH is Entitled to Summary Judgment that Defendants Committed Multiple Civil Trespasses*

As noted, the elements of a civil trespass claim in Wyoming are:

(i)      That the plaintiff possessed the property in question when entry by the defendant took place, or that the plaintiff was entitled to possession, and
(ii)      That while the plaintiff was in possession of the property, the defendant intentionally entered that property.

Wyoming Civil Pattern Jury Instruction 21.09, Trespass (2022).

There is no question of material fact as to these elements.  First, both Wyoming law and federal law make it clear IBH is entitled to possession and control of the airspace above the surface of its deeded real property, discussed *supra*.  Second, the Defendants admitted they entered the IBH Property (i.e., the airspace above the surface of the IBH real property) in eight (8) different and separate locations. *See* ¶ 3 and ¶ 19 of undisputed material facts.

**CONCLUSION**

In conclusion, IBH is entitled to summary judgment as described in its Motion for Partial

Summary Judgment of even date herewith.

RESPECTFULLY SUBMITTED this 12th day of April, 2023.

>   _/s/ M. Gregory Weisz_
> M. Gregory Weisz, Wyo. Bar No. 6-2934
> Crystal D. Stewart, Wyo. Bar No. 7-6057
> PENCE AND MACMILLAN LLC
> P.O. Box 765
> Cheyenne, WY 82003
> (307) 638-0386
> (307) 745-8669 fax
> gweisz@penceandmac.com
> cstewart@penceandmac.com
> Plaintiff's Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of April, 2023, a true and correct copy of the above
and foregoing document was served by CM/ECF upon the following:

Ryan A. Semerad, Wyo. Bar No. 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
_Defendants' Attorney_

Alexandria Layton
Evans Fears & Schuttert LLP
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119
_Attorney for Defendants_

Lee Mickus
Evans Fears & Schuttert LLP
3900 E. Mexico Avenue, Suite 1300
Denver, CO 80210
_Attorney for Defendants_

Patrick J. Lewallen
Trevor J. Schenk
Chapman Valdez & Lansing
P.O. Box 2710
Casper, WY 82602
*Attorneys for Backcountry Hunters*

Eric B. Hanson
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Backcountry Hunters*

Karen Budd-Falen, Wyo. Bar No. 5-2647
Rachael L. Buzanowski, Wyo. Bar No. 8-6693
Budd-Falen Law Offices, LLC
P.O. Box 346
Cheyenne, WY 82003-0346
*Attorneys for Wyoming Stockgrowers Association and Wyoming Wool Growers Association*

    */s/ M. Gregory Weisz*
Pence and MacMillan LLC