Ryan A. Semerad, Esq.
Wyoming Bar No. 7-6270
**THE FULLER & SEMERAD LAW FIRM**
242 South Grant Street
Casper, Wyoming 82601
Telephone: 307-265-3455
Facsimile: 307-265-2859
Email: semerad@thefullerlawyers.com

Lee Mickus, Esq.
Wyoming Bar No. 7-5698
Alexandria Layton, Esq.
Wyoming Bar No. 7-6457
**EVANS FEARS & SCHUTTERT LLP**
3900 E. Mexico Avenue, Suite 1300
Denver, Colorado 80210
Telephone: 303-656-2199
Facsimile: 702-805-0291
Email: lmickus@efstriallaw.com
　　　　alayton@efstriallaw.com

*Attorneys for Defendants Bradly H.*
*Cape, Zachary M. Smith, Phillip G.*
*Yeomans, and John W. Slowensky*

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual,<br><br>　　　　　Defendants. | CASE NO. 22-cv-00067-SWS |

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

## I.    INTRODUCTION

The Unlawful Inclosures of Public Lands Act of 1885 (the "UIA"), 43 U.S.C. §§ 1061 *et seq.*, prohibits "[a]ll inclosures of any public lands in any State or Territory of the United States" and "the assertion of a right to exclusive use . . . of any part of [these] public lands . . . ." 43 U.S.C. § 1061.   The UIA also prohibits preventing or obstructing, by any means, "any person from peaceably entering upon . . . any tract of public land" as well as preventing or obstructing "free passage or transit over or through the public lands." 43 U.S.C. § 1063.  In 1995, the Department of Interior ("DOI") promulgated federal regulations reinforcing the UIA's protection of free access to public lands and prohibitions against monopolization of the public domain.  *See* 43 C.F.R. §4140.1(b)(7) (hereinafter, the "1995 DOI Regulations").

Defendants Bradly H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky (collectively, "Defendants") are entitled to judgment as a matter of law in this case. First, Plaintiff Iron Bar Holdings, LLC's claims rely on a theory of state trespass law that would grant Plaintiff the power to block access to the public lands on Elk Mountain, effectively vesting total control over these public lands to Plaintiff.   In this way, Plaintiff's claims directly conflict with the objectives of the UIA and the 1995 DOI Regulations.   Thus, Plaintiff's claims are preempted and fail as a matter of law.  Second, through this lawsuit and its actions leading to this lawsuit, Plaintiff has violated the UIA, the 1995 DOI Regulations, and Wyoming state laws prohibiting any individual from monopolizing the public domain.  Plaintiff cannot recover from an alleged right founded upon its own violations of law.  Finally, if any of Plaintiff's claims survive the legal scrutiny summarized above, Plaintiff is only entitled to nominal damages because Plaintiff's property has not endured any actual damage as a result of Defendants' actions.

## II.    STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 7.1(b)(2)(D), Defendants aver no genuine dispute exists regarding the following material facts:

1.      Plaintiff is a single member limited liability company and Plaintiff's single member is Dr. Frederic N. Eshelman.  Dec. 1, 2022, Plaintiff's Answers to Defendant Bradly H. Cape's First Set of Requests at Admission No. 7 ("Plaintiff's RFA Responses"), attached as **Exhibit A.**

2.      On November 18, 2005, Plaintiff purchased certain real property situated near Elk Mountain in Carbon County, Wyoming.  *Id.* at No. 3.  Plaintiff's real property relevant to this case is situated on the odd-numbered sections of land in Township 20 North, Range 82 West, 6th P.M., Carbon County, Wyoming, Township 20 North, Range 81 West, 6th P.M., Carbon County, Wyoming, Township 19 North, Range 81 West, 6th P.M., Carbon County, Wyoming, and Township 19 North, Range 82 West, 6th P.M., Carbon County, Wyoming.  *See* ECF No. 37-1 at 13-15.

3.      Plaintiff's real property is interspersed in a checkerboard-like pattern with even-numbered sections of state or federally owned public land.  *See* ECF No. 2 at 1-2, 13-15; *see also* Elk Mountain Map, attached as **Exhibit B**; Rule 30(b)(6) Deposition of Iron Bar Holdings, LLC's Corporate Representative Dr. Fred Eshelman (Mar. 14, 2023) ("F. Eshelman Dep.") at 59:21 – 60:12, attached as **Exhibit C**.  The public and private ownership of these parcels is depicted in the Elk Mountain Map (Ex. B).

4.      Land surveyors enlisted by the DOI first plotted the property boundaries on Elk Mountain in the late 1870s.  Expert Report Fehringer, ECF No. 56-1, ("Fehringer Report") at 2.  They first surveyed the township lines of T. 20N, R. 82W and T. 20N, R. 81W in August 1877, and the interior section lines in July 1878.  *Id.* at 2; *see also* ECF No. 56-2 (relating to the surveys

of T. 20N, R. 82W); ECF No. 56-3 (relating to the surveys of T. 20N, R. 81W).  In doing so, these surveyors used whatever materials they could find in the field to monument property corners, including wood posts, stones, and dinosaur bones.  Fehringer Report at 2.  In 1967 (and in one instance in 2012), the original corner monuments were replaced with uniform iron posts with die-cast brass caps during dependent resurveys authorized by the U.S. Bureau of Land Management ("BLM").  *See id.* at 3.  The original monuments were buried alongside the new "brass caps."  *Id.*

5.      Plaintiff holds cattle grazing permits from the BLM with respect to certain sections of federally owned public land that adjoin Plaintiff's titled lands, including Sections 14, 24 and 30, and is aware that these grazing permits require Plaintiff comply with certain regulations, including that "Iron Bar cannot limit access to the BLM land." Rule 30(b)(6) Deposition of Iron Bar Holdings, LLC's Corporate Representative Becky Englert (Mar. 14, 2023) ("B. Englert Dep.") at 8:12 – 10:17; 11:17 – 11:25; 12:1 – 12:12, attached as **Exhibit D.**

6.      When Plaintiff purchased the land described above, Plaintiff's sole member, Dr. Eshelman's belief that so-called "corner crossing" is illegal was "a condition of [his] having purchased [the property identified above]." F. Eshelman Dep. (Ex. C) at 51:6-10.

7.      In 2015, Plaintiff, through its agent and ranch manager Steven Grende, installed one "No Trespassing" sign on a t-post at the southwest corner of Section 13 and another one "No Trespassing" sign on a t-post at the northeast corner of Section 23.  Photos of Post, Signs, Chain and Lock (DEFS000022-23), attached as **Exhibit E**; Rule 30(b)(6) Deposition of Iron Bar Holdings, LLC's Corporate Representative Steven Grende (Mar. 14, 2023) ("S. Grende Dep.") at 35:12 – 36:12, attached as **Exhibit F**.

8.      Plaintiff owns Section 13 and Section 23.  ECF No. 37-1 (Ex. 1 to First Amended Complaint) at 1-2, 4; *see also* Elk Mountain Map (Ex. B).

9. Plaintiff installed the "No Trespassing" signs just inches inside the boundary lines marked by the brass cap corner monument, *see* Fehringer Report at 3, marking the corner shared with Sections 14 and 24 and facing the public road. Photos of Post, Signs, Chain and Lock (Ex. E); S. Grende Dep. (Ex. F) at 35:12-22; 37:8 – 38:16; 40:15 -40:24.

10. From 2015 to February 11, 2022, Plaintiff connected the two "No Trespassing" signs with a chain and a lock that hung through the airspace above the surface of the corner where Sections 13, 14, 23 and 24 meet. Photos of Post, Signs, Chain and Lock (Ex. E); S. Grende Dep. (Ex. F) at 36:3 – 36:7; 39:5 – 39:14; 42:8-42:11; 48:8-48:18; 49:4 – 49:11; 104:2 – 104:9.

11. The corner of Section 14 and Section 24 (the "First Corner") is the primary access point from which the public may reach the public lands on Elk Mountain—the "first corner" accessible from a public road onto public land. Elk Mountain Map (Ex. B); S. Grende Dep. (Ex. F) at 81:4-10 (A: "That'd be the first corner off that public access.").

12. Plaintiff installed the "No Trespassing" signs facing the county road so they would be visible to any person approaching "the first corner" from the county road. S. Grende Dep. (Ex. F) at 40:9-41:11.

