# EXHIBIT O

# "Warden Jake Miller Trial Testimony in Defendants' Criminal Trial (Apr. 28, 2022)"

# EXHIBIT O

```
 1         CIRCUIT COURT IN THE SECOND JUDICIAL DISTRICT,

 2              IN AND FOR CARBON COUNTY, WYOMING

 3             BEFORE THE HONORABLE SUSAN K. STIPE

 4

 5   STATE OF WYOMING,
     Plaintiff,                  Docket No(s). CT-2021-5869
 6
     v.
 7
     BRADLY H. CAPE,
 8   Defendant,

 9   AND

10   STATE OF WYOMING,
     Plaintiff,                  Docket No(s). CT-2021-5870
11
     v.
12
     JOHN W. SLOWENSKY,
13   Defendant,

14   AND

15   STATE OF WYOMING,
     Plaintiff,                  Docket No(s). CT-2021-5871
16
     v.
17   PHILLIP G. YEOMANS,
     Defendant,
18
     AND
19
     STATE OF WYOMING,
20   Plaintiff,                  Docket No(s). CT-2021-5872

21   v.
     ZACHARY M. SMITH,
22   Defendant.

23   _____

24      Transcription of the Testimony of Game Warden
                         Jake Miller
25                  (3:05:00 - 5:04:46)
```

1    Q.   (By Ms. Mayfield-Davis)  Is it common for you
2  to know whether there's outfitting that happens on
3  different private land holds?
4    A.   Yes.  I work closely with outfitters.
5    Q.   Okay.  And are there any outfitters on Elk
6  Mountain that you're aware of?
7    A.   There's not.
8    Q.   So when an initial comes in, a hunting issue,
9  a complaint, how do you become involved, typically?
10    A.   I would usually ask all the follow-up
11  questions, kind of the who, what, where, when, why,
12  what's all going on.  So I can use that basically to
13  determine if a violation has occurred, if it's likely,
14  or needs a follow-up investigation.  So it's usually
15  how I determine whether I go out or not.
16    Q.   And how do you normally get contacted?  Are
17  you contacted via dispatch?  Are you contacted by the
18  landowner directly, or a manager?
19    A.   Typically, any local in my district will call
20  my cellphone directly.  Most of them have my cellphone.
21  I've seen people from out of the area, once they get
22  ahold of me, are usually through dispatch.
23    Q.   So on September 30, 2021, were you contacted
24  by anyone from the Elk Mountain ranch?
25    A.   Yes.  Steve Grende.

1      Q.   Okay.  And where were you when you initially
2   were contacted?
3      A.   At my house.
4      Q.   And so what information did you initially
5   receive?
6      A.   The report started on the 26th of September.
7   Steve had contacted me that he had located a camp in a
8   BLM section on Rattlesnake Pass, or County Road 400.
9   Based off the information he gave me, all he witnessed
10  was a vehicle trailer and a camp.  I did not respond
11  because there's no violation in setting up a camp on
12  BLM.
13           So he called me multiple times between the
14  26th and 30th.  And, eventually, on the 30th, I did
15  respond out to the location to observe the camp.  When
16  I went out there, Steve had believed they were on the
17  mountain somewhere, but had never seen them.  So I got
18  permission from the ranch to drive down the ranch road
19  located on Elk Mountain Ranch south of Highway --
20  County Road 400.  It's when I observed the hunters.
21     Q.   And do you know what section you observed the
22  hunters on at that time?
23     A.   I believe it was Section 24.
24     Q.   And what were they doing?
25     A.   They were walking south and north from the

1    when I left the mountain and drove to their camp.
2        Q.   And at that point, was anyone else present?
3        A.   Just the four hunters.
4        Q.   Okay.  Were you able to contact the four
5    hunters?
6        A.   Yeah.  I believe I ran into Mr. Cape outside
7    the tent.  They welcomed me into their tent.  That's
8    when I kind of initialized contact with the whole
9    group.
10       Q.   And was that Bradley Cape?
11       A.   I believe so, yes.
12       Q.   Okay.  Do you see him in the courtroom?
13       A.   I do.
14       Q.   Can you please describe him, where he's
15   seated, and what he's wearing for us.
16       A.   He's in the second row in a dark blue polo.
17            MS. MAYFIELD-DAVIS:  Your Honor, the State
18   would ask that the record reflect that the witness has
19   identified Defendant Cape.
20            THE COURT:  The record will reflect that the
21   witness has identified Defendant Cape.
22       Q.   (By Ms. Mayfield-Davis)  Were you able to
23   identify the other three hunters?
24       A.   Yeah.  I asked to see their hunting licenses,
25   and I believe they all provided hunting licenses along

1  with their driver's licenses.

2     Q.   And can you give me the name of another

3  individual who you identified as one of those hunters.

4     A.   Philip Yeomans.  Am I saying that right?

5     Q.   And do you see Mr. Yeomans in the courtroom

6  today?

7     A.   Front row in the light blue polo.

8          MS. MAYFIELD-DAVIS:  Your Honor, the State

9  would ask for the record to reflect that the witness

10 has identified Defendant Yeomans.

