M. Gregory Weisz, Wyo. Bar No. 6-2934
Crystal D. Stewart, Wyo. Bar No. 7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
gweisz@penceandmac.com
cstewart@penceandmac.com
Plaintiff's Attorneys

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North )
Carolina limited liability company registered )
to do business in Wyoming, )
                                )
        Plaintiff, )
                                )
        vs. )        Case No. 22-CV-00067-SWS
                                )
BRADLY H. CAPE, an individual, )
ZACHARY M. SMITH, an individual, )
PHILLIP G. YEOMANS, an individual, and )
JOHN W. SLOWENSKY, an individual, )
                                )
        Defendants. )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its undersigned counsel,

M. Gregory Weisz and Crystal D. Stewart of Pence and MacMillan LLC, and hereby files this

memorandum in opposition to *Defendants' Motion for Summary Judgment*, ECF 65 (hereinafter

"Defendants' Motion") and "*Defendants' Brief In Support of Motion for Summary Judgment*." ECF

66 (hereinafter "Defendants' Brief").  The Court should deny Defendants' Motion.

## <u>INTRODUCTION</u>

Defendants' Motion attempts to turn the Unlawful Inclosures Act, 43 U.S.C. §§ 1061-1066,

(hereinafter "UIA") into a sword to grant the public a right to forcibly cross private property to

reach federal land for recreational purposes.  The UIA contains no such grant, but simply

"preserves access" to public lands "for lawful purposes."[1]  It does not give the Defendants a right to trespass through private property.

Moreover, Defendants' Motion ignores well-established principles of tort law regarding trespass, to wit:

> (1) Except as stated in subsection (2), a trespass may be committed on, beneath, **or above the surface** of the earth.
> (2) Flight by aircraft in the air space above the land of another is a trespass if, but only if,
>> (a) it enters into the immediate reaches of the air space next to the land, and
>> (b) it interferes substantially with the other's use and enjoyment of his land.

RESTATEMENT (SECOND) OF TORTS § 159 (AM. L. INST. 1965, March 2023 update) (emphasis added).  This Restatement provides the following example of what constitutes a trespass: Person "A extends his arm over the boundary fence between A's land and B's land.  A is a trespasser." Id., Illustration 3.  Accordingly, the Supreme Court notes that the right to exclude is "one of the most treasured" rights of property ownership. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982).

Importantly, while this case concerns the airspace above the surface of Iron Bar Holdings, LLC's real property, a "permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property— perhaps the most fundamental of all property interests.'" Kafka v. Montana Dep't of Fish, Wildlife & Parks, 201 P.3d 8, 27 (Mont. 2008) (quoting Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 529 (2005) (other citations omitted).  The result Defendants seek would effectively eviscerate Plaintiff's rights as a private property owner, not to mention those of numerous other private landowners.

---

[1] U.S. ex rel. Bergen v. Lawrence, 848 F.2d 1502, 1510 (10th Cir. 1988).

## **ARGUMENT**

### I.  **Plaintiff's State Law Trespass Claims Are Not Preempted by the UIA**

The UIA does not preempt Wyoming's common law civil trespass cause of action.  Plaintiff Iron Bar Holdings, LLC (hereinafter "IBH") has every right to control access to its private property, and the UIA does not divest IBH of its ability to pursue its civil trespass claims.  IBH's trespass claims are directed at excluding others from its private property, not from federal lands.

### *A.  State-Federal Powers*

The United States Constitution provides: "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, **or to the people**." U.S. Const., amend X (emphasis added).  Thus, the "people of the United States resident within any State are subject to two governments: one State, and the other National; but there need be no conflict between the two. The powers which one possesses, the other does not." United States v. Cruikshank, 92 U.S. 542, 551 (1875).  Accordingly,

> The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people. **No rights can be acquired under the constitution or laws of the United States, except such as the government of the United States has the authority to grant or secure. All that cannot be so granted or secured are left under the protection of the States**.

Id. (emphasis supplied).

By urging the Court to rule the UIA preempts Wyoming law to give the Defendants a federal right to cross IBH private land to reach public land, Defendants would have the Court ignore important federalism principles and the balance of power between the States and the federal government.  Neither preemption caselaw nor the UIA warrants or authorizes such a result.

B.      *Preemption Principles*

It is true "Congress has the power to preempt state law under Article VI of the Supremacy Clause." Choate v. Champion Home Builders Co., 222 F.3d 788, 791 (10th Cir. 2000).  Importantly, however, "the Supreme Court recognizes a presumption against preemption." United States *ex rel.* Coffman v. City of Leavenworth, Kansas, No. 14-2538-JAR, 2018 WL 2159785 at *3 (D. Kan. May 10, 2018) (citing Wyeth v. Levine, 555 U.S. 555, 565 (2009)).  "In other words, preemption is generally disfavored." Coffman (citing Gallup Med Flight, LLC v. Builders Tr. of N.M., 240 F.Supp. 3d 1161, 1212–17 (D. N.M. 2017)) ("noting the Supreme Court has now begun to back away from implied preemption based on an alleged conflict with the purposes underlying federal regulations and has put renewed emphasis on the presumption against preemption.")  "Out of respect for the distinct spheres of authority inherent in our federal system, preemption of state law is generally disfavored." McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13, 16 (1st Cir. 1991) (citing Alessi v. Raybestos–Manhattan, Inc., 451 U.S. 504, 522 (1981)). "But, this presumption is not inviolable. If 'the nature of the regulated subject matter **permits no other conclusion**, or ... Congress has **unmistakably so ordained**,' federal preemption of state law is mandated under the Supremacy Clause." McCoy, 950 F.3d at 16 (citing Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 (1963)) (emphasis added).

