

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability company
registered to do business in Wyoming,

    Plaintiff,

  v.

BRADLEY H. CAPE, ZACHARY M.
SMITH, PHILLIP G. YEOMANS, and
JOHN W. SLOWENSKY,

    Defendants.

Case No. 22-CV-67-SWS

---

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the following cross motions for summary judgment:

 (1) Plaintiff's Motion for Partial Summary Judgment and supporting memorandum (ECF 63, 64), to which Defendants responded (ECF 68); and

 (2) Defendants' Motion for Summary Judgment and supporting memorandum (ECF 65, 66), to which Plaintiff responded (ECF 67), and Defendants provided a limited reply (ECF 75) with the Court's leave.

The Court heard oral argument on the motions on May 10, 2023. (ECF 76.) Having considered the parties' submissions, the arguments of counsel, the record, the amici briefs (ECF 42, 45), and being otherwise fully advised, the Court finds, concludes, and orders as set forth here.

## INTRODUCTION

Plaintiff privately owns a significant amount of real property on Elk Mountain in Carbon County, Wyoming. (Am. Compl. ¶¶ 1, 11; ECF 37-1.) Much of Plaintiff's private property borders and surrounds federal public lands managed by the U.S. Department of Interior Bureau of Land Management (BLM), state public lands managed by the State of Wyoming, and township lands managed by the Town of Hanna. (ECF 64-9; *see also* ECF 66-2.) Many of the private and public lands meet at their corners, forming a checkerboard pattern, as roughly demonstrated here:

| PUBLIC | PRIVATE | PUBLIC | PRIVATE |
|--------|---------|--------|---------|
| PRIVATE | PUBLIC | PRIVATE | PUBLIC |
| PUBLIC | PRIVATE | PUBLIC | PRIVATE |

The points of contact at each corner meet at an infinitely small point and, "like a point in mathematics, are without length or width." *Mackay v. Uinta Development Co.*, 219 F. 116, 118 (8th Cir. 1914.) In brief, the tortured path resulting in this generally 40-mile wide checkerboard pattern of land ownership (20 miles on each side of the railroad track) has been summarized thusly:

> History and politics have complicated the pattern of land ownership in the

West.  To promote western expansion in the nineteenth century, the federal government encouraged the construction of rail lines through the West by granting every other 640-acre parcel along rail corridors to a railroad company. The hope was that the lands remaining with the government would increase in value as the companies built rail lines, which the government would later sell at high prices.  The plan was successful further east, but the government struggled to sell the lands in the arid West.  The result of this failed venture is the checkerboard pattern of public and private land that now plagues much of the West.

Hannah Solomon, *Wyoming's Data Trespass Laws Trample First Amendment Rights*, 18 Vt. J. Envtl. L. 346, 353–54 (2016) (footnotes omitted); *see also Leo Sheep Co. v. United States*, 440 U.S. 668, 670-77 (1979) (discussing the circumstances and events resulting in the creation of the checkerboard pattern of land ownership that persists today in parts of the West).

"It is at once apparent that this checkerboard ownership pattern necessarily impedes the ability of government employees and the general public to travel to and from federal land, as frequently the only access routes travers private property." *United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty, Wyo.*, 691 F.2d 474, 475 (10th Cir. 1982).  This lawsuit involves the decades-long dispute of whether an individual is subject to civil liability for trespassing if they travel by foot through the checkerboard from public land to public land at the corners, while never touching private land and not damaging private property, without the permission of the owner(s) of the adjoining private land(s).  The Court finds the century-old case of *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which also originated in the District of Wyoming, provides the answer and allows such corner crossing by foot without trespass liability.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). Testimony or other evidence "grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

The Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)

Generally, the moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). If the moving party carries this initial burden, the nonmoving party may not rest on its pleadings but must bring forward specific facts showing a genuine dispute for trial. *Id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

## FACTS

### 1.    2020 Hunt and Corner Crossings

In the fall of 2020, Defendants Cape, Smith, and Yeomans traveled from their homes

in Missouri to Carbon County to hunt big game on Elk Mountain. (Am. Compl. ¶¶ 2-4, 18; Answer to Am. Compl. ¶¶ 3-5; 19.) They each had a valid hunting license and/or tag to hunt in the area. (ECF 66 p. 10.) They drove on a public road, Rattlesnake Pass Road, to Section 14, which is public land managed by the BLM, where they parked and set up their camp. (Cape Depo. 42:13-15.) Over the next several days, they hunted on several sections of public land in a south-southeastern direction from their camp, specifically on Sections 24, 30, 36, and 26 (*id.* 31:4-12), which are shown on the following map.



This map is an excerpt from Plaintiff's Exhibit 8 (ECF 64-9), but the Court notes Plaintiff also owns Sections 13 and 23, though not denoted on the map. (ECF 64 p. 3; ECF 68 p. 2; ECF

66 p. 4.)  Each numbered Section is one square mile (640 acres) of land.  (ECF 66-15 p. 7.)

Upon approaching the northwest corner of public Section 24 from public Section 14 (denoted at Pin Drop 8 on the map above), the three hunters were met with two steel posts, each with a "No Trespassing" sign, that were connected together with a chain, a padlock, and some wire.  One post was installed in Section 13 (private) and the other in Section 23 (private), and the chain and wire ran through the air over the corner of Sections 13, 24, 23, and 14, as shown here from Defendants' Exhibit E (ECF 66-5).



The survey marker ("brass cap") shown in the photo between the two signs protruding about a foot out of the ground designates the "corner" where Sections 13, 24, 23, and 14 meet. (ECF

66 pp. 3-4.)  Other than these chained-together signs, there were no posts, fencing, or buildings within one-quarter of a mile of the corner.  (Grende Depo. 43:4-8.)

