Theresa Wardon Benz, Pro Hac Vice
Kristin L. Arthur, Pro Hac Vice
DAVIS, GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
(303) 892-7280
theresa.benz@dgslaw.com
kristin.arthur@dgslaw.com
Plaintiff's Attorneys

M. Gregory Weisz, Wyo. Bar No. 6-2934
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
gweisz@penceandmac.com
Plaintiff's Attorneys

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | | |
|---|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 22-CV-00067-SWS |
| BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MOTION FOR STAY PENDING APPEAL

Pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A), Plaintiff Iron Bar Holdings, LLC respectfully moves the Court to stay its Final Judgment, entered on June 1, 2023 (ECF 87), in order to preserve the status quo pending Plaintiff's appeal.

## INTRODUCTION AND BACKGROUND

On May 26, 2023, the Court entered its Order on Cross Motions for Summary Judgment (ECF 83). On June 1, 2023, the Court entered its Final Judgment (ECF 87), which fully

incorporated its summary judgment ruling and disposed of the action (the "Final Order"). Plaintiff has filed a Notice of Appeal from this Final Order, and now seeks a stay of the Final Order pending appeal.

There is good cause to issue a stay. While this case was being adjudicated in this Court, Plaintiff's employees and owner received various complaints about Plaintiff's positions taken in this case. Following the Court's ruling, these complaints became bolder and threatening, creating a risk of injury to Plaintiff's representatives. To prevent or, at least, minimize the risk of violence and confrontation, justice warrants a stay while the appellate courts consider the matter. A stay will notify the public the matter is unsettled, and it will minimize the risk of public confrontation with Plaintiff and its employees.

## CONTROLLING LAW

Federal Rule of Appellate Procedure 8 allows for stay of a judgment during appeal and directs appellants to first move the district court to stay its judgment. Fed. R. App. P. 8(a)(1). When deciding whether to grant a stay, courts consider the following factors: "(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001). Of the four factors, the first two are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

A district court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket." *Doe v. Jones*, 762 F.3d 1174, 1178 (10th Cir. 2014) (quoting *Landis v. N. Amer. Co.*, 299 U.S. 248, 254 (1936)). Using such power "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254–55. "The sole purpose of such a stay is to preserve the status

quo pending appeal so that the appellant may reap the benefit of a potentially meritorious appeal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1267 (10th Cir. 2004).

## ARGUMENT

A stay is warranted here because Plaintiff will suffer irreparable harm without a stay and can show a likelihood of success on appeal, the two key factors governing stays under Rule 8. *Nken*, 556 U.S. at 434. Moreover, a stay will not substantially harm the Defendants and would be in the public interest.

### I.     Plaintiff Will Suffer Irreparable Harm Absent a Stay

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy [because] damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The harm should not be speculative or theoretical. *Hellebust v. Brownback*, 824 F. Supp. 1524, 1531 (D. Kan. 1993), *aff'd and remanded*, 42 F.3d 1331 (10th Cir. 1994). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Here, the irreparable harm Plaintiff will suffer without a stay is two-fold. First, there is a risk of harm to Plaintiff's owner and the employees who operate and work on the ranch. Second, there will be irreparable harm to Plaintiff's business.

### A.     Irreparable Harm to Persons

Plaintiff has received numerous calls, messages, emails, and mail that directly threaten Plaintiff, Plaintiff's owner, and its employees. Many of these communications are shockingly vulgar, threatening, and specifically reference Plaintiff's owner and employees. To illustrate the

seriousness of the threats directed at Plaintiff and Plaintiff's owner, some examples are detailed

below. In fair warning to the Court, Plaintiff notes that the following messages contain extremely

vulgar, graphic, and hateful language.

One recent threat directed at Plaintiff's owner came in the form of a postcard that was sent

as "from hell, Satan." (**Ex. 1,** *Postcard*.) The postcard states:

> We hold a place for you here in the eternal fire. We are quite sure you will not
> repent. On the day of judgement [sic] we will receive you here in the abyss, …, to
> become one with us, multitude, burning forever. You belong with us, here in the
> darkness, abandoned by god."