13. Plaintiff installed the "No Trespassing" signs for at least two reasons: (1) to deter the public from accessing the interior public lands on Elk Mountain by traveling over this corner; and (2) to communicate to anyone who approaches the First Corner that Plaintiff would pursue criminal or civil legal action against any person who crossed the First Corner, even if no physical contact is made with the surface of Plaintiff's titled land. S. Grende Dep. (Ex. F) at 40:25 – 42:7; 53:8-53:18; 54:5-54:19; 81:4 – 81:23; F. Eshelman Dep. (Ex. C) at 76:17 – 78:14; 83:16 – 84:9;

4

2021 Sheriff Body Camera Video (DEFS000087 video) at time 0:44 - 0:55, attached as **Exhibit G**[1] (Mr. Grende: "I have signs there so you can't step over [the corner].").

14.     Plaintiff installed the lock and chain to prevent members of the public from crossing through the airspace above the shared corner of Sections 13, 14, 23 and 24, obstructing access to the public lands situated on Section 24 and beyond.  S. Grende Dep. (Ex. F) at 76:11 – 79:17;  2020 Audio Recording of Confrontation by Mr. Grende (DEFS000180 audio recording) ("Audio of 2020 Grende Confrontation") at time 4:16-4:42, attached as **Exhibit H** (for authentication and foundation, please see Affidavit of Z. Smith at ¶¶ 3-7, attached as **Exhibit I**).

15.     The lock and chain presented physical obstacles to anyone attempting to walk across the First Corner to access public land on Elk Mountain.   Photos of Post, Signs, Chain and Lock (Ex. E); S. Grende Dep. (Ex. F) at 42:19 – 42:23; Deposition of Bradly Cape (Mar. 30, 2023) ("B. Cape Dep.") at 81:16-19 ("Q: Okay. Do you know whether it would be possible for a person to go between the two fence posts across the corner by ducking under the chain? A: That would be hard to do. I couldn't do it."), attached as **Exhibit J**; Deposition of Zachary Smith (Mar. 30, 2023 ("Z. Smith Dep.") at 27:24-28:6, attached as **Exhibit K.**

16.     Any person carrying a backpack, hunting gear, or camping equipment could not pass through this obstacle to reach the public lands on Section 24 or beyond.  Photos of Post, Signs, Chain and Lock (Ex. E); B. Cape Dep. (Ex. J) at 81:16:-19; Z. Smith Dep. (Ex. K) at 37:20-38:1; Audio of 2020 Grende Confrontation (Ex. H) at time 4:28-4:31 ("Got a chain on it so you can't go between 'em").

---

[1]Pursuant to Local Rule 8.1, Defendants have "redacted" this video file by deleting the video and audio contents from 4:25 to 4:30, which now appear as a black screen with no sound, because Mr. Grende provided his full date of birth at this part of the video.  An unredacted copy has been provided to the Court and Plaintiff.

17.     Apart from the "No Trespassing" signs with the chain and lock, Plaintiff did not install or maintain any fences, fence posts or other boundary markers on its property within a quarter-mile of the First Corner.  S. Grende Dep. (Ex. F) at 42:24 – 43:8; B. Englert Dep. (Ex. D) at 15:1 – 15:8.

18.     Other than at the First Corner, Plaintiff has not erected "No Trespassing" signs connected by a chain and lock similar to the equipment present at the First Corner near any other section corner markers shared with public lands.  S. Grende Dep. (Ex. F) at 45:3-15; Deposition of Phillip Yeomans (Mar. 30, 2023) ("P. Yeomans Dep.") at 43:13-16, attached as **Exhibit L**.

19.     Plaintiff did not erect or maintain any similar physical obstructions at any other section corners because this section corner was the First Corner and, if it was blocked, a person could not reach any other public lands to the south or east on Elk Mountain.  F. Eshelman Dep. (Ex. C) at 81:17 – 81:20; S. Grende Dep. (Ex. F) at 79:25 – 82:15.

20.     Plaintiff has never conferred with the BLM to obtain approval to place the t-posts, signs, chain, and lock surrounding the First Corner.  B. Englert Dep. (Ex. D) at 15:14 – 16:5.

21.     Plaintiff's "No Trespassing" signs and connecting chain and lock remained in place continuously from 2015 until February 11, 2022 (four days before Plaintiff filed this lawsuit), at which time Plaintiff's agent and ranch manager, Mr. Grende, removed the chain and lock. Presently, the t-posts remain in place surrounding the First Corner with the "No Trespassing" signs facing the public road.  S. Grende Dep. (Ex. F) at 38:17 – 39:2; 61:7 – 61:15.

22.     Plaintiff recognizes that, other than by walking from Section 14 to Section 24 at the corner shared by these two sections of public land, Section 24 and the public lands beyond Section 24 are otherwise completely inaccessible on foot.  F. Eshelman Dep. (Ex. C) at 67:1-11.

23.     Nevertheless, Plaintiff holds the position that no person can walk from Section 14 to Section 24 through the First Corner without Plaintiff's permission.  *Id.* at 60:20-25.

24.     Plaintiff believes that it has exclusive control over who may travel over the First Corner to enter the public lands on Elk Mountain by virtue of its ownership interest in the airspace above its private land at Sections 13 and 23.  F. Eshelman Dep. (Ex. C) at 63:6 – 63:23.

25.     Since purchasing the property, Plaintiff has not granted permission to any member of the public seeking to enter the public lands on Elk Mountain by crossing the First Corner, although Plaintiff's sole member uses and hunts these public lands and allows employees and personal friends or guests to access the public lands by other means.  S. Grende Dep. (Ex. F) at 74:10-21; F. Eshelman Dep. (Ex. C) at 53:18-55:19; B. Englert Dep. (Ex. D) at 44:5 – 44:18.

26.     Plaintiff acknowledges that it is not possible for any person to cross diagonally from public land to public land across a section corner shared with private lands without some minimal intrusion into the airspace above the private lands.  F. Eshelman Dep. (Ex. C) at 85:4 – 85:11; 86:9 – 87:3  88:4 – 88:13; S. Grende Dep. (Ex. F) at 85:5 -85:13; 102:18 – 103:4.

27.     Since approximately 2009-2010, Plaintiff has employed an ongoing practice of verbally understood steps to address any person found on the public lands on Elk Mountain, even if that person never touched Plaintiff's private land.  F. Eshelman Dep. (Ex. C) at 32:17 – 34:19; 44:24 – 47:12; S. Grende Dep. (Ex. F) at 61:24-62:8. Plaintiff considers these persons "suspected trespassers." *Id.*

28.     If Plaintiff observes a member of the public on the public lands on Elk Mountain, Plaintiff will confront that person as a suspected trespasser and urge them to leave the area.  F. Eshelman Dep. (Ex. C) at 66:17 – 67:11; 94:14 – 94:20; S. Grende Dep. (Ex. F) at 61:16 – 63:19.

29.     Plaintiff's purpose in confronting "suspected trespassers" is to deter members of the public from accessing public lands on Elk Mountain by crossing the First Corner.  F. Eshelman Dep. (Ex. C) at 65:12 – 65:23.

30.     Following this initial confrontation, if the "suspected trespasser" acquiesces to Plaintiff's demands and leaves the area, Plaintiff takes no further action against the person.  *See* F. Eshelman Dep. (Ex. C) at 34:17-19, 65:4-11.

31.     If Plaintiff learns that the person crossed the First Corner to get to public land and the person refuses to leave public land after this confrontation, Plaintiff will contact local law enforcement, including the Carbon County Sheriff's Office, the Wyoming Game & Fish Department, to seek a criminal trespass citation or prosecution.  F. Eshelman Dep. (Ex. C) at 49:7 – 49:12; 49:22 – 50:3; 93:21 – 93:4; S. Grende Dep. (Ex. F) at 61:16 – 63:19.

32.     If law enforcement initially declines to cite the "suspected trespasser" for crossing the First Corner, Plaintiff's policy is to continue contacting that same or other law enforcement agencies to seek "citations written or arrests made."  F. Eshelman Dep. (Ex. C) at 99:14 – 100:23; 101:7 – 101:17; S. Grende Dep. (Ex. F) at 69:11 – 69:20; 2020 Carbon County Sheriff's Office Investigation Report [SHERIFF000010-16] at SHERIFF000012, attached as **Exhibit M** ("I informed Mr. Eshelman that I would follow up on this and submit a report to the County Attorney's office.  Mr. Eshelman was unhappy with the information he was given.  Mr. Eshelman wanted citations written or arrests made for corner crossing.").