11         THE COURT:  All right.  The record will

12 reflect that the witness has identified

13 Defendant Yeomans.

14    Q.   (By Ms. Mayfield-Davis)  Who was another

15 hunter that you contacted?

16    A.   Zachary Smith.

17    Q.   And do you see Mr. Smith in the courtroom?

18    A.   Yes.  He's in the back row in a button-up

19 shirt, light in color.

20         MS. MAYFIELD-DAVIS:  Your Honor --

21    Q.   (By Ms. Mayfield) Actually,       Warden

22 Miller, does his shirt have, like, little pearl snaps

23 on it?

24    A.   It looks like it.

25    Q.   Okay.  All right.

1   at.
2       Q.   Because these are a mile by mile, right?
3       A.   Correct.  Square mile, yes.
4       Q.   So safe to say you were in Section 24 when
5   you saw the hunters?
6       A.   I believe that was where I was at.
7       Q.   And any question in your mind if they were in
8   Section 24?
9       A.   I have no doubt that they were in 24.
10      Q.   Okay.  And you watched them go to the corner
11  between Section 24 Public and Section 14 Public, right?
12      A.   Yeah.  I observed them take the ladder, place
13  the ladder, cross the ladder, picked up the ladder,
14  kind of. . .
15      Q.   Okay.  And where they placed that ladder --
16  you've already testified, and I don't believe there's
17  any question about it -- it went up and over the
18  T-posts, correct?
19      A.   Uh-huh.
20      Q.   Did you go look at that corner yourself that
21  night?
22      A.   Not that night.
23      Q.   Okay.
24      A.   It was dark by the time I got to that point.
25  Later -- at a later date, I went.

1      Q.   Do you recall when?
2      A.   I don't.  I don't remember the specific date.
3      Q.   To your knowledge, would there have been
4  anything to disturb the ground around that corner
5  between the 30th and whenever you went and saw it?
6      A.   I would have done it within a week of that
7  date, I would say.  I don't believe there was any
8  weather conditions, snow or anything like that that
9  would have. . .
10     Q.   And so when you went to that corner, did you
11 do that so you could see if there were any signs that
12 anyone had crossed private property there?
13     A.   That was the intent when I went there, yes.
14     Q.   And so you didn't find anything that
15 indicated that these four men had done that, right?
16     A.   No.
17     Q.   Okay.
18     A.   And I guess based off reference of where I'd
19 observed them place the ladder, it was specifically
20 over.
21     Q.   Okay. So the two -- well, there's four legs
22 on the ladder, but two on each side of the corner would
23 have been from public to public, right?
24     A.   From what I could tell, yes.
25     Q.   All right.  So you -- you see them go back

1     Q.   Okay.  Okay.  And, at least according to your
2  report, you did not create it until October 4, 2021,
3  correct?
4     A.   Yes.  According to the report it was not
5  created until October 4.
6     Q.   Okay.
7     A.   It would have been that Monday morning.
8     Q.   All right.  So roughly four, four and a half
9  days between your actual interaction with these men on
10 the 30th and the creation of your report?
11    A.   Correct.
12    Q.   All right.  So when you say you were in the
13 tent for about 15 minutes, was that when Mr. Grende
14 stuck his head in the tent?
15    A.   Yes.  Steve did come into the tent, uninvited
16 by the hunters, and that's when I asked him to step
17 outside with me.
18    Q.   Okay.  And why did you ask him to step
19 outside with you?
20    A.   Just experience.  It's best practice to keep
21 groups separate.
22    Q.   Okay.  I believe you said that Mr. Grende
23 made some kind of a comment.
24    A.   Yeah.  I would describe it as a snarky
25 comment.

```
 1        Q.   Okay.
 2        A.   I believe it was, So you guys are here from
 3   last year.  Something along those lines.
 4        Q.   Okay.  And -- and your Spidey senses as a law
 5   enforcement officer --
 6        A.   Keep them separated.
 7        Q.   -- is to de-escalate it right now?
 8        A.   Yes.
 9        Q.   Okay.  During your conversations with
10   Mr. Cape, Mr. Slowensky, Mr. Philip -- or Mr. Yeomans,
11   and Mr. Smith, what was their demeanor?
12        A.   Calm.  They were pleasant to talk to.  Any
13   request I made of them, they complied with.  They were
14   very cooperative of my requests --
15        Q.   Okay.
16        A.   -- and questions.
17        Q.   All right.  So is it fair to say your concern
18   for escalation at that point was not with the hunters
19   when Mr. Grende stuck his head in?
20        A.   His -- I felt -- I don't know the best way to
21   describe it.  He was agitated, I would say, so --
22        Q.   Okay.
23        A.   -- I wanted to work to calm him down.
24        Q.   All right.  And there was some discussion
25   about what you had written in your report versus what
```

C E R T I F I C A T E

I hereby certify that the above audio-recorded interview was transcribed by me using computer-aided transcription and that the above is a true and correct transcript of said recording transcribed by me to the best of my ability to hear and interpret the audio.

I further certify that I am neither of kin nor counsel to any of the parties nor in any way financially interested in the outcome of this case.

So certified on this 18th day of November, 2022.

/s/ *Lisa R. Erickson*

Lisa R. Erickson
Court Reporter
Brighton, Colorado

DEFS00288