Preemption principles are based on federalism principles.  Thus,

A Court of the United States is loathe to interfere in the internal affairs of a state. **The sovereignty of the states insofar as reserved to them by the Constitution of the United States is one of the keystones of our federal system**. Another keystone of that system, of course, is the supremacy of the Constitution and valid federal laws enacted by Congress in pursuance thereof. Under the keystone first mentioned **it is the duty of all persons**, including those protesting against alleged grievances including alleged racial discrimination, **to obey all valid state laws**,

4

properly administered, while asserting their protests. If they disobey them they run the risk of justified arrest and prosecution and punishment for their violations.

Graves v. Walton County Bd. of Educ., 300 F.Supp. 188, 193 (M.D. Ga. 1968), aff'd, 410 F.2d 1152 (5th Cir. 1969), and aff'd sub nom. Graves v. Walton County Bd. of Educ., 410 F.2d 1153 (5th Cir. 1969) (emphasis added).

"There are three types of preemption: '(1) express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law ...; (2) field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it; and (3) conflict preemption, which occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Cerveny v. Aventis, Inc., 855 F.3d 1091, 1097–98 (10th Cir. 2017) (quoting Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998)).  Defendants apparently assert conflict preemption.

State laws are in conflict with federal law either: (i) "when compliance with both federal and state laws is a 'physical impossibility'" (Arizona v. U.S., 567 U.S. 387, 399 (2012) (quoting Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142–43 (1963)), **or** (ii) when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Arizona v. U.S., 567 U.S. at 399 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  In a "preemption analysis, courts should assume that '**the historic police powers of the States**' are not superseded '**unless that was the clear and manifest** purpose of Congress.'" Arizona v. U.S., 567 U.S. at 400 (citation omitted) (emphasis supplied).

"Whether a state law stands as an obstacle to the accomplishment of Congress's objectives is determined by examining the federal statute and identifying its purpose and intended effects."

Carden v. Kelly, 175 F.Supp. 2d 1318, 1324 (D. Wyo. 2001) (internal citation omitted) (neither Federal Land Policy and Management Act (FLPMA) nor U.S.D.A. Forest Service regulations preempted Wyoming Recreational Safety Act). With respect to federal land, "the federal government does not assert exclusive jurisdiction over the public lands within the states." Id. (citing Kleppe v. New Mexico, 426 U.S. 529, 541-43 (1976)). "The states are free to enforce their criminal and civil laws on those lands, but where those state laws conflict with valid legislation passed pursuant to the property clause, the law is clear; the state law must recede." Id.

The Court's analysis in Carden is instructive.  The Court noted that FLPMA contained language expressly recognizing state police powers, even with respect to federal public land:

> Nothing in this Act shall be construed as limiting or restraining the power and authority of the United States or  .  as a limitation upon any State criminal statute or upon the police power of the respective States, or as derogating the authority of a local police officer in the performance of his duties, or as depriving any State or political subdivision thereof of any right it may have to exercise civil and criminal jurisdiction on the national resource lands; or as amending, limiting, or infringing the existing laws providing grants of lands to the States.

Id. (quoting 43 U.S.C. § 1701(g)(6)).

In rejecting the argument FLPMA and Forest Service regulations preempted Wyoming law, the Court found that neither FLPMA nor the Forest Service regulations indicated any purpose to preempt Wyoming law. Id . at 1325.  While the case at bar pertains to IBH's trespass claims regarding only its deeded private property, to the extent its claims might have an incidental tie to adjacent federal land, the Carden case validates such a tie.

C.    *Purpose and Legislative Intent of Unlawful Inclosures Act*

Congress enacted the UIA to prevent the unlawful inclosure of federal land.  Its enactment came in response to the "'range wars,' the legendary struggle between cattlemen and farmers during the last half of the 19th century." Leo Sheep Co. v. United States, 440 U.S. 668, 683 (1979).

It is obvious the UIA is meant to deal with the limited and specific problem of unlawful inclosures of public land to which there is otherwise lawful access, and it is not a comprehensive regulatory scheme governing management of public lands.  The UIA specifically applies to "public land." 43 U.S.C. § 1061.  The UIA is limited to elimination of unlawful inclosures of federal land to "preserve[] access to federal lands for 'lawful purposes,' including forage by wildlife." U.S. *ex rel.* Bergen v. Lawrence, 848 F.2d 1502, 1510 (10th Cir. 1988).

While the UIA looks to activity on adjacent private lands, "[s]o long as the individual proprietor confines his inclosure to his own land, the government has no right to complain, since he is entitled to complete and exclusive enjoyment of it, regardless of any detriment to his neighbor . . . ." Camfield v. United States, 167 U.S. 518, 528 (1897).  Thus, the UIA cannot be viewed as some sort of comprehensive land management scheme to affirmatively *grant access* at corners in the checkerboard area.

Indeed, with respect to application of the UIA in the checkerboard area, if "**odd-numbered sections were separately fenced in, which the owner would doubtless have the right to do**  . . . [so as] to practically exclude the government from the even-numbered sections . . . [such] was a contingency which the government was bound to contemplate in granting away the odd-numbered sections." Id. at 528. (emphasis added).[2]  However, a fence constructed entirely on private land but which is useless for enclosing that private land, is not lawful under the UIA if it encloses public land instead. Id.  Further discussion of the UIA is set forth *infra*.

---

[2] In Camfield, the private landowners had enclosed about 20,000 acres of public land by fences constructed entirely on private land, but they placed swinging gates at each section line. Camfield, 167 U.S. at 520. Notably, the defendants *admitted* they had constructed the fence to inclose "all of the even-numbered sections" [i.e., federal land] in two townships. Id.