With their backpacks and hunting gear, Defendants Cape, Smith, and Yeomans could not fit between the signs and under the chain to move from Section 14 to Section 24.  (ECF 66 p. 6; *see* Grende Depo. 42:19-23 (agreeing the chain and lock "present a physical obstacle to anyone who is walking from Section 14 to Section 24 across the corner").)  So, one by one, each grabbed one of the steel posts and swung around it, planting their feet only on Sections 14 (BLM) and Section 24 (BLM) but passing through the airspace above Section 23 (Plaintiff) and/or Section 13 (Plaintiff).  (ECF 64 p. 4; ECF 68 pp. 3-4.)  In holding onto the steel posts and swinging around them to cross from Section 14 to Section 24, there is no evidence the Defendants caused any damage to Plaintiff's property.  (Grende Depo. 27:3-25.)

They then proceeded with their hunt on the public land.  At the other corners they crossed (denoted as Pin Drops 1, 2, and 5 on the above map), there were no further physical barriers such as steel posts and chain, so the hunters simply stepped or jumped over the survey marker/brass cap from public land to public land, again passing momentarily through airspace above Plaintiff's privately-owned land.  (*See, e.g.*, ECF 64 p. 8; ECF 68 p. 2; Cape Depo. 58:11-24 (describing stepping over the survey marker from Section 36 (BLM) to Section 26 (BLM)); Yeomans Depo. 39:10-18.)  The hunters spent about a week hunting in the area and crossed the corners multiple times using the methods described.  (ECF 64 p. 4; ECF 68 p. 2.)

Plaintiff observed Defendants Cape, Smith, and Yeomans during their 2020 hunt and did not approve of Defendants' presence.  Plaintiff never consented to Defendants entering its property or airspace in any manner.  (ECF 64 p. 8; *see* ECF 68 pp. 3-5.)  Prior to 2020,

Plaintiff instituted an ongoing practice of having its employees confront or interact with a "suspected trespasser" found on or near Plaintiff's property, even if the person was found while on public land. (Eshelman Depo. 32:12-34:8, 66:17-25.) The suspected trespasser is instructed to leave, but if they resist, Plaintiff will contact local law enforcement, including the Wyoming Game & Fish Department, to seek a criminal trespass citation or other prosecution. (ECF 66 p. 9.) And if in Plaintiff's view law enforcement takes insufficient action on the matter, Plaintiff will continue to contact law enforcement to push the matter and will also contact the local prosecutor's office to request criminal prosecution. (*Id.* p. 9.) Finally, as here, Plaintiff may also institute a civil action against the suspected trespasser. (*Id.* p. 10.) Probably obvious at this point, Plaintiff considers corner crossing to be an invasion of the airspace above its land that constitutes unlawful trespassing. (Eshelman Depo. 60:20-25, 63:13-23, 78:9-14, 83:25-84:8.)

In 2020, Plaintiff's property manager, Steven Grende, confronted the Defendants when he found them on public land because he determined they could only reach such public land by trespassing, whether by corner crossing through Plaintiff's airspace or otherwise. (ECF 66 p. 10; Grende Depo. 68:9-20; Smith Depo. 25:17-26:17.) When he requested they leave the area, the hunters refused. (Yeomans Depo. 81:18-82:6.) Mr. Grende then contacted law enforcement to complain about the alleged trespassing. (Smith Depo. 56:4-11.) The hunters explained to the responding sheriff's deputy that they had corner crossed from public land to public land without touching private land, and law enforcement did not issue any warning or citation to the hunters in 2020. (Cape Depo. 105:3-23; Smith Depo. 56:1-57:23; Yeomans Depo. 80:14-81:14.) The three hunters successfully completed their hunting trip as

planned that year and then returned home.

There is no evidence the three hunters physically touched the surface of Plaintiff's land when corner crossing or caused any damage to Plaintiff's private property in 2020. (Grende Depo. 22:12-24:20.)

**2.    2021 Hunt and Corner Crossings**

The three hunters plus Defendant Slowensky returned to the same area in the fall of 2021 to hunt. This time, in an effort to not touch Plaintiff's steel posts when crossing from public Section 14 to public Section 24, they brought a steel A-frame ladder that Defendant Cape had constructed. (ECF 64-10; Cape Depo. 77:2-22; Smith Depo. 34:1-5; Yeomans Depo. 43:20-44:12.) As shown here in a cropped portion of Plaintiff's Ex. 9 (ECF 64-10), the ladder straddled over the lower "No Trespassing" sign, with two feet resting on Section 14 and the other two feet on Section 24. (ECF 66-15 p. 8.)



The now-four hunters crossed the same corners as the previous year plus a few more to access additional sections of public lands.  Specifically, Defendants hunted on Sections 14, 24, 26, 30, 36, 32, 6, and 8, while crossing the corners denoted by Pin Drops 1-8 on the following map. (*See* ECF 64 pp. 6-7; ECF 68 p. 2.)



This map was adapted from Plaintiff's Exhibit 8 (ECF 64-9) to show the additional Sections

of land that were hunted in 2021, and the Court again notes Plaintiff also owns Sections 13 and 23 though such is not denoted on the map. The hunters only used their ladder to cross from Section 14 to Section 24 because the other corners were unobstructed and they could simply step or jump over the survey marker/brass cap from public land to public land. (ECF 64 p. 8; ECF 68 p. 2.)