(*Id.*)

Others threats have come by email. An email sent to Plaintiff on April 23, 2023, reads as

follows:

> I hope you die of the most painful cancer imaginable. You suing 2 hunters has to
> be the worst thing I have ever heard of. … In a just world those 2 hunters would be
> allowed to harvest your organs for the money to pay their legal fees. You are a
> bigger threat to our society than any leftie smashing a window. Faggot little bitch."

(**Ex. 2,** *April 23, 2023 Email*.) Two days later, one of Plaintiff's employees received an email

stating: "Watched the cop cam and you came off as an immature, sellout little pussy. Your damn

lucky that the Missouri 4 were gentleman . . . if it had be [sic] someone else that you harassed and

hazed, it's quite likely you would of experienced a severe ass whippin' . . . ." (**Ex. 3,** *April 25,*

*2023 Email*.) That same employee also received an email that said the following:

> Are you still the manager? If so, our hunting party will be corner crossing onto the
> fed lands next to Elk Mtn Ranch and we'd love to meet you. You'll have every
> opportunity to haze, intimidate and harass us. The only catch is, much different
> results that you will receive back vs. the Missouri 4. You game, tough guy?"

(**Ex. 4,** *March 9, 2023 Email*.)

Plaintiff and Plaintiff's owner have also received threatening voicemails. One voicemail

left on May 27, 2023—the day after the summary judgment ruling—stated: "Hi this is probably

another of lots of people calling to congratulate you on some recent court losses. You fucking billionaire piece of shit fucking cocksucker faggot retard." (*See* Affidavit of Rebecca Englert ("Englert Aff"), ¶ 7.) Another voicemail stated: "your boss Fred is a piece of shit, he belongs in the fucking ground, I hope he fucking dies of cancer." (*Id.*) Yet another voicemail stated: "do me a favor and tell Fred Eshelman that communist piece of shit he can take his fucking corner crossing case and stick it up his ass." (*Id.*) Finally, Plaintiff's employees have also received messages on Facebook, one of which reads as follows: "Just read about you in the paper. Very ignorant individual. Suck up to an out of state loser. What a dick." (**Ex. 5,** *Facebook Message.*) Unfortunately, these are just a few examples of many that Plaintiff and its owner and employees have received during this case and since the summary judgment ruling. For those who made threats before the Court's ruling, they will now feel emboldened to act on those threats, in reliance on the ruling.

### B.      Irreparable Harm to Property and Business

Based on threats received before and after the ruling, Plaintiff expects that many people, relying on the Court's ruling, will come to Plaintiff's ranch. While the ruling is limited to corner crossing, it is unlikely—particularly given the tone of many of the threats—that everyone will corner cross in a manner that causes no damage, or that they will even confine themselves to the corners. Indeed, given the harassing communications and threats directed to Plaintiff, it is clear there are many people who not only dislike—but actually hate—Plaintiff and may seek revenge for the ruling by imposing property damage under the auspices of corner crossing, blatantly trespassing onto Plaintiff's deeded property, or threatening Plaintiff's representatives and employees while corner crossing. Damage, whether intentional or negligent, will result.

Additionally, there is risk to Plaintiff's business. Some of the threats explicitly address Plaintiff's business: one voicemail caller said they would work to see the ranch business "go down the drain." (Englert Aff. ¶ 7.) A threat to trade or business viability may constitute irreparable harm. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). If these threats are carried out, Plaintiff's ranch will be overrun with people and its business will suffer significantly. This is a certain irreparable harm that can be avoided by granting the stay. A stay will send a strong message to all involved that protection of the status quo—that the legality of corner crossing remains unsettled—is warranted pending appeal.

The "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)). Here, the threats and harassment directed at Plaintiff are real, and not just speculative or theoretical. Moreover, the threats are severe. Thus, the risk of not granting the stay is significant, and Plaintiff's concerns about the safety of its owner and employees far outweigh the risk of any damage or injury to Defendants. A stay will send a clear message that Plaintiff and its employees should not be subjected to threats and harassment while the appellate courts consider the important legal issues at play in the case.