33.     If local law enforcement continues to take no action, Plaintiff will contact the Carbon County Attorney's Office to inquire about citations or criminal prosecution. F. Eshelman Dep. (Ex. C) at 43:23-44:4.

34.     If these steps do not remedy the "suspected trespasser," then the next step in the policy is to institute civil legal action, which was first necessitated by this case.  F. Eshelman Dep. (Ex. C) at 47:18-48:12.

35.     In 2020, Defendants Cape, Smith, and Yeomans hunted the public lands on Elk Mountain and each man had a valid hunting license or tag to hunt in the area.  B. Cape Dep. (Ex. J) at 17:6-12; P. Yeomans Dep. (Ex. L) at 13:3-13; Z. Smith Dep. (Ex. K) at 23:4-5.

36.     Mr. Slowensky was not present during the hunt in 2020.  Deposition of John Slowensky (Mar. 30, 2023) ("J. Slowensky Dep.") at 44:6-8, attached as **Exhibit N**.

37.     In 2020, Plaintiff's obstruction at the First Corner prevented Defendants from traveling directly over the corner to the public lands beyond.  Audio of 2020 Grende Confrontation (Ex. H); Z. Smith Dep. (Ex. K) at 27:23-28:6; B. Cape Dep. (Ex. J) at 113:23-114:6; Grende Dep. (Ex. F) at 42:19-23 (Q. [...] That chain and that lock present a physical obstacle to anyone who is walking from Section 14 to Section 24 across the corner; correct? A. Correct.).

38.     Because of the obstacle Plaintiff erected at the First Corner, Defendants were required to travel around the obstruction to enter the public lands to the southeast.  Specifically, the three Defendants grabbed one of the t-posts and stepped around the obstruction without touching the private lands and then visually identified and stepped over the corner monuments at all other section corners.  Z. Smith Dep. (Ex. K) at 27:23-28:6; B. Cape Dep. (Ex. J) at 113:23-114:6 (Q. You testified that you grabbed onto [the t-post] -- A. I did. Q. -- and swung around, right? A. I did out of necessity of being obstructed. That's the only way around it.)

39.     Plaintiff's agent, Mr. Grende, confronted these three Defendants on public land about how they had traveled to get there.  Audio of 2020 Grende Confrontation (Ex. H) at time 4:16-4:42; P. Yeomans Dep. (Ex. L) at 81:18-82:2.

40.     Mr. Grende claimed that, because these Defendants grabbed Plaintiff's obstruction at the First Corner, they had trespassed on private land.  Audio of 2020 Grende Confrontation (Ex. H) at time 4:16-4:42.

41.     When Defendants refused Mr. Grende's orders to leave Elk Mountain, Mr. Grende repeatedly reported Defendants to local law enforcement authorities.  2020 Carbon County Sheriff Report (Ex. M); Z. Smith Dep. (Ex. K) at 25:17-26:8.

42.     Local law enforcement spoke with these three Defendants, but did not issue them any citations or give them any warnings about their "corner crossing."  *Id.;* B. Cape Dep. (Ex. J) at 105:8-23; Z. Smith Dep. (Ex. K) at 56:4-57:16; P. Yeomans Dep. (Ex. L) at 80:14-81:14.

43.     In late September 2021, all four Defendants returned to hunt the public lands on Elk Mountain, and again, each man had a valid hunting license or tag to hunt in the area.  B. Cape Dep. (Ex. J) at 24:17-25; P. Yeomans Dep. (Ex. L) at 13:14-20; Z. Smith Dep. (Ex. K) at 23:6-21; J. Slowensky Dep. (Ex. N) at 13:10-16; Warden Jake Miller Trial Testimony in Defendants' Criminal Trial (April 28, 2022) ("Warden Miller Trial Testimony") at 22:22-23:1, attached as **Exhibit O.**

44.     Unbeknownst to Defendants, in October 2021 (the beginning of rifle season), Plaintiff's sole member, Dr. Eshelman, began hunting on Elk Mountain.  *See* Steven Grende Trial Testimony in Defendants' Criminal Trial (April 28, 2022) ("Grende Trial Testimony") at 13:13-22, attached as **Exhibit P** ("Q: Was Mr. Eshelman hunting in a different area of the mountain? A: Yes. He was actually on the east side of the mountain from the location we were at."); 2021 Sheriff Body Camera Video (Ex. G) at 2:49-3:01.

45.     This time, Defendant Cape constructed an A-frame ladder to cross over Plaintiff's obstructions at the First Corner without making any contact with either Plaintiff's land or the

obstructions, as Mr. Grende had warned them against in 2020.  Photo of Ladder, attached as **Exhibit Q**; B. Cape Dep. (Ex. J) at 77:9-20; Z. Smith Dep. (Ex. K) at 34:1-7; P. Yeomans Dep. (Ex. L) at 43:20-44:5.

46.     During Defendants' 2021 hunt, Mr. Grende and other Plaintiff employees watched Defendants by parking their vehicles nearby while Defendants were on public lands, including when Defendants were hunting and walking in the middle of public parcels, and relieving themselves.  B. Cape Dep. (Ex. J) at 101:3-18; 106:22-107:13; J. Slowensky Dep. (Ex. N) at 46:23-48:1; P. Yeomans Dep. (Ex. L) at 82:7-84:1; Hunter Harassment Statements at DEFS00060, 62-63, 67, 71, attached as **Exhibit R** (for authentication and foundation, see Aff. of Z. Smith (Ex. I) at ¶¶ 8-11 and B. Cape Dep. (Ex. J) at 106:22-107:13).

47.     Mr. Grende and other employees also drove up behind or next to Defendants throughout their hunt.  *See, e.g.,* Hunter Harassment Statements (Ex. R) at DEFS00062-64.

48.     Specifically, during Defendants 2021 hunt, Mr. Grende and these employees confronted Defendants, including by stating, "What the fuck?" upon seeing Defendants on public land and claiming that they "weren't allowed to be here."  Hunter Harassment Statements (Ex. R) at 64, 69; Grende Diary Entry (PLT0165-0166), attached as **Exhibit S**; J. Slowensky Dep. (Ex. N) at 45:12-46:7 (Mr. Slowensky: We were in the middle of public land and he was following us with his truck, stopped us, harassed us, telling us we weren't supposed to be here, didn't want us here, blah, blah, blah, said some very un-nice things and some profanity. And then we went on and he came back and he followed us for quite a while. So it was not a good for conversation. We felt threatened, harassed . . . . Q. Did you understand that Mr. Grende wanted you to leave the public lands? A. Oh, absolutely.); P. Yeomans Dep. (Ex. L) at 85:10-86:1.

49.     After Defendants refused to leave, Mr. Grende followed within 30 yards of the Defendants for a half mile and told them he was tracking their location.  Hunter Harassment Statements (Ex. R) at 65, 69.  On the morning of October 1, 2021, two of Plaintiff's agents approached Defendants on a blue side-by-side vehicle while they were glassing a mule deer and ran the deer off.  *Id.* at 63-64.

50.     As in 2020, after observing the Defendants hunting on public lands, Mr. Grende repeatedly reported Defendants to local law enforcement.  2021 Audio Recording of Grende Calls to Carbon County Sheriff, attached as **Exhibit T;** 2021 Carbon County Sheriff Report (SHERIFF000001-11), attached as **Exhibit U**; Sept. 30, 2021 Wyoming Game & Fish Incident Report (DEFS00053-58) attached as **Exhibit V**; Grende Diary Entry (Ex. S); Warden Miller Trial Testimony (Ex. O) at 19:23-20:23 (Warden Miller: "So [Mr. Grende] called me multiple times between the 26th and 30th.").

51.     Once again, local law enforcement refused to issue any citations for Defendants' "corner crossing" at the First Corner.  *Id.; see also* S. Grende Dep. (Ex. F) at 69:11 – 69:20; 2021 Sheriff Body Camera Video (Ex. G) at 0:50-1:20.

52.     In response, Mr. Grende claimed that "his boss" would shut all the lands down in the area and questioned whether law enforcement knew how much money and land "his boss" had. *Id.* at 4:50-5:24, 10:00-10:12; Grende Dep. (Ex. F) at 85:19-87:11.