### D.  Purpose and Intent of 1995 Interior Department Regulations

Defendants contend a 1995 Department of Interior ("DOI") rule found at 43 C.F.R. § 4140 preempts Wyoming civil trespass claims.  Such is not the case.  In 1995, the DOI issued a final rule amending the regulations that govern how the Secretary of the Interior, through the Bureau of Land Management ("BLM"), should administer livestock grazing. *See, e.g.,* Department Hearings and Appeals Procedures; Cooperative Relations; Grazing Administration—Exclusive of Alaska, 60 Fed. Reg. 9894 (Feb. 22, 1995). The rule was "promulgated under the principal authorities of the Federal Land Policy and Management Act (FLPMA) of 1976 (43 U.S.C. 1739, 1740), and the Taylor Grazing Act of 1934 (TGA) (43 U.S.C. 315a-r)." Id.  In addressing Section 4140.1, Prohibited Acts on Public Lands, the DOI specifically noted that:

> **Nothing in these rules prohibits landowners from protecting private property from trespass or vandalism, or prohibits the landowner from keeping their gates closed to protect private property**. … The provision of §4140.1 relating to public access merely reiterates existing requirements. The intent of the provision is to prevent individuals from interfering with *lawful* uses of the public lands.

60 Fed. Reg. at 9947 (emphasis added).

More importantly, the DOI's explanation of its 1995 rule specifically states "nothing in the subpart prevents the landowner from placing signs on private property to prevent trespass and destruction." Id.  Finally, the DOI's explanation of the rule notes "the Department has no authority to prevent human trespass on private lands. **Trespass is governed under the State laws in each State.**" Id. (emphasis added).

Thus, DOI's own explanation of its rule negates Defendants' contention as to preemption: the rules specifically *preserve* a landowner's ability to protect private property from trespass. There is no intent under the 1995 DOI rules to preempt state law and, in fact, there is a stated intent *not* to preempt state law.

*E.  Public Land Laws*

The UIA is grounded in the Property Clause of the Constitution, which grants the government plenary power, but "only over federal property." Kleppe v. New Mexico, 426 U.S. 529, 537-38 (1976).  However, "even within the sphere of the Property Clause, state law is preempted only when it conflicts with the operation or objectives of federal law, or when Congress 'evidences an intent to occupy a given field.'" California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 593 (1987) (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984)).

Defendants argue "the UIA was 'intended to prevent obstruction of free passage or transit for any and all lawful purposes over public lands.'" (Defendants' Brief at 22) (citing Bergen, 848 F.2d at 1509).  Defendants, however, fail to emphasize that such passage itself must be *lawful*.  Trespass across private property is not lawful.  Although the UIA makes inclosures of federal lands unlawful, "neither the UIA nor the railroad grant reserved any easement for a public road across private lands." Bergen, 848 F.2d at 1506 (citing Leo Sheep, 440 U.S. at 683)).[3]

Instructively, federal law provides a useful definition of the term "lawful hunt."  "Lawful hunt" means the "taking or harvesting (or attempted taking or harvesting) of wildlife … on Federal lands, which—is lawful under the laws applicable in the place it occurs; and **does not infringe upon a right of an owner of private property**." 16 U.S.C. § 5207(2) (emphasis added).

Thus, the right of a private property owner to bring state trespass claims cannot be infringed by persons who have unlawfully accessed federal lands by a trespass.  Moreover, federal public land laws explicitly recognize there are public lands that might otherwise be open to hunting, but which are inaccessible.  Federal law defines such inaccessible lands as "public lands

---

[3] In Bergen, the private landowner constructed a twenty-eight mile fence enclosing over twenty thousand acres of private, state, and federal land. Bergen , 848 F.2d at 1504.

in … [including Wyoming] consisting of at least 640 contiguous acres on which the public is allowed under Federal or State law to hunt, … but-- **to which there is no public access or egress**; or (B) to which public access or egress to the land is significantly restricted, as determined by the Secretary." 43 U.S.C. § 2302(3) (emphasis added).

Next, the Taylor Grazing Act acknowledges:

[n]othing in this subchapter shall be construed as restricting the respective States from enforcing any and all statutes enacted for police regulation, nor shall the police power of the respective States be, by this subchapter, impaired or restricted, and all laws heretofore enacted by the respective States or any thereof, or that may hereafter be enacted as regards public health or public welfare, shall at all times be in full force and effect.

43 U.S.C. § 315n.

Similarly, BLM grazing regulations distinguish between *public access* to public land with *governmental access* to public land, providing as follows:

The authorized officer may specify in grazing permits or leases other terms and conditions which will assist in achieving management objectives, provide for proper range management or assist in the orderly administration of the public rangelands. These <u>may</u> include but are not limited to:
…
(h) A statement disclosing the requirement that permittees or lessees shall provide reasonable **administrative** access across private and leased lands **to the Bureau of Land Management** for the orderly management and protection of the public lands.

43 C.F.R. § 4130.3-2 (emphasis added).

Importantly, the distinction between governmental access and public access has been applied by this Court to the *very property* now owned by IBH.  In <u>Elk Mountain Safari, Inc. v. U.S., Dept. of Interior, Bureau of Land Management</u>, 645 F.Supp. 151 (D. Wyo. 1986), this Court ruled the BLM could not allow public use of an administrative easement granted to the BLM (the easement was granted by a predecessor-in-interest of IBH). <u>Id</u>. at 155.  While the easement gave the BLM a property interest in the real property now owned by IBH, the BLM could not use its

property interest to allow public access.  The Court went on to state if the BLM "desires to open this roadway to the general public, it must proceed according to law to avoid an unlawful taking without compensation as prohibited by the Fifth Amendment to the United States Constitution." Id. at 156 (citing Leo Sheep, 440 U.S. 668).