Defendants' 2021 hunting expedition did not go as smoothly as the prior year's. Plaintiff proved much more aggressive about expelling the hunters from the area and seeking their criminal prosecution for alleged trespassing in 2021. Mr. Grende and another Plaintiff employee confronted the hunters in person multiple times in attempts to get them to leave the public lands bordering Plaintiff's private lands. (Yeomans Depo. 82:7-83:1, 83:18-84:1.) Plaintiff's employees also interfered with Defendants' hunt by constantly watching them from nearby and by driving motorized vehicles on public parcels near Defendants while they hunted in an effort to scare away the game. (ECF 66 p. 12.) When the hunters refused to stop corner crossing and hunting on the public lands, Mr. Grende contacted the Wyoming Game and Fish Department, which said it would not take action against the hunters. (Grende Depo. 68:21-69:5.) Undeterred, he then contacted the local sheriff's office, which initially also refused to take action against the hunters. (*Id.* at 69:6-15.) He then contacted the local prosecuting attorney's office, which said it was willing to prosecute the corner crossings as criminal trespassing. (*Id.* at 69:21-70:5.) The prosecuting attorney's office directed the sheriff's office to write citations for criminal trespass to each Defendant, which were issued. (ECF 66 p. 14; ECF 66-21 p. 8.) In connection, the Wyoming Game and Fish Department also instructed Defendants to leave the area and not enter the subject public lands again. (ECF 66 p. 14.)

Consequently, the hunters' 2021 hunting trip was cut short. Following a jury trial several months later, each Defendant was acquitted by the jury of the state criminal trespass charge. (ECF 66-24.)

There is no evidence the hunters made physical contact with Plaintiff's private land or caused any damage to Plaintiff's private property in 2021. (Grende Depo. 21:2-23:2, 28:1-13.)

### 3. "Waypoint 6" from Defendant Smith

During Defendants' 2020 hunting trip, Defendant Smith used a GPS mapping tool on his cellphone called "onX Hunt," which helps hunters find property lines and determine land ownership. (*See* Decl. Zachary Smith at ¶¶ 3-8, ECF 72-1 p. 3; Spitzer Depo. 10:19-12:18.) Plaintiff subpoenaed the raw metadata created by Defendant Smith's use of the onX Hunt application and found that Defendant Smith had designated a waypoint, "Waypoint 6," that was located on Plaintiff's private land and not near a corner. (ECF 67-3, 67-4.) Plaintiff contends Waypoint 6 establishes Defendant Smith, and maybe other Defendants, trespassed upon the surface of Plaintiff's private land in 2020. (ECF 67 p. 24.)

The onX Hunt metadata for Waypoint 6 shows it was created on September 30, 2020 (while Defendant Smith was hunting in Wyoming) and was deleted from the application on October 19, 2020. (ECF 67-3 p. 2.) Defendant Smith believes his onX Hunt raw data is accurate but says he does not recall creating Waypoint 6 and, in any event, it does not solely prove his physical presence at the location of the waypoint. (Decl. Zachary Smith at ¶¶ 7-12.) An onX Hunt user can "drop" (create) a waypoint to designate their current location, but they can also drop a waypoint that is nowhere near their current location, including from a different state. (Spitzer Depo. 25:2-12.)

## ANALYSIS

The Court will focus its initial discussion on the issue of corner crossing and whether it, as it was performed by Defendants in this case, constitutes an actionable trespass.

**1.**   **Subject to Certain Restrictions, a Private Landowner Owns the Airspace Within a Reasonable Height of the Land and Enjoys a Right to Exclude Others from that Airspace**

No person can reasonably doubt the fundamental importance of private property rights to the development and continuing validity of the United States.  "The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom.  As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'" *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (quoting Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851)).  Indeed, the Fifth Amendment protects an individual's property against encroachment by the federal government and the Fourteenth Amendment protects that same property against encroachment by a state.

While the U.S. Constitution protects a person's property interests, *Jordan-Arapahoe, LLP v. Board of Cnty. Comm'rs of County of Arapahoe, Colo.*, 633 F.3d 1022, 1025 (10th Cir. 2011), the actual property interests themselves "are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits," *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

> We thus must turn to state law in understanding the scope of property rights in
> land ownership.  This is not always a simple task.  The modern understanding
> of the bundle of sticks of land ownership is overlain with myriad competing
> land use, zoning, and environmental regulations.  A landowner faces numerous

restrictions on the full use and alienability of land depending on the interplay of local, state, and federal law.

*Jordan-Arapahoe*, 633 F.3d at 1026; *see Garnett v. Brock*, 2 P.3d 558, 563 (Wyo. 2000) ("In order to be afforded constitutional status, property rights must have been initially recognized and protected by state law."), *overruled on other grounds by Brown v. City of Casper*, 248 P.3d 1136 (Wyo. 2011).

The property rights at issue in this case are two-pronged and intertwined: (1) Plaintiff's ownership of the airspace above its land, and (2) Plaintiff's right to exclude others from that airspace.  Looking at the first prong, the Wyoming Statutes have stated since 1931:

> The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of [aircraft] flight[1] ....

Wyo. Stat. § 10-4-302; *see Cheyenne Airport Board v. Rogers*, 707 P.2d 717, 722 (Wyo. 1985).  The U.S. Supreme Court similarly stated:

> [I]t is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere.  Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run.  The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land.  The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land.  The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material.

*United States v. Causby*, 328 U.S. 256, 264 (1946) (internal citation and footnote omitted); *see Griggs v. Allegheny County, Pa.*, 369 U.S. 84, 89 (1962) ("the use of land presupposes the use of

---

[1] The right of aircraft flight is immaterial to this case, which involves incursions into airspace only a few feet off the ground, but the Supreme Court case of *United States v. Causby*, 328 U.S. 256 (1946), effectively "divided the airspace into two strata.  The landowner owned the airspace within the 'immediate reaches' of the surface of his land, but the upper air was navigable airspace, in the public domain."  *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043, 1045–46 (10th Cir. 1974).

some of the airspace above it").