## II.    Likelihood of Success on the Merits on Appeal

When an appellant "can meet the other requirements for a stay pending appeal, they will be deemed to have satisfied the likelihood of success on appeal element if they show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation.'" *McClendon v. City of Albuquerque*, 79

F.3d 1014, 1020 (10th Cir. 1996) (quoting *Walmer v. U.S. Dep't of Defense,* 52 F.3d 851, 854 (10th Cir.) and citing *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (there is a "substantial case on the merits when a serious legal question is involved")). Plaintiff can make that showing here.

As an initial matter, the vast attention this case has garnered in the news and social media demonstrates the public importance of determining whether "corner crossing" is a trespass. There are serious legal questions at issue in this case, specifically (1) whether *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914) ("*Mackay*"), is still good law; and (2) whether *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ("*Leo Sheep*"), controls. Plaintiff maintains that *Leo Sheep* controls, and, if an appellate court agrees, the corner crossing deemed permissible by the Final Order would again constitute trespassing.

This Court interpreted *Mackay* as allowing corner crossing over private property without imposing trespass liability. By so doing, the ruling granted the public an easement across private property in the checkerboard. The ruling runs counter to *Leo Sheep*, which found that the federal government is not entitled to that type of easement. 440 U.S. at 679-81. Moreover, the Court's ruling created this easement without compensation to Plaintiff, the private landowner. This also runs afoul of *Leo Sheep*. *Id.* at 687-88. Thus, the Court's reliance on *Mackay* and rejection of *Leo Sheep* raises serious legal questions about private property rights in Wyoming and other western states.

This Court followed *Mackay*, finding it had neither been expressly overruled, nor implicitly overruled. Consequently, it held that *Mackay* was either binding or persuasive authority. The ultimate question in *Mackay* was, "whether Mackay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass." 219 F. at 120. *Mackay* held that Mackay should have a reasonable way of passage over private lands to access public lands. *Id*. The

*Mackay* Court explained that if the opposite position were upheld (i.e., that no implied easement existed), "a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon terms prescribed by it." *Id*. at 118. The *Mackay* Court thus granted an implied easement for the public to pass through private property.

Contrary to *Mackay*, however, *Leo Sheep* squarely addressed the issue of whether there exists an implied easement over private property to access public property. In *Leo Sheep*, the United States argued that an "implicit reservation of [a right of way] easement [across private property] is established by 'settled rules of property law' and by the Unlawful Inclosures of Public Lands Act of 1885." 440 U.S. at 679. *Leo Sheep* rejected this argument and aptly noted that "the State of Wyoming no longer recognizes the common-law easement by necessity in cases involving landlocked estates," and that it instead provides "for a procedure whereby the landlocked owner can have an access route condemned on his behalf upon payment of the necessary compensation to the owner of the servient estate." *Id.* at 680.

*Leo Sheep* thus repudiated *Mackay*'s holding that an implied easement exists to provide access to public lands, and explicitly ruled that no implied easement exists, whether it be for the government or the public. Moreover, the Supreme Court reached this result knowing that its "holding affects property rights in 150 million acres of land in the Western United States." *Id*. at 678. **Since *Leo Sheep* came after *MacKay*—and from the Supreme Court—it controls, meaning that *Mackay's* implied easement ruling has been replaced by *Leo Sheep.***

This Court's reliance on *Mackay* and rejection of *Leo Sheep* was, respectfully, mistaken. After noting that "one of the essential sticks in the bundle of property rights is the right to exclude others," (ECF 83, p. 15 (citing *Pruneyard Shopping Center v. Robbins*, 447 U.S. 74, 82 (1980)), this Court ultimately concluded Plaintiff "has the right to exclude others from its airspace." (ECF

83, p. 15.) But this Court then said that because the Supreme Court recognizes "landowners take their land subject to certain ***express*** legal restrictions, such as zoning ordinances" corner crossing does not constitute trespass. (ECF 83, p. 15 (emphasis added).) A restriction such as zoning is not at issue in the case, nor was such a restriction at issue in *Leo Sheep*.

In fact, *Leo Sheep* found that the private landowner's ownership interest was not subject either to any express restrictions or to an implied grant of public access. The Supreme Court held:

> Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before. . . . This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, ***and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.***

*Leo Sheep*, 440 U.S. at 687–88 (emphasis added).