53.     During the 2021 hunt, Mr. Grende also entered into Defendants' private tent and stated, "You're the same guys from last year," and Game & Fish Warden Jake Miller had to escort Mr. Grende away to calm Mr. Grende and de-escalate the situation.  Warden Miller Trial Testimony (Ex. O) at 77:8-78:23 (Q. All right. So is it fair to say your concern for escalation at that point was not with the hunters when Mr. Grende stuck his head in [the tent]? A. [. . .] He

[Grende] was agitated, I would say, so -- Q. Okay. A.-- I wanted to work to calm him down."); B. Cape Dep. (Ex. J) at 104:1-5.

54.     After local law enforcement, including the Carbon County Sheriff's Office and the Wyoming Game & Fish Department, determined they would not issue criminal citations to Defendants at Plaintiff's request, Plaintiff contacted the Carbon County Attorney's Office directly to demand Defendants be prosecuted.   F. Eshelman Dep. (Ex. C) at 43:6 – 44:4; S. Grende Dep. (Ex. F) at 68:21 – 70:5; 70:23 – 73:23.

55.     Following this direct contact from Dr. Eshelman, the Carbon County Attorney's Office directed the Carbon County Sheriff's Office to issue citations for criminal trespass to Defendants and Warden Miller ordered Defendants to leave the public lands beyond the First Corner.  2021 Carbon County Sheriff Report  (Ex. U) at SHERIFF000007; P. Yeomans (Ex. L) at 86:2-16.

56.     When Defendants were ordered off the public lands in 2021, Defendant Slowensky had not filled his tag, leaving his hunt incomplete.  J. Slowensky Dep. (Ex. N) at 44:13-45:11; P. Yeomans Dep. (Ex. L) at  87:3-25.

57.     Defendants' hunt ended approximately 4 days earlier than they had originally planned.  J. Slowensky Dep. (Ex. N) at 44:13-45:11; P. Yeomans Dep. (Ex. L) at  87:3-25;  Hunter Harassment Statements (Ex. R) at DEFS00072.

58.     The State's criminal case against Defendants regarding the 2021 hunt proceeded to a jury trial at which each Defendant was acquitted of all charges on April 29, 2022.  *See* Defendants' Judgments of Acquittal (DEFS00024 – 30), attached as **Exhibit W.**

59.     On February 15, 2022, Plaintiff filed its original complaint against Defendants in this case in the Second Judicial District Court, Carbon County, Wyoming, asserting that

Defendants committed a civil trespass on Plaintiff's private property by crossing the First Corner and other section corners at which Plaintiff's private land meets public land.  Plaintiff seeks damages, a declaratory judgment that corner crossing always constitutes a trespass and requesting a permanent injunction forever barring any person from crossing the First Corner.  ECF No. 2 at 1-2.

60.     Plaintiff in this case claims damages against Defendants as follows:

$10.00 for "[c]ivil trespass damages arising from Defendants' conduct – implied at law;"

$3,100,000 to $7,750,000 for "[e]stimated actual damages arising from Defendants' conduct: 10% - 25% diminution of value of Iron Bar Holdings, LLC real property (subject to revision);"

$7,500.00 for "[e]stimated extra employee time, fuel, interference with military veteran hunting program, interference with other operations to deal with unlawful trespass across ranch;" and

"$TBD" for "[d]amages arising from Defendants' contention that any person may cross Plaintiff's private property without its permission to reach adjacent lands;" and

"$TBD" for "[c]osts, fees, and expenses related to this action."

Plaintiff's Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) at 2, attached as **Exhibit X**.

61.     Plaintiff requests that this Court declare that crossing from public-to-public land at a shared corner in the Checkerboard lands of Wyoming is always an unlawful trespass on private property.  *See* ECF No. 37 (First Amended Complaint) at 6-7 (¶¶ 33-37).

62.     Plaintiff also seeks an injunction permanently restraining Defendants and any other member of the public from accessing public land by crossing from public-to-public land at a corner shared by the public lands and Plaintiff's private property.  *See* ECF No. 37 at 9 (¶¶ 51-54).

63.     Plaintiff has no evidence that any Defendant contacted the surface of Plaintiff's private land at any point in 2020 or 2021.  S. Grende Dep. (Ex. F) at 11:14-12:12; 21:2-11; 23:24 – 24:10; B. Cape Dep. (Ex. J) at 82:4-20.

64.     Plaintiff has no evidence that any Defendant contacted any fixtures such as fences, signs, posts or equipment located on Plaintiff's privately-held land at any point in 2021.  S. Grende Dep. (Ex. F) at 21:12 – 22:2.

65.     Plaintiff has no evidence that any Defendant damaged the ground of Plaintiff's private land, structures, or fixtures (fences, signs posts, equipment, etc.) at any point in 2020 or 2021. Plaintiff's RFA Responses (Ex. A) at No. 12; S. Grende Dep. (Ex. F) at 16:16 – 25; 22:3 – 22:11; 24:11 – 24:15; 27:8-27:20; 28:1-28:7;  Warden Miller Trial Testimony (Ex. O) at 73:20-74:16.

66.     Plaintiff has not made any repairs to the ground, structures, or fixtures (fences, signs posts, equipment, etc.) on its private land—nor were any repairs necessary—due to Defendants' actions in 2020 or 2021.  Plaintiff's RFA Responses (Ex. A) at Nos. 13 & 14; S. Grende Dep. (Ex. F) at 17:1 – 17:11; 22:12 – 23:2; 24:16 – 24:20; 27:21 – 27:25; 28:8-28:12.

67.     Plaintiff's only evidence of "trespass" by Defendants into Plaintiff's property interests is observing Defendants passing through Plaintiff's airspace at the First Corner. S. Grende Dep. (Ex. F.) at 30:20-30:23; 32:14-33:3.

68.     Under Plaintiff's theories in this case, throughout the United States, 8.3 million acres—equivalent to 3.8 Yellowstone National Parks—of state and federal public lands are inaccessible to the public absent private landowner permission.  *The Corner-Locked Report*, (Apr. 8, 2022), Exhibit 7 to Rule 30(b)(6) Deposition of onXmaps, Inc.'s Corporate Representative Joshua Spitzer (Apr. 5, 2023), attached as **Exhibit Y**.   Forty-nine percent (49%) of these "landlocked" lands are only one corner away from public access. *Id.*

III.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

Defendants are entitled to judgment as a matter of law for two reasons.  First, Plaintiff's state trespass action depends upon the existence of private property rights that stand as an obstacle to the accomplishment of the objectives of the UIA and the 1995 DOI Regulations—ensuring the public's right to access the public lands and preventing private domination of those lands.  Thus, Plaintiff's claims are preempted by federal law.  Second, Plaintiff's efforts to enforce these alleged property rights by controlling transit through the only terrestrial access point to public lands on Elk Mountain violate federal and state laws prohibiting the assertion of exclusive rights to the public lands.  Plaintiff cannot recover from its own violations of law.

A.  PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW

Plaintiff's trespass lawsuit against Defendants is the culmination of its extensive efforts to secure exclusive control over access to the public lands on Elk Mountain.  The UIA and the 1995 DOI Regulations prohibit all private efforts that have the effect of monopolizing use of the public lands.  Plaintiff's trespass claims depend upon a private property right to control travel through the only access point to the public lands on Elk Mountain and so stand as an obstacle to the accomplishment of the federal laws' objectives.  Accordingly, Plaintiff's trespass action conflicts with federal law and is preempted.

i.     The Federal Preemption Doctrine

Pursuant to the Supremacy Clause of the United States Constitution, U.S. CONST., art. VI, state laws must yield where they are preempted by federal law.  *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).  In the context of preemption, "federal law" means federal statutes and federal regulations as both have preemptive effects.  *See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153–54 (1982) (holding that "[f]ederal regulations have no

less pre-emptive effect than federal statutes"); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872, 881 (2000).

Federal law may preempt state law in several different ways. *See id.* at 98 (opinion of O'Connor, J.). Absent explicit preemptive language, federal law preempts state law when the state law:

> actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580-81 (1987) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)) (cleaned up). Federal law also preempts state law when the state law "interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Put another way, "under the circumstances of the particular case," state law is preempted when it impedes the federal law irrespective of "whether that 'obstacle' goes by the name of 'conflicting; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference,' or the like." *Geier*, 529 U.S. at 873 (alterations omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). This species of federal preemption is referred to as "conflict preemption." *See Gade*, 505 U.S. at 98.