In sum, numerous federal public land laws make it clear those laws: (i) do not preempt or override state common law regarding trespass on private land, (ii) do not provide for access to public lands that are part of the checkerboard, and (iii) do not disturb important federalism concepts which grant the United States power to regulate public land, but which recognize the reserved power of the States to define and control protection of private property rights.

F.  Leo Sheep Decision

In Leo Sheep, cited earlier, the Supreme Court addressed the interplay between the checkerboard land ownership pattern, the UIA, and desired recreational access to public land.  Leo Sheep, 440 U.S. at 669-677.  Leo Sheep Company, a private landowner in the checkerboard in Carbon County, Wyoming, challenged the BLM's construction of a road across a small part of Leo Sheep Company's land at common corners of BLM land and Leo Sheep Company deeded property. Id. at 678.  The BLM constructed the road primarily on public land, but it crossed Leo Sheep Company land at common corners. Id.  Based upon "numerous complaints" to the BLM by citizens who desired recreational access to Seminoe Reservoir, the BLM built the road across the corners to provide public access to the reservoir, without the consent of Leo Sheep Company. Id.  In response, Leo Sheep Company brought an action to quiet title against the United States. Id.

The United States Court of Appeals for the Tenth Circuit ruled that, at the time of the railroad land grants, the United States had reserved an implied easement to cross the odd-numbered sections granted to the Union Pacific Railroad when necessary to access adjacent even-numbered

sections retained by the government. Id.  The Supreme Court reversed.  It ruled the United States does not have an implied easement that would permit uncompensated use of a right-of-way across private land. Id. at 686-688.  The Supreme Court rejected various arguments by the federal government, mainly those based on the doctrine of easement by necessity and the UIA. Id.

The government argued "that the prohibitions of . . . [the UIA] should somehow be read to include the Leo Sheep Company's refusal to acquiesce in a public road over its property . . . ." Id. at 684.  The Supreme Court rejected the argument and found no UIA violation. Id.  The Supreme Court discussed Camfield.  The Supreme Court reasoned that since Camfield held that the enclosure of odd-numbered sections of private land in the checkerboard would not violate the UIA (even though such enclosure would obstruct access to adjacent even-numbered sections of public land), Leo Sheep Company's refusal to allow a public access road across its land without compensation did not violate the UIA. Id. at 685-687.

*G.  Plaintiff's State Law Trespass Claims Do Not Conflict with the UIA*

Because the UIA regulates unlawful inclosures of federal lands, for the Defendants' preemption argument to prevail, they must show either: (i) it would be physically impossible to comply with both state and federal law, or (ii) that Wyoming common law civil trespass claims prevent full execution of the purpose and intent of federal law. Arizona v. U.S., 567 U.S. at 399. This they cannot do.  The UIA is wholly independent of state law trespass claims, and a common law civil trespass claim in no way thwarts the UIA's provisions preventing unlawful inclosures of public land.  The UIA and Wyoming common law regarding civil trespass co-exist.

First, it is critical to note how Congress directed enforcement of the UIA.  The UIA vests *only* the United States Attorney with power to enforce the UIA.  The UIA provides:

> **It shall be the duty of the United States attorney …, to institute a civil suit in the proper United States district court, or territorial district court, in the name**

**of the United States, and against the parties named or described who shall be in charge of or controlling the inclosure complained of as defendants**; and jurisdiction is also conferred on any United States district court or territorial district court having jurisdiction over the locality where the land inclosed, or any part thereof, shall be situated, to hear and determine proceedings in equity, by writ of injunction, to restrain violations of the provisions of this chapter . . . .

43 U.S.C. § 1062.

Congress charged United States Attorneys to enforce the UIA, and conferred subject matter jurisdiction in federal court to hear enforcement actions. Thus, enforcement power lies solely with the United States Attorney. Notably, however, regardless of whether a landowner such as IBH files a common law trespass claim, such claim in no way diminishes the power of the United States Attorney to institute an action in federal court for a UIA violation. As such, there is no support for Defendants' contention IBH's common law civil trespass claims are preempted by the UIA.

There is no "physical impossibility" of compliance with both Wyoming law and the UIA. The Camfield Court specifically noted a private landowner could build a fence located entirely on his own land (and thereby exclude trespassers). Camfield, 167 U.S. at 527. But the Camfield Court at the same time upheld the UIA enforcement action by the United States Attorney.

Thus, there is no physical impossibility, and the filing of a common law civil trespass claim does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona v. U.S., 567 U.S. at 399. Again, given that the United States Attorney is charged with UIA enforcement, a civil trespass claim in no way infringes, limits, or hinders the United States Attorney from fully and completely enforcing the UIA.

Indeed, the facts of the case at bar demonstrate exactly how IBH's common law civil trespass claims did not prevent the United States Attorney from enforcing the UIA. As shown by Exhibit 13 hereto, a Wyoming resident filed an affidavit with the United States Attorney alleging that another landowner and Iron Bar Holdings, LLC (i.e., the very plaintiff in the case at bar)

violated the UIA.  In response, the United States Attorney indicated he considered the matter and determined IBH had not violated the UIA.  Exhibit 14 hereto ("we do not consider the situation, as it currently exists, to constitute an unlawful 'inclosure' of public land.")

While the United States Attorney did not find a violation of the UIA, had he made such a finding, he could have instituted an action.  The case at bar would have no impact on such an action.  This is a perfect demonstration of the federalism embodied in the Tenth Amendment:  the "people of the United States resident within any State are subject to two governments: one State, and the other National; but there need be no conflict between the two. The powers which one possesses, the other does not." Cruikshank, 92 U.S. at 551.  The civil trespass claims asserted by IBH do not interfere with the ability of the United States Attorney to enforce the UIA.  The trespass claims neither do any injustice to, nor interfere with, a UIA action.