Turning now to the latter prong, of course an owner of real property has a right to exclude others from their property. The Wyoming Supreme Court has explained, "Ownership of property implies the right of possession and control and includes the right to exclude others; that is, a true owner of land exercises full dominion and control over it and possesses the right to expel trespassers." *Sammons v. Am. Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo. 1996). The U.S. Supreme Court similarly said, "It is true that one of the essential sticks in the bundle of property rights is the right to exclude others." *Pruneyard Shopping Center v. Robbins*, 447 U.S. 74, 82 (1980).

Applying these ownership principles here, the law makes clear that Plaintiff is the lawful owner of "as much of the space above the ground" of its property as it could reasonably occupy or use in connection with the land. Additionally, Plaintiff has the right to exclude others from that airspace.

Taken together, this would appear dispositive of the matter. This is not the end of the analysis, though. As the Court noted, "A landowner faces numerous restrictions on the full use and alienability of land depending on the interplay of local, state, and federal law." *Jordan-Arapahoe*, 633 F.3d at 1026. The U.S. Supreme Court has recognized landowners take their land subject to certain express legal restrictions, such as zoning ordinances, as well as "'background principles of nuisance and property law' [that] independently restrict the owner's intended use of the property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1026-32 (1992)). "And valid preexisting federal-law limitations on what otherwise would be state-law property rights are among the

limitations that may inhere in title so as to limit compensable property rights." *McCutchen v. United States*, 14 F.4th 1355, 1365 (Fed. Cir. 2021), *cert. denied*, 143 S. Ct. 422 (2022); *see also Interstate Consol. St. Ry. Co. v. Commonwealth of Massachusetts*, 207 U.S. 79, 87 (1907) ("the great constitutional provisions for the protection of property are not to be pushed to a logical extreme, but must be taken to permit the infliction of some fractional and relatively small losses without compensation, for some, at least, of the purposes of wholesome legislation").

## 2. Relevant Restrictions on the Ownership of Airspace and Right to Exclude Within the Checkerboard Pattern of Land Ownership

Thus, the next step of the examination is determining whether there are any relevant restrictions on the Plaintiff's ownership of the subject airspace or its right to exclude others from that airspace. The Court's examination reveals history, federal caselaw, federal statutory law, and recent Wyoming legislation demonstrate corner crossing in the manner done by Defendants in this case is just such a restriction on Plaintiff's property rights because Defendants, "in common with other persons [have] the right to the benefit of the public domain," *Mumford v. Rock Springs Grazing Ass'n*, 261 F. 842, 849 (8th Cir. 1919), which necessarily requires some limitation on the adjoining private landowner's right of exclusion within the checkerboard pattern of land ownership.

First, and most pertinent to the issues here, is the case of *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which has many parallels to the instant lawsuit. In *Mackay*, the "Uinta Development Company sued Mackay for damages for trespass by trailing his sheep across and depasturing its lands in Wyoming." *Id.* at 117. Mackay was moving his sheep south across the Wyoming checkerboard to graze on federal lands for the winter. *Id.* at 117-18. Uinta Development Company warned Mackay not to cross its privately-owned lands on the

way. *Id.* at 118.  Mackay nevertheless started his sheep south, crossing portions of the

company's private land as well as parcels of public land as he went, while his sheep grazed

upon the land the entire way. *Id.*  Mackay "drove his sheep, over the protest and prohibition

of the [company], upon and along a strip of land three-fourths of a mile wide upon and across

the entire length or width of some of the [company's] sections of land, and caused his sheep

to consume nine-tenths of the grass thereon." *Id.* at 120-21 (Sanborn, J., dissenting).  At the

company's insistence, Mackay was arrested along the way, and the company also sued him for

civil trespass. *Id.*  After a bench trial, the district court rendered judgment for the company,

holding Mackay liable for civil trespass damages. *Id.* at 117.

On appeal, the Eighth Circuit reversed the District of Wyoming's decision. *Id.* at 120.

The Eighth Circuit held: "The question here, which we think should be answered in the

affirmative, is whether Mackay was entitled to a reasonable way of passage over the unenclosed

tract of land without being guilty of trespass." *Id.* at 120.  In determining that Mackay should

have a reasonable way of passage over the company's private lands to access the public lands,

the appellate court said:

> The company admitted [Mackay's] right as to the public domain, but warned
> him not to go over any of its lands on penalty of prosecution for trespass.... If
> the position of the company were sustained, a barrier embracing many thousand
> acres of public lands would be raised, unsurmountable except upon terms
> prescribed by it.  Not even a solitary horseman could pick his way across
> without trespassing.  In such a situation the law fixes the relative rights and
> responsibilities of the parties.  It does not leave them to the determination of
> either party.  As long as the present policy of the government [concerning public
> lands] continues, all persons as its licensees have an equal right of use to the
> public domain, which cannot be denied by interlocking lands held in private
> ownership.
>
> ...

This case illustrates the conflict between the rights of private property and the public welfare under exceptional conditions.... This large body of land, with the odd-numbered sections of the company and the even-numbered sections of the public domain located alternately like the squares of a checker-board, remains open as nature left it. Its appearance is that of a common, and the company is so using the contained public portions. In such use it makes no distinction between them and its own holdings. It has not attempted physically to separate the latter for exclusive private use. It admits that Mackay had the right in common with the public to pass over the public lands. But the right admitted is a theoretical one, without utility, because practically it is denied except on terms it prescribes. Contrary to the prevailing rule of construction, it seeks to cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form. It could have lawfully fenced its own without obstructing access to the public lands. That would have lessened the value of the entire tract as a great grazing pasture, but it cannot secure for itself that value, which includes as an element the exclusive use of the public lands, by warnings and actions in trespass.