This Court also distinguished *Leo Sheep* on the grounds that "the primary intruder in *Leo Sheep* was the federal government." (ECF 83, p. 20.) That does not change the analysis. The federal government was seeking to create a *public* right of access without just compensation. *See Leo Sheep*, 440 U.S. at 688 n.25. That is what *Leo Sheep* said was improper, but it is exactly what this Court's ruling does here: it gives the public a right of access over, across, or through private property without any compensation to the private landowner.

The solution to corner crossing access is condemnation and payment of just compensation to the landowner, just as with any other easement for public access. Anything less amounts to an unconstitutional taking, as the Supreme Court observed in *Nollan v. California Coastal Commission*. 483 U.S. 825, 831 (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather (as Justice Brennan contends) 'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning."). The *Nollan* Court also noted that "the right to exclude [others is]

'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Id*. There is a likelihood that the appellate courts will decide that this "essential stick" has been violated by this Court's adoption of *Mackay*, instead of *Leo Sheep*.

### III.    A Stay Will Not Substantially Injure Defendants

Defendants, all of whom are nonresidents, must apply for big game licenses. *See, e.g.*, Wyo. Stat. Ann. §§ 23-1-107, 23-2-101. During deposition, two Defendants testified they had not applied for Wyoming hunting licenses in 2023. (**Ex. 6**, *Cape Depo.* at 84:24 to 85:1 and *Smith Depo.* at 22:15-16.) Thus, a stay pending appeal would have no practical effect on Defendants.

### IV.    The Public Interest Favors a Stay

Finally, a stay during appeal would promote the public interest. The Supreme Court has "traditionally recognized the special need for certainty and predictability where land titles are concerned." *Leo Sheep*, 440 U.S. at 687. By rejecting *Leo Sheep* in favor of *Mackay* and creating implied easements through thousands of acres of property, the Final Order created uncertainty for property rights in those thousands of acres of property. Implementation of the Final Order creates confusion about the status of private property rights, for both private property owners and the public. The Court can maintain the status quo by staying its judgment, which will facilitate, rather than preclude, the development and resolution of the significant legal issues at play as these issues are explored on appeal.

### CONCLUSION

For these reasons, Plaintiff respectfully requests this Court grant a stay of the Final Order pending appeal. Plaintiff's counsel certifies that he consulted with Defendants' counsel to see if Defendants would consent to a stay, but Defendants' counsel would not consent.

RESPECTFULLY SUBMITTED this 7th day of July, 2023.


_/s/ Theresa Wardon Benz_
Theresa Wardon Benz, Pro Hac Vice
Kristin L. Arthur, Pro Hac Vice
DAVIS, GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
(303) 892-7280
theresa.benz@dgslaw.com
kristin.arthur@dgslaw.com
Plaintiff's Attorneys

_/s/ Greg Weisz_
M. Gregory Weisz, Wyo. Bar No. 6-2934
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
gweisz@penceandmac.com
Plaintiff's Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of July, 2023, a true and correct copy of the above and foregoing document was served by CM/ECF upon the following:

Ryan A. Semerad, Wyo. Bar No. 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
*Defendants' Attorney*

Alexandria Layton
Evans Fears Schuttert McNulty Mickus
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119
*Attorney for Defendants*

Lee Mickus
Evans Fears Schuttert McNulty Mickus
3900 E. Mexico Avenue, Suite 1300
Denver, CO 80210
*Attorney for Defendants*

Patrick J. Lewallen
Trevor J. Schenk
Chapman Valdez & Lansing
P.O. Box 2710
Casper, WY 82602
*Attorneys for Backcountry Hunters*

Eric B. Hanson
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Backcountry Hunters*

Karen Budd-Falen, Wyo. Bar No. 5-2647
Rachael L. Buzanowski, Wyo. Bar No. 8-6693
Budd-Falen Law Offices, LLC
P.O. Box 346
Cheyenne, WY 82003-0346
*Attorneys for Wyoming Stockgrowers Association and Wyoming Wool Growers Association*

*/s/  Kristin L. Arthur*
Davis Graham & Stubbs, LLC