When determining whether state law is preempted by federal law in a particular instance, the Court must examine the federal law as a whole as well as the federal law's objectives and policy. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51–52 (1987). In considering potential preemptive effects, the Court may also take guidance from the "goals and policies" of the federal law pertaining to an issue. *Ouellette*, 479 U.S. at 493; *Wyoming v. United States*, 279 F.3d 1214, 1231 (10th Cir. 2002).

The Property Clause of Article IV of the U.S. Constitution grants Congress virtually limitless power when it enacts laws or instructs an agency to administer laws regulating the use of public lands. *See Kleppe v. New Mexico*, 426 U.S. 518, 539 (1976) ("[W]hile the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, [the United States Supreme Court has] repeatedly observed that '[the] power over the public land thus entrusted to Congress is without limitations.'" (quoting *United States v. San Francisco*, 310 U.S. 16, 29 (1940))). The laws or regulations produced by Congress's exercise of this "plenary" power "necessarily override and preempt conflicting state laws, policies and objectives[.]" *Wyoming*, 279 F.3d at 1227; *see also Kleppe*, 426 U.S. at 543 ("when Congress so acts [pursuant to the Property Clause], the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. . . . 'A different rule would place the public domain of the United States completely at the mercy of state legislation.'") (quoting *Camfield v. United States*, 167 U.S. 518, 526 (1897)). "[T]he power granted by the Property Clause is broad enough to reach beyond territorial limits" and authorizes federal regulation of "conduct on private land that affects the public lands." *Id.* at 538 (interpreting *Camfield*, 167 U.S. 518); *Minnesota v. Block*, 660 F.2d 1240, 1249 (8th Cir. 1981), *cert. denied,* 455 U.S. 1007 (1982).

Thus, if enforcement of state laws will produce a conflict with federal laws enacted pursuant to the Property Clause, "the law is clear: The state laws must recede." *Kleppe*, 426 U.S. at 543. Even where the state law concerns private conduct that does not occur on public land, if the state law conflicts with the federal law concerning the use of public land, the state law is preempted. *See, e.g., United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1510 (10th Cir. 1988) (finding that fence constructed on private land violated the UIA); *Mackay*, 219 F. 116 (8th Cir. 1914) (relying on the UIA to overturn verdict finding trespass under Wyoming law where the

defendant incidentally passed over private land in passing from public land section to public land section at shared corner).

The "state laws" that may be preempted by federal law include not just state statutes but also causes of action based on a state's common law. *See*, *e.g.*, *Geier*, 529 U.S. at 886; *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 522–524 (1992) (holding that common law-based negligent failure-to-warn claims preempted and observing "we have recognized the phrase 'state law' to include common law as well as statutes and regulations."). For example, in *Geier*, the petitioners sued a car manufacturer after a serious crash causing personal injury because the car lacked a driver's side airbag. 529 U.S. at 865. However, the effective federal statute and regulations at the time afforded the manufacturer "a range of choices among different passive restraint devices" and did uniformly require driver's side air bags. *Id.* at 875. Ultimately, the U.S. Supreme Court concluded that the petitioners' tort claim was preempted because it depended upon the existence of a legal duty that would have stood as an "obstacle to the accomplishment and execution of" objectives and policies prescribed by federal statute and regulations. *Id.* at 881–882.

If state law—whether statute, common law claim, or some other manifestation—is found to conflict with federal law, the state law is deemed to be "without effect." *Cipollone*, 505 U.S. at 515-17. Where the preempted state law takes the form of a tort law claim asserted in a civil lawsuit, the appropriate remedy is dismissal of the state claim. *See*, *e.g.*, *Geier*, 529 U.S. at 865–866, 886 (affirming lower courts' dismissal of preempted tort law claims).

In this case, Plaintiff asserts state law trespass claims that, as this Court has already recognized, would "effectively bar[ ]" free access to the public lands on Elk Mountain if successful. *See* ECF No. 22 at 6. Further, of a piece with Plaintiff's direct efforts to prevent and remove the general public from the public lands on Elk Mountain, which it uniformly considers

"suspected trespassers,"  SUF 7, 9-22, 27-34, Plaintiff seeks, under color of state property law, an injunction eliminating free passage over the public lands on Elk Mountain.  *See* SUF 59, 61-62. Plaintiff's lawsuit, then, seeks a legally binding declaration that an impassable, invisible obstacle stands in the way of the accomplishment of the objectives of the UIA and the 1995 DOI Regulations—*i.e.*, free access to and transit through the public lands.

ii.        The UIA & the 1995 DOI Regulations

The UIA protects "free passage over the public lands" and prohibits private obstructions that permanently or temporarily prevent free passage.  *See McKelvey v. United States*, 260 U.S. 353, 357–359 (1922).  The UIA, 43 U.S.C. §§ 1061 *et seq.*, expressly provides:

> All inclosures of any public lands in any State or Territory of the United States, heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation . . . are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such inclosure is hereby forbidden and prohibited; and the assertion of a right to the exclusive use . . . of any part of the public lands . . . is likewise declared unlawful, and hereby prohibited.

43 U.S.C. § 1061.

> No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon . . . any tract of public land subject to . . . entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands[.]

43 U.S.C. § 1063.

Congress enacted the UIA in response to private actors who,"[w]ithout the least authority" and "on any pretext whatever," sought exclusive control over the public domain.  *See* Chandra Rosenthal & Kara Gillon, *Don't Fence Me In: Application of the Unlawful Inclosures of Public Lands Act to Benefit Wildlife*, 5 ANIMAL 1, 5 (1999) (quoting S. Rep. No. 48-979, at 1 (1885)); H.R. Exec. Doc. No. 1, 48th Cong., 1st Sess. (1883), *Annual Report of the Comm'r of the General Land Office 1883*, at 30–31, *available at* https://digitalcommons.law.ou.edu/indianserialset/5727/

(last visited Apr. 7, 2023) ("I renew the recommendation that an act be passed . . . preventing by force and intimidation legal . . . entry [to public lands]."); *see also Leo Sheep Co. v. United States*, 440 U.S. 668, 683 (1979) (describing how Congress enacted the UIA in response to exclusionary practices engaged in by private actors to "yield effective control of thousands of acres of [public lands]").  The Tenth Circuit has observed that "the UIA 'was intended to prevent the obstruction of free passage or transit for <u>any and all lawful purposes over public lands</u>.'"  *Bergen*, 848 F.2d at 1509 (emphasis original) (quoting *Stoddard v. United States*, 214 F. 566, 568-69 (8th Cir. 1914)).

When Congress enacted the UIA, "[t]he order of the day was the open range . . . and the type of incursions necessary to reach public land was not such an interference that litigation would serve any motive other than spite."  *Leo Sheep*, 440 U.S. at 685–686; *see also Anthony Wilkinson Livestock Co. v. McIlquam*, 14 Wyo. 209, 226, 83 P. 364, 369 (Wyo. 1905) (recognizing that federally owned public lands in Wyoming "shall be free to the people who seek to use them" and such use "is not a special privilege conferred upon one person or a few persons").  Since at least 1790, American custom dictated that the open range was free for all to use for lawful purposes. *See Buford v. Houtz*, 133 U.S. 320, 326 (1890).

The original land surveyors plotted the property boundaries on Elk Mountain in August 1877, only eight years before the UIA became law.  *See* SUF 4.  These surveyors used whatever materials they could find in the field to monument property corners, including wood posts, stones, and dinosaur bones.  *Id.*  Had the posts, stones, or bones marking section corners established impassable airspace boundaries prohibiting public transit through public lands while reserving the right of private landowners to do as they pleased, as Plaintiff suggests here, these monuments would have singlehandedly upended a century-old American custom concerning the freedom to travel the public lands and rendered the UIA void *ab initio*.  *See Buford*, 133 U.S. at 326, 332

("Upon the whole, we see no equity in the relief sought by the appellants in this case, which undertakes to deprive the defendants of this recognized right to permit their cattle to run at large over the lands of the United States and feed upon the grasses found in them, while, under pretence of owning a small proportion of the land which is the subject of controversy, they themselves obtain the monopoly of this valuable privilege."); *see also Leo Sheep*, 440 U.S. at 687 n.24 (recognizing that the UIA protects custom and necessity supporting access to and use of public lands).