Finally, the UIA even gives individuals a defined role.  Thus, while "the Unlawful Inclosures Act provides for federal enforcement, [it] . . . also explicitly defines a role for private citizens in the process—filing an affidavit alerting the United States Attorney for this district of their allegation that the Act is being violated." Crow Tribe of Indians v. Repsis, 866 F.Supp. 520, 525 (D. Wyo. 1994), aff'd, 73 F.3d 982 (10th Cir. 1995).  "[I]t is [even] possible for an interested party . . . to obtain permission to intervene." Id. (citation omitted).  Thus, while Defendants improperly argue the UIA preempts IBH's civil trespass claims, they nonetheless are afforded the opportunity to assert a substantive factual defense that IBH violated the UIA.

Given that the power of a United States Attorney to institute an enforcement action under the UIA is no way affected by a civil trespass claim, there simply is no basis for Defendants' preemption argument.  It is the United States Attorney who is given exclusive enforcement powers, and those powers are in no way affected by a civil trespass claim.

Finally, federal courts recognize that the access problems arising from the checkerboard arise not from the actions of landowners such as IBH, but instead from congressional action:

> **The present problem has its genesis in the federal land grants of the 1800's**, whereby the federal government, which initially owned all the land here involved, conveyed alternate sections to private parties. Such grants resulted in a "checkerboard" pattern of land ownership in many western states, to the end that sections granted to private parties frequently are surrounded by public lands, and, conversely retained public land is often completely surrounded by land owned by private parties. In this regard, see Leo Sheep Co. v. United States, 440 U.S. 668, 670–77 . . . (1979). **It is at once apparent that this checkerboard ownership pattern necessarily impedes the ability of government employees and the general public to travel to and from federal land, as frequently the only access routes traverse private property.**

United States v. 82.46 Acres of Land, More or Less, Situate in Carbon County, Wyo., 691 F.2d 474, 475 (10th Cir. 1982) (emphasis added).

"Congress obviously believed that when development came, it would occur in a parallel fashion on adjoining public and private lands and that the process of subdivision, organization of a polity, and the ordinary pressures of commercial and social intercourse would work itself into a pattern of access roads." Leo Sheep, 440 U.S. at 686.  That such a result did not come about is no fault of IBH, but the United States has the power to address the access problem Congress created with the railroad land grants and resulting checkerboard pattern: condemnation.  Id. Indeed, the United States could even condemn portions of private deeded property to provide access to hunters such as the Defendants: the uses for which the United States can condemn private land to get to landlocked BLM sections "may include both those promoted by government agencies as well as spontaneous citizen uses." 82.46 Acres of Land, 691 F.2d at 478 n. 1, concurring opinion.

Finally, while the UIA provides for federal enforcement actions to address unlawful inclosures of federal lands, it does not address state law claims or remedies.  Conversely, Wyoming law recognizes a private cause of action for unauthorized entry upon private property, and even

spells out that a landowner owes no duty of care to trespassers. *See* Wyo. Stat. Ann. § 34-19-201. Moreover, obviously, Wyoming law also provides for common law civil trespass claims. Thus, if Defendants were correct in their preemption argument, the UIA would have to provide a private federal cause of action to address the supposed harm to the private parties. *See, e.g.,* Schmeling v. NORDAM, 97 F.3d 1336, 1340 (10th Cir. 1996) (if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily "arises under" federal law). As noted, the UIA provides no such private right of action. 43 U.S.C.A. § 1062; Crow Tribe of Indians, 866 F.Supp. at 524.

In conclusion, because state law claims for trespass are based upon the common law right to exclude others *from private property*, such common law rights do not conflict with the UIA's purpose of preventing unlawful inclosures of *federal* public lands. State law remedies address harm caused by a trespass upon private property, while the UIA provides for federal enforcement actions to address unlawful inclosures of federal land. Thus, the federal law and state law are separate and apart, rather than conflicting. There is no preemption.

### H. *If the UIA Preempts State Law, It Would Constitute a Taking*

Given the central importance of property ownership and the right to exclude others, it comes as little surprise the Supreme Court has long treated "government-authorized physical invasions as takings requiring just compensation." Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2073 (2021). The Supreme Court described the property interest that would be taken in that case (a right granted to a labor union to enter private agricultural land to recruit members) to be a servitude or an easement. Id. The same would be the case with respect to IBH's property: the Cedar Point Court discussed Causby and private airspace, and noted how "invasions of it are in

the same category as invasions of the surface."  Cedar Point , 411 S.Ct. at 2073 (citing United States v. Causby, 328 U.S. 256 (1946)).

Here, a finding that UIA preempts state law trespass claims would expand federal authority over matters traditionally controlled only by state law and would constitute a taking.  A finding in favor of Defendants would necessarily create a public thoroughfare, by way of a forced easement, across IBH's property—a result at odds with Supreme Court precedent in Leo Sheep and its application by this Court in Elk Mountain Safari.  Were this Court to nevertheless permit the public to lawfully cross upon, across, or through IBH property under the UIA by creation of an easement to access landlocked federal public property, such would amount to an uncompensated taking.  No such taking is warranted, and such a ruling would run afoul of centuries-old and well-settled property rights.  Indeed, the Supreme Court "has traditionally recognized the special need for certainty and predictability where land titles are concerned," and has therefore been "unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation." Leo Sheep, 440 U.S. at 687–88.