*Id.* at 118-20.[2]

The many parallels between the circumstances in *Mackay* and those here are obvious. And significant to *Mackay's* decision that a member of the public was "entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" were the "exceptional conditions" created by the unique checkerboard of land ownership that is at the center of this controversy. However, questions remain concerning whether *Mackay* is still valid law all these years later, and the Court turns to those questions now.

*Mackay* has never been expressly overruled, but whether it is binding on this Court appears unsettled. *Mackay* was decided by the Eighth Circuit Court of Appeals. In 1929, Congress divided the Eighth Circuit into two circuits. The Eighth Circuit retained Minnesota,

---

[2] Judge Sanborn dissented in *Mackay*, but not concerning whether Mackay had the right to cross the company's private land to gain access to the public lands. Instead, Judge Sanborn opined, "The owner of land is not deprived of his right to recover the damages he sustains by the taking by another of his grass, growing grain, or timber from his land, or the mineral out of it, even if the taker has the right to cross his land[.]" *Mackay*, 219 F. at 121.

Iowa, North Dakota, South Dakota, Nebraska, Missouri, and Arkansas. The new Tenth Circuit took Wyoming, Colorado, Utah, New Mexico, Kansas, and Oklahoma. Thus, at the time of *Mackay*, Wyoming was part of the Eighth Circuit. In the years since its formation, the Tenth Circuit has issued conflicting guidance on the binding nature of prior Eighth Circuit decisions. *Compare Boynton v. Moffat Tunnel Improvement Dist.*, 57 F.2d 772, 781 (10th Cir. 1932) ("decisions cited from the Supreme Court of the United States, from the Eighth Circuit Court of Appeals, and from this court, are binding upon us"), *with Estate of McMorris v. Comm'r*, 243 F.3d 1254, 1258 (10th Cir. 2001) ("we have never held that the decisions of our predecessor circuit are controlling in this court").

Because *Mackay* originated from the District of Wyoming and was decided by the appellate court then sitting over this Court, this Court can find no reasonable basis to believe it is not bound by *Mackay's* decision. Nonetheless, even if *Mackay* is somehow only persuasive authority, the Court finds it particularly persuasive due to the many factual parallels between *Mackay* and the instant case.

Additionally, Plaintiff in this case has argued *Mackay* was implicitly overruled by *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979). The material differences between *Leo Sheep* and *Mackay* suggest such a claim to be exaggerated. In *Leo Sheep*, two companies (Leo Sheep Co. and Palm Livestock Co.) owned the odd-numbered sections in an area of the checkerboard lands in Wyoming that sat east and south of the Seminoe Reservoir. *Id.* at 677-78. "Because of the checkerboard configuration, it is physically impossible to enter the Seminoe Reservoir sector from this direction without some minimum physical intrusion upon private land." *Id.* at 678. The federal government intervened after receiving several complaints that the private

landowners were denying the public access to the reservoir over the private lands or were demanding access fees. *Id.* Upon the theory that Congress reserved to the federal government an implied easement over the privately-owned checkerboard lands when they were originally conveyed, the federal government built a dirt road extending from a local county road to the reservoir that crossed both public and private lands and invited the public to access the reservoir using the new road. *Id.* The companies moved to quiet title in the private lands against the federal government. *Id.* The District of Wyoming granted the petition and quieted title in the companies, but the Tenth Circuit reversed on direct appeal, concluding Congress implicitly reserved an easement to pass over the private odd-numbered sections of the checkerboard in order to reach the even-numbered public sections. *Id.* On permissive review, the U.S. Supreme Court reversed the Tenth Circuit. *Id.* at 688. The Supreme Court found insufficient evidence existed to suggest Congress impliedly reserved an easement by necessity in favor of the government across the private lands. *Id.* at 681-82.

The Court does not agree that *Leo Sheep* implicitly overruled *Mackay* for two reasons. First, several years after *Leo Sheep* was decided, the Tenth Circuit relied on *Mackay* in part in *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988), and never noted or suggested *Mackay* was overruled or invalid in any manner.

Second, and more significantly, *Leo Sheep* and *Mackay* are too factually and legally different for the Court to conclude *Mackay* cannot coexist in a world with *Leo Sheep*. The primary intruder in *Leo Sheep* was the federal government, whereas in *Mackay* (as in the instant case) it was a private individual. This is a fundamental difference because the federal government holds the power of eminent domain (condemnation), but private individuals do

not. Then Justice Rehnquist noted in *Leo Sheep*, "This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power **to construct public thoroughfares without compensation.**" *Id.* at 687-88 (emphasis added). As this quote demonstrates, significant to the Supreme Court's consideration of the matter in *Leo Sheep* was the federal government's power of eminent domain (condemnation) under the Fifth Amendment, which allows the government to take private property without the owner's consent and convert it to public use (such as a public thoroughfare) in exchange for just and fair compensation.[3] The *Leo Sheep* opinion added: "Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before. When the Secretary of the Interior has discussed access rights, his discussion has been colored by the assumption **those rights had to be purchased.**" *Id.* at 687 (emphasis added). Essentially, the Supreme Court determined the federal government's argument for an implied easement was an attempt to condemn a portion of private property to build a public thoroughfare without having to pay for it. That simply isn't the case or the issue in *Mackay* (or in the instant case).

The eminent domain distinction is substantial because *Leo Sheep* distinguished itself from a prior case that did not involve the federal government based in part on the availability of eminent domain. In *Buford v. Houtz*, 133 U.S. 320 (1890), a group of cattle ranchers owned some odd-numbered lots in the checkerboard pattern within the then-territory of Utah. *Id.* at

---

[3] *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2251-52, 2254-57 (2021), for a recent discussion of eminent domain.