Bolstering the UIA, on February 22, 1995, the DOI announced the issuance of regulations relating to public access to federally owned public lands. *See* Final Rule: Grazing Administration – Exclusive of Alaska, 60 Fed. Reg. 9894, 9947 (Feb. 22, 1995) (observing that the regulation "relating to public access merely reiterates existing requirements"). Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1739, 1740, and the Taylor Grazing Act ("TGA"), 43 U.S.C. § 315a-r, the DOI promulgated a regulation that prohibits any person from "[i]nterfering with lawful uses or users including obstructing free transit through or over public lands by force, threat, intimidation, signs, barrier or locked gates[.]" *See* 43 C.F.R. § 4140.1(b)(7).

The DOI established the 1995 DOI Regulations, 43 C.F.R. §4140.1(b)(7), "to prevent individuals from interfering with lawful uses of the public lands." 60 Fed. Reg. at 9947. The DOI stated that these new regulations "include a prohibition on obstructing free transit across public land." *Id*. As with other public land laws like the FLPMA and the TGA,[2] the 1995 DOI Regulations generally aim to promote the "multiple use" of the public lands, 43 C.F.R § 4100.0-2

---

[2] The FLPMA directs that "the public lands be managed in a manner . . . that will provide for outdoor recreation and human occupancy and use[.]" 43 U.S.C. §1701(a)(8). The TGA expressly protects hunting on the federal lands while also reinforcing the UIA's protection of public access to the public domain. *See* 43 U.S.C. §§ 315, 315e; *see also Bergen*, 848 F.2d at 1510 (recognizing that the TGA "<u>reinforces</u> the UIA's mandate that access to public lands be preserved").

(a) & (b), which entails more than grazing alone, but also activities that are compatible with grazing like "[h]iking, birding, camping, fishing, hunting, mountain biking and mineral development activities . . . ."  60 Fed. Reg. at 9895.

The regulatory provisions "in subpart 4140 apply to BLM's administration of the grazing program on the public lands[.]"  *Id.*  Plaintiff participates in the BLM grazing program and holds grazing permits for BLM sections which it alleges Defendants entered by crossing through Plaintiff's airspace.  SUF 5.   Plaintiff is aware that its grazing permits on the BLM require that Plaintiff comply with certain regulations, including that "Iron Bar cannot limit access to the BLM land."  *Id.*

The DOI's "Summary of Rules Adopted" observes that the provision set forth in §4140.1 "relating to public access merely reiterates existing requirements."  60 Fed. Reg. at 9947.  Thus, the 1995 DOI Regulations reflect the federal government's ongoing commitment to the policies and objectives set forth in other legal sources regarding the public's freedom to access, traverse and hunt the federal lands.

> iii.   <u>Plaintiff's Actions Obstruct Public Access to the Federal Lands in Conflict with the UIA and the 1995 DOI Regulations and Interfere with Achievement of those Laws' Purpose.</u>

Plaintiff has asserted its private property rights to exact total control of the public lands on Elk Mountain, to the exclusion of all lawful users like Defendants.  Plaintiff's actions run the gamut from the creation of physical obstacles to interpersonal confrontation and intimidation to invoking state laws.

First, Plaintiff erected and maintained a physical barrier at the first section corner accessible from a public road running through public land—the First Corner shared by Sections 13, 14, 23, and 24.  *See* SUF 7, 11.  This physical barrier included two t-posts planted on Plaintiff's

property just inches inside the boundary line at the USGS corner monument, connected by a chain and a lock, and affixed with "No Trespassing" signs facing the public road. *See* SUF 7, 9-12. This physical barrier blocked any person walking from public land on Section 14 to public land on Section 24. SUF 15. Any person carrying a backpack, hunting gear, or camping equipment could not pass through this obstacle to reach the public lands on Section 24 or beyond. SUF 16. Other than by stepping from over this First Corner, Section 24 and the other public lands on Elk Mountain are otherwise completely inaccessible to the public. SUF 11, 22.

Plaintiff maintained this barrier at this First Corner to stop people from crossing from Section 14 to Section 24 and accessing the other public lands. SUF 13-14. Plaintiff did not place or maintain any similar physical barriers at any other section corners because this section corner was the First Corner and, if it was blocked, a person could not reach any other public lands to the south or east on Elk Mountain. SUF 19. Plaintiff did not maintain any other barriers, signs, or fences marking or enclosing its private property within 440 yards of this First Corner. SUF 17.

Second, Plaintiff engages in an intentional set of specific practices to exclude others from the public lands on Elk Mountain. SUF 27-33. If Plaintiff finds a person who was not given express permission by Mr. Eshelman or his deputies to enter into Elk Mountain on the public lands, Plaintiff confronts that person as a suspected trespasser and demands the person leave the public lands and Elk Mountain area. SUF 28. If the person acquiesces to Plaintiff's confrontation and leaves the public land, Plaintiff takes no further action. SUF 30. If the person objects and maintains any reason or justification for remaining on or traveling through public lands, Plaintiff will contact several local law enforcement authorities to request that law enforcement remove the person from the area and/or issue a criminal citation. SUF 31. If law enforcement initially refuses to remove the person or issue a citation, Plaintiff's policy is to continue contacting law enforcement

24

entities to pursue removal or citation.  SUF 32.  If local law enforcement continues to take no action, Plaintiff will directly contact the Carbon County Attorney's Office to inquire about citations or criminal prosecution.  SUF 33.  If all else fails, Plaintiff will initiate civil litigation against the person found on public lands.  SUF 34.

Plaintiff applied this practice to Defendants in 2020 and 2021.  Specifically,  Plaintiff (1) closely observed Defendants by parking their vehicles nearby and watching Defendants while they were on public lands, including when Defendants were hunting and walking in the middle of public parcels, as well as driving up behind or next to Defendants in recreational vehicles; (2) confronted them on public lands, including by entering into their private tent, using expletives to intimidate and harass them into leaving the public land, and driving off mule deer that Defendants were hunting; and (3) repeatedly contacted law enforcement about Defendants seeking their removal, citation, and arrest.  SUF 39-42, 45-54.  Although none of the three Defendants hunting public lands in 2020 were cited for their actions despite repeated calls from Plaintiff, in 2021, at Plaintiff's insistence, local authorities ultimately ordered Defendants to leave the public lands on Elk Mountain and cited Defendants for trespass.  SUF 54-55.  When Defendants were ordered off the public lands in 2021, Defendant Slowensky had not filled his tag and his hunt was left incomplete.  SUF 56.  Defendants were forced to end their hunt approximately four days earlier than they planned.  SUF 56-57.  Finally, after learning that Defendants were contesting the criminal prosecution initiated against them by taking the case to a jury trial, Plaintiff filed this lawsuit to seek a permanent injunction prohibiting free travel over publicly accessible section corners on Elk Mountain and millions of dollars in damages from Defendants.  SUF 59-62; *see also* ECF No. 22 at 6 ("If Plaintiff prevails, Defendants would be effectively barred from accessing the landlocked public lands on which they enjoy hunting.").

iv.   Because Plaintiff's Actions, Including Their Assertion of State Law Claims in This Lawsuit, Conflict with the UIA and the 1995 DOI Regulations and Obstruct Achievement of Those Laws' Purposes, Plaintiff's Claims are Preempted.

Through this lawsuit, Plaintiff seeks judicial recognition and enforcement of private property rights that would render public lands on Elk Mountain totally enclosed and completely obstructed for all members of the public while reserving exclusive control over access to these lands to Plaintiff itself.  Plaintiff's claims are preempted because the outcome Plaintiff seeks would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *see Hines*, 312 U.S. at 67; *see also Geier*, 529 U.S. at 886, specifically by vitiating the UIA and the 1995 DOI Regulations.

Plaintiff's claims depend upon an alleged right to control who may cross shared section corners in the Checkerboard to travel from public land to public land.  *See* SUF 24.  However, as Plaintiff recognizes, crossing section corners is the only terrestrial path through which a person may access public lands in the Checkerboard on Elk Mountain, and it is not physically possible for any person to step across a section corner shared with private lands without some minimal intrusion into the airspace above the private lands.  *See* SUF 22, 26.  Consequently, Plaintiff's proposed application of state trespass law in this case would grant Plaintiff more than control over its airspace; instead, it would give Plaintiff complete control over access to all the public lands on Elk Mountain and bar all other lawful users.  *See* ECF No. 22 at 6.