## II.     IBH's State Law Trespass Claims are Independent of any Alleged UIA Violation

Contrary to Defendants' assertions, IBH cannot be found to have committed a violation of the UIA, especially at any corner of its property outside of what Defendants call the "First Corner." (Defendants' Brief at 4). It is undisputed that this so-called "First Corner" is located at the corners of Section 13 (owned by IBH), Section 14 (managed by BLM), Section 23 (owned by IBH), and Section 24 (managed by BLM).  Moreover, it is undisputed IBH posted two "No Trespassing" signs on its real property at this "First Corner" on steel fence posts, clearly visible to others,

including the Defendants.  Finally, it is also undisputed that the "First Corner" is the *only* corner where "No Trespassing" signs were located. Eshelman Depo. 77:9-11; 81:17-20.[4]

It is important to remember the UIA only prohibits unlawful inclosures of *federal* land, so the crossing into *federal* land is a necessary showing of any UIA defense.  As Defendants admit, IBH's real property is interspersed with some lands owned by the State of Wyoming and the Town of Hanna. (Defendants' Brief at 2). *See also* Plaintiff's Exhibit 8.  Additionally, of the seven other corners where Defendants traveled across IBH property, only three are IBH/BLM corners, one is a State of Wyoming/Town of Hanna/IBH corner, and three are a combination of IBH/State of Wyoming/BLM lands. *See* Plaintiff's Exhibit 8 and IBH's *Memorandum in Support of Motion for Partial Summary Judgment* at 6-7 (ECF 64).

As to the State of Wyoming/Town of Hanna/IBH corner (Location # 5), the UIA has no application, and Defendants' cannot raise it as a defense: no federally-owned property is involved. As to the three locations where the lands are IBH/State of Wyoming/BLM (Locations 2, 3 and 4), the potential application of the UIA would come into play only when the Defendants were entering BLM-managed land.  The Defendants necessarily crossed back-and-forth across these corners, and when they did so to enter State of Wyoming land, the UIA would not apply.

Notwithstanding the factual question of whether IBH violated the UIA with respect to the co-called "First Corner" due to the No Trespassing signs posted there, the undisputed facts establish IBH could not have committed a violation of the UIA at four of the seven other corners when the Defendants were entering State of Wyoming land or Town of Hanna land.  Thus, when

---

[4] It should be noted that for IBH to make a report to law enforcement to institute a criminal trespass complaint, IBH is obligated to give notice to persons not to trespass.  Under Wyoming's criminal trespass statute, notice can be accomplished by "[p]osting of signs reasonably likely to come to the attention of intruders." Wyo. Stat. Ann. § 6-3-303(a)(ii).

Defendants crossed over IBH's private property at those locations in the manner indicated, there can be no question of fact or law as to the UIA: the Defendants committed civil trespass in such instances, and they have no UIA defense.

One final note:  Defendants might argue that only their actions with respect to the so-called "First Corner" is relevant to IBH's trespass claims, and that their actions in crossing other corners is not relevant.  Such a contention is incorrect:  "'[i]f there are multiple acts of trespass, then there are multiple causes of action . . .'" Papanikolas Bros. Enter., L.C. v. Wendy's Old Fashioned Hamburgers of New York, 163 P.3d 728, 734 (Utah Ct. App. 2007).  As this Utah court explained, "'if the nuisance or trespass may be discontinued at any time it is considered continuing in character ... [and] the person injured may bring successive actions for damages until the nuisance [or trespass] is abated . . . ." Id. (quoting Brieggar Properties, L.C. v. H.E. Davis & Sons, Inc., 52 P.3d 1133, 1135 (Utah 2002) (internal citation omitted).

### III.    Plaintiff's State Law Trespass Claims Do Not Conflict with Wyoming Law

Contrary to Defendants' assertions, IBH's state law trespass claims are entirely consistent with Wyoming law and serve a valid purpose and remedy for the protection and enforcement of its real property rights.  Defendants again attempt to misconstrue the basis of IBH's claims by stating "Plaintiff is necessarily asserting and seeking judicial recognition of exclusive access rights to 'unappropriated public lands lying within the boundaries' of Wyoming." (Defendants' Brief at 32).  IBH, however, makes no such assertion; IBH seeks no right to any land outside its private lands.  As is plainly explained throughout its *Memorandum In Support of Motion for Partial Summary Judgment*, IBH seeks only judicial recognition of its right to protect lands it owns and the airspace above those lands, subject of course, to the right of flight described in Wyo. Stat. Ann. § 10-4-302.

IBH's civil trespass claims under Wyo. Stat. Ann. § 10-4-302 are well-recognized.  In fact, Wyoming's neighbor to the south recognizes the same trespass principles asserted by IBH.  In People v. Emmert, the Colorado Supreme Court noted the "common law rule holds that he who owns the surface of the ground has the exclusive right to everything which is above it . . . .'" People v. Emmert, 597 P.2d 1025, 1027 (Colo. 1979).  The Colorado Supreme Court noted that "**[t]his fundamental rule of property law** has been recognized not only judicially but also by our General Assembly when in 1937 it enacted what is now codified as section 41-1-107, C.R.S. 1973: 'The ownership of space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight of aircraft.'" Id. (emphasis added).  The Colorado Supreme Court went on:

> [a]pplying this rule . . . the ownership of the bed of a non-navigable stream vests in the owner the exclusive right of control of everything above the stream bed, subject only to constitutional and statutory limitations, restrictions and regulations. . . . It follows that **whoever "breaks the close"** intrudes upon the **space above the surface of the land** without the permission of the owner, whether it be for fishing or for other recreational purposes, such as floating, as in this case, **commits a trespass**. See Restatement (Second) of Torts § 159.