321-22. They sought an injunction against a group of sheep ranchers to prevent the sheep ranchers from moving their sheep across the odd-numbered parcels to reach even-numbered public lands for grazing. *Id.* at 322-24. The trial court dismissed the case, determining the cattle ranchers had failed to state a viable claim for equity to support its injunction request, and the supreme court of Utah affirmed the dismissal. *Id.* at 321. The U.S. Supreme Court agreed and also affirmed the dismissal, stating:

> The appellants [cattle ranchers] being stock-raisers, like the defendants [sheep ranchers], whose stock are raised and fattened on the unoccupied lands of the United States mainly, seek by the purchase and ownership of parts of these lands, detached through a large body of the public domain, to exclude the defendants from the use of this public domain as a grazing ground, while they themselves appropriate all of it to their own exclusive use.... If we look at the condition of the ownership of these lands on which the plaintiffs rely for relief, we are still more impressed with the injustice of this attempt.... Of this 921,000 acres of land, the plaintiffs only assert title to 350,000 acres; that is to say, being the owners of one-third of this entire body of land, which ownership attaches to different sections and quarter sections scattered through the whole body of it, they propose by excluding the defendants to obtain a monopoly of the whole tract, while two-thirds of it is public land belonging to the United States, in which the right of all parties to use it for grazing purposes, if any such right exists, is equal. The equity of this proceeding is something which we are not able to perceive.

*Id.* at 325-26. The Supreme Court distinguished the *Leo Sheep* decision from *Buford* by stating, "The Court [in *Buford*] also was influenced by the sheep ranchers' lack of any alternative." *Leo Sheep*, 440 U.S. at 687 n.24. The federal government's power of condemnation, to take private land for public use in exchange for fair payment, is the important alternative that was available in *Leo Sheep* but not available in *Buford* or in *Mackay* (or in this case). In sum, the Court does not find *Leo Sheep* implicitly overruled *Mackay*.

The Court further finds *Leo Sheep* of limited applicability when examining the instant case. First, as already noted, *Leo Sheep* concerned the construction of a public thoroughfare (a

dirt road) across portions of private property, whereas the undisputed evidence in this case shows no damage or alteration to Plaintiff's private property. In this case, the primary intrusion of Plaintiff's property takes the form of an incursion into a small portion of the airspace above the land that lasted a matter of seconds, not a permanent construction that altered Plaintiff's land. Second, like in *Mackay*, the power of eminent domain (condemnation) is not an alternative available to Defendants in this case. Thus, *Leo Sheep* is so materially different from the case at bar as to offer practically no persuasive value on the matter. The Court concludes *Mackay* remains valid and finds it is the authority most directly on point to the questions in this case.

In sum, *Mackay* is still valid authority that is at least very persuasive, if not outright binding, on the instant matter. The many similarities cause the Court to conclude the core principle of *Mackay*, that private individuals possess "a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" within the checkerboard applies to the circumstances of this lawsuit. Admittedly, though, the "way of passage" taken in *Mackay* was significantly more intrusive than the "way of passage" taken in this case, and the scope of the path taken in *Mackay* is not at issue in this case. Instead, the scope of the path taken by Defendants in 2020 and 2021 is at issue in this case, which is where the Court now turns.

3.      **Determining the Scope of the Relevant Restriction on the Ownership of Airspace and Right to Exclude Within the Checkerboard Pattern of Land Ownership**

The Court's conclusion that the main principle of *Mackay* applies here to give Defendants "a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" is both buttressed and limited in scope by two additional considerations.

First, the Court finds the Tenth Circuit case of *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d

1043 (10th Cir. 1974), offers persuasive guidance on the matter. That case concerned aircraft

travel rather than pedestrian travel, but the discussion there runs parallel to the issues

concerning Defendants' corner crossings in this case. Specifically, the Tenth Circuit there

stated an incursion into only airspace requires some accompanying damage to or interference

with the actual use of the landowner's property to constitute an actionable trespass. *Id.* at

1045.

> Appellant contends the allegation and proof of actual damages is unnecessary
> because violation of a landowner's possessory right constitutes a trespass for
> which at least nominal damages are presumed. This is ordinarily true when
> trespass to realty is concerned. But traversing the airspace above a plaintiff's
> land is not, of itself, a trespass. It is lawful unless done under circumstances
> which cause injury.

*Id.* Applying a similar principle to the present case, Defendants' temporary incursions into the

airspace at the corners of Plaintiff's land does not constitute trespassing unless actual damages

result therefrom, and there is no evidence that Defendants' airspace intrusions caused actual

damage to or interfered with Plaintiff's use of its property. Neither does this Court believe

Plaintiff can premise damages upon the loss of the right to exclude individuals from public

lands, absent the use of an aircraft or human cannon shot, which Plaintiff never held.

Second, recalling that the scope of property rights is largely defined by state law, the

Court considers the recently amended version of Wyoming Statute § 23-3-305(b), Senate File

No. SF0056, which was passed overwhelmingly by the Wyoming Legislature earlier this year,

signed into law by the Governor, and set to take effect July 1, 2023. The new version of that

statute, with the recent amendments in bold, provides:

> (b)      No person shall enter upon, **travel through or return across** the private

property of any person to **take wildlife,** hunt, fish, collect antlers or horns, or trap without the permission of the owner or person in charge of the property. Violation of this subsection constitutes a low misdemeanor punishable as provided in W.S. 23-6-202(a)(v) [up to $1,000 fine and six months of imprisonment]. **For purposes of this subsection "travel through or return across" requires physically touching or driving on the surface of the private property.**

Wyo. Stat. § 23-3-305(b) (bold added) (to become effective July 1, 2023). The plain language of the recent amendments to this statute applies to corner crossings as they occurred in this case, where Defendants did not touch the surface of Plaintiff's land. Moreover, the statutory changes plainly demonstrate the Wyoming Legislature's intent to ensure such corner crossing does not constitute a criminal act.