Private property rights that prevent lawful users from entering public land—which Plaintiff's claims depend upon and seek judicial recognition of—conflict with the UIA and the 1995 DOI Regulations.  The UIA broadly prohibits any action or combination of actions that effectively prevent use of or free travel through the federal lands:

The words "by force, threats, intimidation, or by any fencing or inclosing, or any

other unlawful means" are as comprehensive of transient means of obstruction as of continuing or relatively permanent means.  Besides, it is "free" passage or transit that is to be unobstructed.  <u>Passage or transit is free in the sense intended when it is open to all.  When some withhold it from others, whether permanently or temporarily, it is not free.</u>

*McKelvey*, 260 U.S. at 357 (quoting 43 U.S.C. § 1063) (emphasis added).  Similarly, in *Camfield*, the Court concluded that fences "erected a few inches inside the defendants' line" violated the UIA even though the conduct involved the landowner's use of his private property.  *Camfield*, 167 U.S. at 525.  To this end, private property rights cannot sidestep the UIA—"it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute."  *Id.*  Drawing upon *Camfield*, the Tenth Circuit and its predecessor have repeatedly held that fences obstructing users' passage across the federal lands violate the UIA and must give way to the requirements of the federal law despite the fact that the landowners erected barriers or obstructions only on private land.  *See Bergen*, 848 F.2d at 1510 ("If the government can demand removal of a fence on private land [as was ordered in *Camfield*, 167 U.S. at 525], certainly it may order the fence modified to abrogate the 'enclosing' effect' that makes the fence unlawful."); *Stoddard*, 214 F. at 569 (even though erected entirely on private land, fencing that impedes lawful users' access to the public lands effectually "thwart[s] the obvious intent of the act.").

The conflict Plaintiff's actions create with the UIA and 1995 DOI Regulations is further shown by the practical impact of those actions on public use of the federal lands.  Members of the public cannot use the public lands as the federal laws intended, much less traverse them, unless they can first enter upon the public lands.  Accordingly, when courts decide if a landowner's actions violate the UIA and the 1995 DOI regulations, a key consideration is whether people are "provide[d] adequate access" to public lands.  *Bergen*, 848 F.2d at 1511, n. 13 (quoting with

approval from *Bergen*, 620 F. Supp. at 1419); *see also Mackay*, 219 F. at 120 ("Mackay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass.").

Blocking entrance points to the public lands with "No Trespassing" signs and similar physical barriers, as Plaintiff has done, impedes public access and conflicts with the UIA.  *See Bergen*, 848 F.2d at 1511, n.13.  A permanent injunction barring travel across the First Corner would, of course, have the same effect.  Where a landowner prevents public entry the federal lands, by whatever means, the action conflicts with the UIA and 1995 DOI Regulations: "[the UIA] has been construed to prohibit every method that works <u>a practical denial of access to</u> and passage over the public lands." *Mackay*, 219 F. at 119 (emphasis added); *see also Bergen*, 848 F.2d at 1510 ("the UIA preserves access to federal lands for 'lawful purposes[.]'").

To determine whether a landowner's specific actions conflict with the UIA and 1995 DOI Regulations, courts focus on the <u>effect</u> of an obstruction—not the landowner's purpose in creating it.  *See Camfield*, 167 U.S. at 525 ("it is only by treating [the UIA] as prohibiting all 'inclosures' of public lands, by whatever means, that the act becomes of any avail.").  The court in *Bergen* relied on *Camfield* to reject the argument that the landowner's asserted purpose, rather than the practical effect of the landowner's actions, should be dispositive:

> We are not persuaded that intent is a controlling factor, or that it would matter here if it was. [. . .] *Camfield* focused on the effect of the fence, not the landowner's intent. In this case, the effect of the fence is to exclude antelope from the public lands.

*Bergen*, 848 F.2d at 1508, n.8 (emphasis added) (citations omitted); *see Homer v. United States*, 185 F. 741, 745 (8th Cir. 1911) ("The [UIA] . . . makes no mention of any specific intent.  It condemns 'all inclosures.'").[3]   The court concluded, "'[i]t is not the fence itself, but its effect

---

[3]Although Plaintiff's intent in placing the obstructions at the First Corner was clear in this case:

which constitutes the UIA violation.'" *Id*. at 1511 (quoting *United States ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414, 1419 (D. Wyo. 1985)).

In this case, there can be no mistaking the effect of Plaintiff's various actions. Plaintiff erected a physical barrier impeding entry at the First Corner. SUF 7, 9-10, 15-16. Plaintiff placed signs deterring members of the public from travelling onto the federal lands beyond the First Corner. SUF 13-14. Plaintiff pursued a practice of confronting members of the public who access the federal lands to drive those people away. SUF 27-34, 39-41, 46-55. Plaintiff has now invoked Wyoming state laws to place legal barriers preventing entry into the public lands through the only existing access point. SUF 59-62. Plaintiff's actions have the effect of obstructing public entry into and use of the public lands.

The conflict between Plaintiff's state law claims and the federal laws is apparent: Plaintiff contends that its private property rights justify an injunction barring "corner crossing" to enter the federal lands beyond the First Corner, but the UIA and 1995 DOI Regulations establish that Plaintiff does not have "the right to exclude others, . . ., from the public domain" by strategically blocking access to the public domain. *Bergen*, 848 F.2d at 1508; *see also Camfield*, 167 U.S. at 525 ("The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute."). Thus, Plaintiff's assertion of its property rights to, in effect, exclude Defendants from the public lands and exert control over free transit through the public lands on Elk Mountain conflicts with the UIA and the 1995 DOI Regulations.

The UIA and the 1995 DOI Regulations aim to prevent private landowners from exerting monopolistic control over public lands. Plaintiff has asserted private property rights that would

---

keep the public off public lands on Elk Mountain. *See* SUF 6, 13, 14, 19, 22-24.

grant it total authority over who may enter the public lands with the attendant ability to prevent Defendants and other members of the public from accessing public lands.  Because this assertion of state trespass law stands as an obstacle to the accomplishment of the objectives of the UIA and the 1995 DOI Regulations, Plaintiff's state law claims are preempted and fail as a matter of law. *See Geier*, 529 U.S. at 886; *Hines*, 312 U.S. at 67; *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325-26 (1981).

## B.   PLAINTIFF HAS VIOLATED THE UIA AND CANNOT RECOVER

Plaintiff has actually violated the UIA through its installation and maintenance of physical obstacles obstructing access to the public lands on Elk Mountain, SUF 7, 9-16, 22-24, 25-26, 37, as well as Plaintiff's policy of confrontation, escalation, and litigation to remove people from these public lands, SUF 27-34, 39-41, 46-55.  *See* U.S.C. §§ 1061 (prohibiting all enclosures of public lands), 1063 (prohibiting all efforts to obstruct or prevent free passage or transit over or through the public lands).  Plaintiff's violation of the UIA through its various actions deprive Plaintiff's claims of any viable foundation.   *See Mackay*, 219 F. at 120 ("[A] private litigant cannot recover from another for an invasion of an alleged right founded upon his own violation of the [UIA] statute.").

A landowner cannot prosecute a trespass claim against a public land user who accessed public lands by crossing section corners, like Defendants here, where the landowner's claim depends on violating federal laws that prohibit obstruction of such access.  As the court in *Mackay* explained,

> Mackay claimed the right to trail his sheep over the even-numbered sections of the public domain and to do what else was necessary to secure it <u>without subjecting himself to a charge of trespass</u>. The company admitted his right as to the public domain, but warned him not to go over any of its lands on penalty of prosecution for trespass. The odd-numbered sections touch at their corners and their points of contact, like a point in mathematics, are without length or width. <u>If the position of</u>

> the company were sustained, a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon terms prescribed by it. Not even a solitary horseman could pick his way across without trespassing. In such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party.
>
> * * * *
>
> The question here, which we think should be answered in the affirmative, is whether Mackay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass.