Id.

Defendants contend Wyoming's statute (identical to the Colorado Statute just cited) must be read in a manner to conclude that IBH and the United States somehow have shared ownership of the airspace above IBH private property.[5]  This contention is unsupported: the Restatements, dating back to 1935, recognize trespass into airspace as a cognizable claim. RESTATEMENT (FIRST) OF TORTS, § 159 (AM. L. INST. 1935) ("A trespass . . . may be committed on, beneath, or above the surface of the earth.").

---

[5] *See* Angus M. Thuermer, Jr., *Corner-Crossing hunters claim 'shared airspace' in trespassing defense,* WyoFile, April 25, 2023,  available at https://wyofile.com/corner-crossing-hunters-claim-shared-airspace-in-trespassing-defense.

Indeed, in a "corner-crossing" case like the case at bar, the Court of Appeals of Wisconsin examined corner-crossing from one private parcel, across two privately-owned parcels, and onto an adjacent public parcel.  The owner of the first private parcel simply stepped over the common corner of his land with two parcels owned by his neighbor, and onto a public parcel—the other property in the four-parcel common corner.   The Wisconsin court ruled the corner-crossing to be an act of trespass. Koenig v. Aldrich, 387 Wis.2d 187 at 2 (Unpublished) (Wis. Ct. Appeals 2020). The Wisconsin court cited the Wisconsin statute (identical to Wyo. Stat. Ann. § 10-4-302): "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in [Wisconsin Statute]."  The Wisconsin Court noted how this statute "governs '[l]andowner's rights skyward . . . .'" Id. at 2.  Notably, the Wisconsin court cited with approval the Restatement's explanation of the following scenario: person "A extends his [or her] arm over the boundary fence between A's land and B's land. A is a trespasser." Id. (citing RESTATEMENT (SECOND) OF TORTS § 159 (AM. L. INST. 1965).  This decision impliedly rejects any contention of "shared" airspace.

Moreover, while the property interest at issue in Leo Sheep was the land surface, the Supreme Court's rejection of an implied easement across the deeded property serves to reject the assertion of some sort of common ownership between the United States and IBH.[6]  In sum, IBH owns the airspace above the surface of its real property, and has a right under Wyoming law to bring its civil trespass claims against the Defendants.

---

[6] The Defendants' idea of shared air space proves too much: if the airspace above the corners is shared, then IBH would own an interest in the airspace above the BLM-managed property. "Sharing" is mutual: if the United States has an interest in the IBH airspace, then IBH has an interest in the federal airspace.  The fallacy of such a contention runs afoul of the Property Clause, which vests public land in the United States.  Moreover, the contention runs afoul of common sense.  There is no shared space, and IBH makes no claim to federal airspace.

**IV.  Iron Bar Holdings Did Not Violate the UIA**

The testimony of IBH representatives demonstrates IBH did not violate the UIA.

IBH head ranch manager Becky Englert made it clear IBH has *no policy* regarding controlling access to public land: Ms. Englert stated that IBH practices relate only to people trespassing on "deeded ground." Englert Depo. 25:8-22; 29:9-12.  She went on to refute the idea IBH has policies on corner crossing: when asked about a person crossing public-to-public corners, she responded that if a person stayed solely on public land, then IBH could do nothing about it. Id. 25:23–26:8. However, if the public lands were completely encompassed/bordered by deeded land, then IBH would inquire as to how the person got there. Id.  Finally, she carefully distinguished how IBH treats persons who are on deeded private property versus public property. Id. 29:5-19.

IBH property manager Steven Grende demonstrated his knowledge of the configuration of IBH property in relation to adjacent public land.  He accurately described that the private/public corners are arranged in a pie shape with the corner marker being the middle. Grende Depo. 32:21 – 33:3.  He indicated he knew the air space above the private land is private property. Id.  As to the placement of "No Trespassing" signs, he testified he posted signs at the Section 13/Section 14/Section 23/Section 24 corner "to deter any trespassers on over or in Elk Mountain Ranch property."  He testified the signs were not posted to keep people from entering public land. Id. 42:1-3 ("the signs weren't to prevent anyone from passing corner to corner. They were to prevent people from trespassing on Iron Bar Holdings.")  When asked about the issue multiple times, he consistently testified he placed the signs to prevent people from trespassing *on private property*. Id. 41:12 - 42:3; 54:15 - 55:16; 81:15-17; 81:24 - 82:4.  Moreover, Mr. Grende testified he put up the No Trespassing signs at the advice of a Wyoming Game and Fish Department employee. Id. 43:11-15; 46:7-16.   He testified his discussion with the Game and Fish Department employee

related to trespassing in general, and not to control corner crossing. Id. 45:16-25; 46:7-12. He testified the placing of signs was for private property concerns and not to prevent corner crossing. Id. When asked what would happen if someone were to call the telephone number on the "No Trespassing" sign, he stated he assumed a caller would be told not to cross "private property." Id. 52:1-7. Finally, just like Ms. Englert, Mr. Grende stated that IBH has no policies concerning controlling access to public land via corner crossing. Id. 70:6-9.

Finally, Fred Eshelman, the sole member of Iron Bar Holdings, LLC, testified this litigation has nothing to do with public land access, but only control of IBH deeded property. Eshelman Depo. 51:15-18 ("this has nothing to do with public land. This is to do with my private land."). He testified IBH does not try "to regulate public asset access to public claims in any way, shape, or form, or fashion." Id. 52:8-11. He was clear: this litigation relates to protecting IBH private property. Id. 52:15-16. He also testified corner crossing could occur other than with respect to BLM-managed land, as "it could be that there was a corner cross with two pieces of private land, same thing would occur." Id. He testified IBH *does not* assert control over public land, but that IBH "should have control over who crosses *the private land*." Id. 63:6-14 (emphasis added). He testified the "No Trespassing" signs "were there to prevent the public from *crossing private property* to access those sections." Id. 77:12-18 (emphasis added). The signs were "to prevent the public from trespassing on private land." Id. 78:9-10; and 76:17-23.