4. **Corner Crossing on Foot in the Checkerboard Pattern of Land Ownership Without Physically Contacting Private Land and Without Causing Damage to Private Property Does Not Constitute an Unlawful Trespass**

In sum, Plaintiff indeed possesses a property interest in the airspace above its land (up to a certain height that is not at issue in this case) and generally holds the right to exclude others from its property, but that right is not boundless. Defendants

> in common with other persons [have] the right to the benefit of the public domain, and the courts will not enforce any rule of property in the [Plaintiff] that will deny to the [Defendants] and those similarly situated a reasonable way of passage over the uninclosed tracts of land of the [Plaintiff].

*Mumford*, 261 F. at 849; *see Mackay*, 219 F. at 118 ("As long as the present policy of the government continues, all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership."). Plaintiff asserts, "Federal courts have recognized that Congress purposely created the checkerboard, and [Plaintiff] is not to blame for the problems arising from the pattern." (ECF 67 p. 25.) Plaintiff is correct that it is not to blame for the problems caused by the checkerboard pattern

of land ownership, but "[i]n such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party." *Mackay*, 219 F. at 118. Plaintiff may not "cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form." *Id.* at 119-20.

It is only reasonable for the owner of the private sections and the public, as the owner of the alternating sections, to share in the solution. Synthesizing the law surveyed above, the Court finds that where a person corner crosses on foot within the checkerboard from public land to public land without touching the surface of private land and without damaging private property, there is no liability for trespass. In this way, the private landowner is entitled to protect privately-owned land from intrusion to the surface and privately-owned property from damage while the public is entitled its reasonable way of passage to access public land. The private landowner must suffer the temporary incursion into a minimal portion of its airspace while the corner crosser must take pains to avoid touching private land or otherwise disturbing private property. Similar restrictions imposed upon a landowner within the "exceptional conditions" created by the checkerboard, *Mackay*, 219 F. at 120, date back well over a century and are some of those "background principles of nuisance and property law [that] independently restrict the owner's intended use of the property," *Lingle*, 544 U.S. at 538 (internal quotations omitted).

5.   **Defendants' Corner Crossings in this Case are Not Unlawful Trespasses**

In applying this principle to the undisputed facts of this case, the Court considers first the corner crossings where Defendants did not make physical contact with Plaintiff's land or

private property, including those where Defendants needed to only step over a survey marker/brass cap and where they used the A-frame ladder in 2021 to climb over Plaintiff's signs, lock, and chain without touching them. This covers every corner crossing in 2021 as well as all 2020 corner crossings except for the crossings between Section 14 and Section 24. The undisputed evidence here is that Defendants performed these corner crossings without physically touching Plaintiff's private land and without otherwise damaging Plaintiff's private property. (Grende Depo. 11:14-12:12, 16:16-17:11, 21:2-22:11.) Consequently, a cause of action for civil trespass does not lie against Defendants as it concerns these corner crossings, and they are entitled to summary judgment in their favor as to these corner crossings.

The Court now considers the 2020 corner crossings between Sections 14 and 24, where Defendants Cape, Smith, and Yeomans admitted to holding onto Plaintiff's steel post to swing around the locked chain that connected the two steel posts. The Court again finds guidance in *Mackay*. The Unlawful Inclosures Act of 1885 (UIA), 43 U.S.C. §§ 1061-1066, was a consideration in *Mackay* but was not singularly controlling. *See Mackay*, 219 F. at 120. The Court similarly finds the UIA applicable but not singularly controlling regarding Defendants' 2020 corner crossings between Sections 14 and 24. The UIA states in relevant part:

> No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct ... any person from peaceably entering upon ... any tract of public land subject to ... entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands[.]

43 U.S.C. § 1063.

It is undisputed that the locked chain that was installed between the steel posts by Plaintiff hung through the airspace over the adjoining public land of Sections 14 and 24.

(Grende Depo. 39:5-14.)   And the locked chain further presented a physical obstacle and obstruction to anyone attempting to step across the corner from Section 14 to Section 24. (Grende Depo. 42:19-23.)   Thus, Plaintiff's lock and chain constituted an improper attempt to "prevent or obstruct … any person from peaceably entering upon … any tract of public land" in violation of the UIA.[4]   The Eighth Circuit in *Mackay* said about the UIA, "We think, however, that a private litigant cannot recover from another for an invasion of an alleged right founded upon his own violation of the statute." *Mackay*, 219 F. at 120.   Plaintiff's violation of the UIA forced Defendants to grab the steel posts, which were anchored on private property, to maneuver around the physical obstacle.   Consistent with *Mackay*, Plaintiff may not recover for a trespass, if any, occurring due to Plaintiff's violation of the UIA.

Moreover, and apart from the UIA, the undisputed evidence again shows Defendants did not touch the surface of Plaintiff's land or damage its private property in connection with these corner crossings.   (Grende Depo. 22:12-24:20, 27:3-28:13)   Consequently, a cause of action for civil trespass does not lie against Defendants as it concerns these 2020 corner crossings, and they are entitled to summary judgment in their favor as to these 2020 corner crossings.

As it relates to the various corner crossings performed by Defendants in moving from public land to public land by foot in 2020 and 2021 within the checkerboard pattern of land ownership, they cannot be subject to liability for civil trespass.   Defendants are therefore entitled to summary judgment in their favor concerning Plaintiff's cause of action for civil

---

[4] In addition to precluding the use of physical barriers, § 1063 of the UIA also makes it unlawful to threaten or intimidate any person from peaceably entering upon any tract of land subject to entry under the public land laws of the United States, or preventing or obstructing free passage or transit over or through the public lands.

trespass related to all of Defendants' corner crossings.