*Mackay*, 219 F. at 118, 120 (emphasis added); *see also Western Wyoming Land & Live Stock Co. v. Bagley*, 279 F. 632, (8th Cir. 1922) (affirming dismissal of civil trespass and injunctive relief claims, concluding "[i]t was not unlawful to drive the cattle across plaintiff's lands for the purpose of reaching the public lands."). As in *Mackay*, Plaintiff's claims cannot survive.

## C.   PLAINTIFF'S TRESPASS CLAIMS DIRECTLY CONFLICT WITH WYOMING LAW

In certain instances, Defendants crossed from a section of federally owned public land to a section of public land owned by the State of Wyoming or a similar public locality (the Town of Hanna).  While Defendants maintain that Plaintiff cannot prosecute a trespass claim or otherwise prohibit the public from traveling between these sections of public land pursuant to the UIA and the 1995 DOI Regulations, to the extent Wyoming state law governs this question (or any other question in this case), Plaintiff's claims run afoul of Wyoming law.

Beyond the issues governed by federal law described above, this Court applies Wyoming state law in this matter because "in a federal court diversity case, '[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the [forum] state.'"  *McGehee v. Forest Oil Corp.*, 908 F.3d 619, 624 (10th Cir. 2018) (quoting *Die RR v. Tompkins*, 304 U.S. 64, 78 (1938)).

Under Wyoming law, any state law, including a common law tort action like trespass, is invalid if it transgresses the state constitution. *See Powers v. State*, 2014 WY 15, ¶ 7, 318 P.3d 300, 303 (Wyo. 2014) (relying on *Washakie Cty. Sch. Dist. v. Herschler*, 606 P.2d 310, 319 (Wyo. 1980)). Here, in relevant part, the Wyoming Constitution provides that, "[t]he people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof . . . ." Wyo. Const. art. 21, § 26, cl. 1.

In this case, Plaintiff asks this Court to declare that Plaintiff, as a landowner who owns property immediately adjacent to state or federally owned public lands, has the absolute right to control who may cross from public-to-public land at a shared corner. *See* SUF 61-62. Plaintiff also claims that Defendants committed civil trespass under Wyoming law and violated Plaintiff's exclusive right by traveling from public-to-public land, whether owned by Wyoming or the United States, at these shared corners. *See* SUF 61. Consequently, Plaintiff is necessarily asserting and seeking judicial recognition of exclusive access rights to "unappropriated public lands lying within the boundaries" of Wyoming. Wyo. Const. art. 21, § 26, cl. 1.

Because this claim and request expressly conflicts with the total disclaimer of "all right . . . to the unappropriated public lands lying within the boundaries" of Wyoming provided in the Wyoming Constitution, this claim and request is invalid and cannot be prosecuted. *Powers*, ¶ 7, 318 P.3d at 303.

What's more, Plaintiff's claim to exclusive rights over the airspace above the corners shared by its property and public lands runs contrary to Wyoming state law. Wyo. Stat. Ann. § 10-4-302 provides "[t]he ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303."

The Wyoming Supreme Court has not directly addressed how Wyo. Stat. Ann. § 10-4-302 applies to the Checkerboard of public and private lands in Wyoming so this Court must make "an *Erie*-guess as to how the Wyoming Supreme Court would rule" on this issue. *See Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005). However, in making this particular "*Erie*-guess," this Court should apply the words in this statute according to their "ordinary and obvious meaning." *See Ailport v. Ailport*, 2022 WY 43, ¶ 22, 507 P.3d 427, 437 (Wyo. 2022); *see also Millward v. Bd. of County Comm'rs of Teton*, 2018 U.S. Dist. LEXIS 231367, at *6 (D. Wyo. Aug. 21, 2018).

Here, Wyo. Stat. Ann. § 10-4-302 vests ownership in the airspace immediately above the surface of land in the "several owners of the surface." The phrase "several owners" simply cannot be read to mean "single owner" or "only private landowners" when, as is the case here, the surface of the land at issue is owned by multiple entities, both public and private. Thus, Plaintiff's assertion that it alone has exclusive ownership and control over the airspace above the common corner its property shares with federally owned or state-owned public lands fails.

If any part of Plaintiff's claims is governed by Wyoming state law, then they must pass constitutional muster under the Wyoming Constitution and not run afoul of Wyoming state law. Because Plaintiff's claim to exclusive control over the public domain is contrary to both the Wyoming Constitution and Wyoming state law, its claims fail as a matter of state law.

### D.  PLAINTIFF HAS SUFFERED NO ACTUAL DAMAGES

Although Plaintiff has raised claims for compensatory damages, it has presented no evidence that Defendants' actions caused any actual damages to its property. Because Plaintiff cannot establish any actual damages, to the extent its claims survive Defendants' arguments for the entry of summary judgment discussed above, the Court should enter summary judgment

against Plaintiff on its claims for compensatory damages and limit Plaintiff's recovery to nominal damages only. *See*, *e.g.*, *Mosier v. Alexander*, No. CIV-05-1068-R. 2006 WL 3228703, at *1 (W.D. Okla. Nov. 7, 2006) (granting summary judgment as to compensatory damages claim due to absence of proof of recoverable damages, and allowing claims to proceed only for nominal damages); *Bates v. Anderson*, No. CV210-088, 2011 WL 2550365, at *1 (S.D. Ga. June 27, 2011) (same).

Under applicable Wyoming law, a plaintiff may recover compensatory damages if it establishes that a trespass permanently damaged the property at issue or rendered it irreparable except at great expense. Under those circumstances, "the measure of damages is the difference between the value of the property before and after the injury." *City of Kemmerer v. Wagner*, 866 P.2d 1283, 1287 (Wyo. 1993). When a trespass only temporarily injures property or it can be repaired at small expense, the cost of repair generally reflects the measure of damages. *Id*. But if the plaintiff has no evidence supporting actual damages to the property, Wyoming allows the plaintiff to recover only nominal damages. *Goforth v. Fifield*, 352 P.3d 242, 250 (Wyo. 2015).

Here, no evidence supports Plaintiff's contention that Defendants caused an actual injury to Plaintiff's property to justify an award of compensatory damages. Plaintiff admits that it has no evidence that (1) Defendants made physical contact with Plaintiff's private property, SUF 63-64; (2) Defendants caused any actual damage to the ground surface of Plaintiff's private property or any fixtures or structures on Plaintiff's private property, SUF 65; and (3) Plaintiff had to make any repairs to any part of its private property or that such repairs are necessary, SUF 66. Plaintiff also admits that the only evidence it possesses of any trespass by Defendants is Plaintiff's observations that Defendants briefly passed through the air situated above the First Corner—air shared by Plaintiff's property and public lands. SUF 67.

If this Court determines that Plaintiff may maintain its claims, then the Court should enter summary judgment on Plaintiff's claims for compensatory damages and limit any of Plaintiff's surviving claims to nominal damages only because there is no evidence that any Defendant caused actual damages to Plaintiff's property.

## IV.   CONCLUSION

The singular objective of UIA and the 1995 DOI Regulations is to preserve public access to the public domain.  These laws accomplish this objective by prohibiting any efforts to enclose or obstruct lawful entry to and travel through the public lands.  Plaintiff's claims demand that state common law entirely upends this objective or, at least, subjugates it to the will of private landowners.  Plaintiff's practices regarding the public and access to the public lands on Elk Mountain over the past decade present a case study in this subjugation of federal law to private whims.  Because Plaintiff's claims depend upon a rule of law that poses an obstacle to the accomplishment of federal law, these claims are preempted and fail as a matter of law.

Further, Plaintiff cannot recover in this case because its exclusionary practices deprived the public of the freedom to travel the public lands in violation of federal and state law.  For all these reasons, Defendants are entitled to judgment as a matter of law.

Dated: April 12, 2023.                    By: */s/Ryan A. Semerad*
                                              Ryan A. Semerad, Esq.
                                              FULLER & SEMERAD, LLC

                                              Lee Mickus, Esq.
                                              Alexandria Layton, Esq.
                                              EVANS FEARS & SCHUTTERT LLP

                                              *Attorneys for Defendants Bradly H.*
                                              *Cape, Zachary M. Smith, Phillip G.*
                                              *Yeomans, and John W. Slowensky*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 12th day of April, 2023, I electronically filed the foregoing instrument with the Clerk of the Court for the United States District Court for the District of Wyoming by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


*/s/Ryan A. Semerad*
Fuller & Semerad LLC