He testified IBH does not "confront" potential trespassers, but instead seeks to have an interaction with such persons. Id. 37:18 - 38:8; 65:4-20. He made it clear that if IBH finds trespassers who admit their mistake and cooperate, IBH does not pursue any charges: "oh, I'm sorry, I was trespassing, no blood, none [sic] foul." Id. 34:3-19; 38:2-5. If a trespasser becomes belligerent or argumentative, however, then IBH will call law enforcement. Id. 38:6-8. IBH's

actions depend on the reaction of the trespasser. Id. 37:18-22.  Importantly, he repeatedly testified that IBH has no policies with respect to control of public land or corner crossing. Id. 31:1-5; 31:19 – 32:1; 32:4-15; 40:22 – 41:11; 93:1-6; 95:1-10; 101:18-23.   He also testified IBH has *no policy* by which he contacts law enforcement to request criminal prosecution. Id. 93:1-6.   Finally, explaining IBH's actions regarding protection of its property rights with respect to trespass by corner crossing, he testified it has always been his understanding that corner crossing through private property is not lawful, based on the BLM's own analysis of the question. Id. 45:21-24; 51:7-10; 100:14-16. *See, e.g.,* Plaintiff's Exhibit 10, Exhibit 12 in support of IBH's *Motion.*

## V. At Least One Defendant Trespassed on the *Surface* of IBH Real Property

IBH just obtained geographic location data from Defendants' use of the "onX Hunt" application.  OnX Hunt data shows where an onX Hunt user is located; the user can place a "waypoint" showing his ground location. OnX Hunt data for Defendant Zachary Smith proves he trespassed on the surface of IBH land in Section 19, Township 20 North, Range 81 West, 6th P.M. *See* Plaintiff's Exhibit 15a (onXHunt data), Exhibit 15b (OnX Hunt map showing "Waypoint 6" location reading taken by Mr. Smith on September 30, 2020), Exhibit 15c (placement of geographic coordinates from Ms. Smith's onX Hunt data in a different mapping program), and Exhibit 15d, Affidavit.  Defendants declared the onX Hunt app to be "accurate." Smith Depo. 45:9-22 ("pretty accurate"); Yeomans Depo. 59:5 – 60:9 (used onX to make sure he did not violate property boundaries; it allowed him to find a point in the dark; identified exact location on the ground); Cape Depo. 90:18 – 91:11 ("very accurate"); Slowensky Depo. 25:1-18 ("very accurate").

## VI. Damages

While IBH's *Motion for Partial Summary Judgment* suggested that damages are a jury matter, IBH has examined the present stance of the issue.  While a ruling that corner crossing is

legal would inflict substantial damage to the value of IBH's Elk Mountain Ranch (i.e., in the millions of dollars), pursuit of money damages against the individual Defendants in this case detracts from important legal issues.  As such, if the Court rules in favor of Plaintiff Iron Bar Holding, LLC, declares the Defendants' actions as being actionable trespasses, and restrains further trespass, then Iron Bar Holdings, LLC will withdraw money damage claims against Defendants, in the interest of justice and judicial economy.

## FINAL OBSERVATION

The big picture makes one thing clear.  If Defendants are correct in their assertion the UIA makes the landowner's intent irrelevant, then Defendants' unsupported contention that IBH is trying to take exclusive control of the public lands in the checkerboard area is itself irrelevant. Federal courts have recognized that Congress purposely created the checkerboard, and IBH is not to blame for the problems arising from the pattern.  As such, this case boils down to the basic question of whether the Defendants' actions constituted civil trespasses.

## CONCLUSION

The Court should deny Defendants' Motion.  Rather, IBH is entitled to summary judgment in all respects and the restraint of Defendants' further trespasses across IBH's property.

RESPECTFULLY SUBMITTED this 26th day of April, 2023.

      /s/ M. Gregory Weisz
     M. Gregory Weisz, Wyo. Bar No. 6-2934
     Crystal D. Stewart, Wyo. Bar No. 7-6057
     PENCE AND MACMILLAN LLC
     P.O. Box 765
     Cheyenne, WY 82003
     (307) 638-0386
     gweisz@penceandmac.com
     cstewart@penceandmac.com
     Plaintiff's Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of April, 2023, a true and correct copy of the above and foregoing document was served by CM/ECF upon the following:

Ryan A. Semerad, Wyo. Bar No. 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
*Defendants' Attorney*

Alexandria Layton
Evans Fears & Schuttert LLP
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119
*Attorney for Defendants*

Lee Mickus
Evans Fears & Schuttert LLP
3900 E. Mexico Avenue, Suite 1300
Denver, CO 80210
*Attorney for Defendants*

Patrick J. Lewallen
Trevor J. Schenk
Chapman Valdez & Lansing
P.O. Box 2710
Casper, WY 82602
*Attorneys for Backcountry Hunters*

Eric B. Hanson
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Backcountry Hunters*

Karen Budd-Falen, Wyo. Bar No. 5-2647
Rachael L. Buzanowski, Wyo. Bar No. 8-6693
Budd-Falen Law Offices, LLC
P.O. Box 346
Cheyenne, WY 82003-0346
*Attorneys for Wyoming Stockgrowers Association and Wyoming Wool Growers Association*

   */s/ M. Gregory Weisz*
   Pence and MacMillan LLC