**6.     A Genuine Dispute of Material Fact Exists Concerning Whether "Waypoint 6" Constitutes Unlawful Trespassing**

Recall that Waypoint 6 does not appear to involve an act of corner crossing but rather an alleged trespass upon the surface of Plaintiff's private land, Section 19, in an area away from a corner. (*See* ECF 67-4.)  Waypoint 6 was created on September 30, 2020, on the onX Hunt application being used by Defendant Smith, and it was deleted (from the app but not from onX Hunt's metadata) about three weeks later.  (*See* ECF 67-3 p. 2.)  And a waypoint can be created without the user ever being at the designated location.

Many or most of the waypoints created by Defendant Smith indicated his current location or an area where he had been or intended to go.  (*See* ECF 67-5.)  On the other hand, all Defendants were adamant in their depositions that they never stepped foot on Plaintiff's private land.  Defendant Smith also expressly asserted under penalty of perjury that his onX Hunt metadata is accurate, that he must have created Waypoint 6 without realizing it, but he never made physical contact with or traveled to Waypoint 6.  (ECF 72-1.)  Thus, evidence exists to support Plaintiff's claim of trespass as to Waypoint 6, specifically the conceded accuracy of the onX Hunt data and the other waypoints that depicted many of Defendants Smith, Cape, and Yeomans physical locations.  Contrary evidence in the form of Defendants' depositions and declarations exists to counter Plaintiff's claim as to Waypoint 6.  Therefore, the Court finds a genuine dispute of material fact exists regarding whether a Defendant trespassed upon Plaintiff's Section 19 in connection with Waypoint 6, and the question should be submitted to a jury for determination.  Summary judgment is not appropriate on this issue.

On this claim, though, the undisputed evidence is that Plaintiff does not know of any

damage and has not repaired any damage caused by Defendants to its property in 2020. (Grende Depo. 24:11-20, 27:8-12.)   Accordingly, only nominal damages in the maximum amount of $100.00 are at issue for Defendants' alleged trespass in 2020 concerning Waypoint 6.[5]  *See Goforth v. Fifield*, 352 P.3d 242, 250 (Wyo. 2015) (noting that when no actual damages are shown, Wyoming allows the recovery of nominal damages for an actionable trespass, and the Wyoming Supreme Court interprets nominal damages to max out at $100.00 based on Wyo. Stat. § 1-14-125).

## CONCLUSION

The conflict inherent in the checkerboard pattern of landownership, which pits a landowner's right to exclude others from private property against the public's right to access public lands, has been around for well over a century and has visited this Court multiple times over the years.   In determining the present lawsuit, the Court primarily relies on the opinion from *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which originated in this Court and was issued by the appellate court for this Court.   *Mackay* explained that for "exceptional conditions," including the conflict borne of the checkerboard, "the law fixes the relative rights and responsibilities of the parties.   It does not leave them to the determination of either party." *Id.* at 118.   And the Court's survey of the law revealed that where a person corner crosses on foot in the checkerboard from public land to public land without touching the surface of private land and without otherwise damaging private property, there is no liability for trespass. *See id.* at 120 ("The question here, which we think should be answered in the affirmative, is

---

[5] Defendant Slowensky was not present for the 2020 hunting trip and therefore cannot be liable for any such trespass.

whether Mackay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass."). This determination, though, is necessarily unique to and limited in application to the "peculiar" "interlocking arrangement of odd and even numbered sections," *id.* at 119-20, making up the checkerboard pattern of land ownership created by Congress in the mid-1800s.

When this law is applied to the undisputed evidence in this case, no reasonable jury could find Defendants liable for civil trespass for their corner crossing activities. However, the facts and circumstances surrounding Waypoint 6 are in genuine dispute, and this claim of trespass must be submitted to a jury for a decision, albeit limited to nominal damages.

The Court addresses one final matter. While this lawsuit has been pending, and with greater frequency in recent weeks, the Court has received various attempts, whether by email or phone call, from members of the public to offer their opinions as to how this Court should resolve this controversy. These submissions have come from people who are not parties to this case and who, unlike the amici parties, have not been given permission by the Court to tender a submission that can be viewed and responded to by all parties. The Court's staff has screened these improper submissions, and the Court has not reviewed or considered these submissions as part of examining the issues in this case, nor will the Court review or consider them or any other improper ex parte submissions in the future. Attempts by a person or entity not a party to a lawsuit to influence or persuade a court of law's decision are improper. "Whereas the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion, the judiciary does not decide cases by reference to popular opinion." *Hodge v. Talkin*, 799 F.3d 1145, 1159 (D.C. Cir. 2015) (quotations omitted)

(alteration in original).  The founders of the United States sought to insulate the Judicial branch of government from public opinion so judges could apply and be influenced only by the law, not by popular opinion or public polling.  This Court's sworn obligation is to uphold and apply the law.  The Court has done its utmost to decipher the applicable law and apply it to the facts of this and every case.  To the extent this Court's determination of the law is believed to be erroneous, the remedy is for a party to take an appeal.

## ORDER

In conformity with the findings of fact and conclusions of law determined herein,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF 65) is **GRANTED IN PART AND DENIED IN PART**.  Defendants are entitled to judgment as a matter of law as to all claims of trespassing involving Defendants' corner crossings in 2020 and 2021.  Defendants' request for summary judgment is denied as to the claim of trespassing involving Waypoint 6 (which does not involve corner crossing) due to the existence of a genuine dispute of material fact, but any recovery by Plaintiff on such claim shall be limited to nominal damages.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF 63) is **DENIED**.  Plaintiff is not entitled to judgment as a matter of law concerning Defendants' corner crossings in 2020 and 2021, and a genuine dispute of material fact exists to preclude summary judgment concerning the alleged Waypoint 6 trespassing (which does not involve corner crossing).

**ORDERED**: May 26TH, 2023.

Scott W. Skavdahl
United States District Judge